Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV-21-105-DLC-KLD |
| Plaintiff, | |
| vs. | BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER |
| NATHAN GASSMAN, et al., | |
| Defendants, | |
| and | |
| AMERICAN FOREST RESOURCE COUNCIL, et al, | |
| Defendant-Intervenors | |

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The public interest and balance of the equities tip sharply in
        Plaintiff's favor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    The public interest and balance of equities tip sharply in
            Plaintiff's favor by law because this case raises ESA claims. . 3

        2.    Even if there were no ESA claims, the irreparable harm of
            logging would outweigh the temporary delay of economic
            benefit to the Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        3.    Mere speculation that a wildfire may occur in this area at some
            time in the future does not outweigh the irreparable
            environmental injury posed by the Project.. . . . . . . . . . . . . . . 6

    B.    There is a likelihood of irreparable harm in the absence of preliminary
        relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    Plaintiff raises serious questions on the merits. . . . . . . . . . . . . . . . 14

        1.    Serious questions have been raised regarding the agencies'
            failure to conduct a lawful cumulative effects analysis in the
            ESA consultation for the grizzly bear because they failed to
            analyze state and private activities.. . . . . . . . . . . . . . . . . . . . . 15

2.   Serious questions have been raised regarding the Forest Service's failure to prepare a biological assessment for lynx for the Project because lynx are listed on the FWS species list for this Project area. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     a.   The FWS species list in the record for this Project includes lynx; therefore a biological assessment is mandatory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     b.   Defendants' "no effect" argument puts the cart before the horse.  A "no effect" determination can only be made in a biological assessment, which has not yet been prepared here for lynx. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TABLE OF AUTHORITIES

CASES

*All. for Wild Rockies v. Marten,* 253 F. Supp. 3d (D. Mont. 2017) . . . . . . . . . 7, 26

*Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir. 2011) . . .  passim

*Amoco Production Company v. Village of Gambell, AK,* 480 U.S. 531 (1987) 2, 11

*Bark v. United States Forest Serv.,* 958 F.3d 865 (9th Cir. 2020) . . . . . . . . . . . . . 7

*Cottonwood Environmental Law Ctr. v. USFS,*
     789 F.3d 1075 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Forest Guardians v. Johanns,* 450 F.3d 455 (9th Cir. 2006). . . . . . . . . . . . . . . . 25

*Friends of the Clearwater v. Petrick,*
     2022 WL 622460 (D. Id. 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24, 26

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,*
     387 F.3d 989 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Landwatch v. Connaughton,* 905 F.Supp.2d 1192 (D. Or. 2012) . . . . . . . . . . . . 15

*Lane Cty. Audubon Social v. Jamison,* 958 F.2d 290 (9th Cir. 1992) . . . . . . . . . 26

*League of Wilderness Defs v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) . . . . 5, 6

*Native Ecosystems Council v. Krueger,* 946 F. Supp. 2d 1060 (D. Mont. 2013) . 22

*Native Ecosystems Council v. Marten,*
     334 F. Supp. 3d (D. Mont. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 13, 25

*Native Ecosystems Council v. Marten*, 2020 WL 1479059 . . . . . . . . . . . . . . . . . 25

*Pacific Rivers Council v. Thomas,* 30 F.3d 1050 (9th Cir. 1994) . . . . . . . . . . . . . 26

*Republic of the Philippines v. Marcos,* 862 F.2d 1355 (9th Cir. 1988). . . . . . 14, 15

*Southern Yuba River Citizens League v. NMFS,*
  723 F.Supp.2d 1247 (E.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*TVA v. Hill,* 437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4, 27

*Thomas v. Peterson,* 753 F. 2d 754 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 21

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982). . . . . . . . . . . . . . . . . . . . . . 2

*Winter v. Nat. Resources Defense Council,* 555 U.S. 7 (2008) . . . . . . . . . . . . . . . 1

STATUTES

16 U.S.C. §§6512-6516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16 U.S.C. § 1536. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

REGULATIONS

50 C.F.R. §402.02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

50 C.F.R. §402.12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

50 C.F.R. §402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

# I.  INTRODUCTION

Plaintiff respectfully moves this Court for a preliminary injunction and/or temporary restraining order against the Ripley Project (Project) on the Kootenai National Forest.  Cross-motions for summary judgment are fully briefed, however this Court has not yet had the opportunity to issue a ruling on the merits. Nonetheless, Defendants filed a notice on April 20, 2022 stating that logging and road construction activities for the Project may commence as soon as June 1, 2022. Doc. 48.

As this Court has noted: "The purpose of a preliminary injunction is to preserve the status quo and prevent the 'irreparable loss of rights' before a final judgment on the merits." *Native Ecosystems Council v. Marten*, 334 F. Supp. 3d 1124, 1130 (D. Mont. 2018).  Accordingly, Plaintiff respectfully requests temporary injunctive relief to maintain the status quo and prevent imminent and irreparable harm until this Court has the opportunity to issue a final decision on the merits in this case.

# II. STANDARD OF REVIEW

In general, "[a] plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council*,

555 U.S. 7, 20 (2008). The Ninth Circuit applies a sliding scale test to these factors, which does not require absolute surety as to the "likelihood of success on the merits" prong. Instead, if the plaintiff can at least raise "serious questions going to the merits," and demonstrate "a balance of hardships that tips sharply towards the plaintiff," the plaintiff is entitled to preliminary injunctive relief "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Furthermore, in *Weinberger v. Romero-Barcelo*, the Supreme Court noted that requests for injunctions under the Endangered Species Act (ESA) are not subject to the traditional equitable discretion afforded to requests for injunctive relief under the Clean Water Act:

> In *TVA v. Hill*, we held that Congress had foreclosed the exercise of the usual discretion possessed by a court of equity. There, we thought that "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer" than that before us. . . . The purpose and language of the statute limited the remedies available to the District Court; only an injunction could vindicate the objectives of the Act.

456 U.S. 305, 313-14 (1982)(citing TVA v. Hill, 437 U.S. 153, 173 (1978)); *see also Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 543 n.9, 544 (1987)(requests for injunctions under Alaska National Interest Lands Conservation Act are subject to equitable discretion not afforded to requests for injunctions under the ESA).

2

Accordingly, in ESA cases, the injunction test is altered so that "the equities and public interest factors *always* tip in favor of the protected species." *Cottonwood Envtl. Law Ctr. v. USFS*, 789 F.3d 1075, 1090-91 (9th Cir. 2015)(emphasis added).

## III.  ARGUMENT

A preliminary injunction is necessary and appropriate in this case because the public interest and balance of equities tip sharply in Plaintiff's favor by law, there is a likelihood of irreparable harm in the absence of preliminary relief, and there are at least serious questions on the merits.

**A.    The public interest and balance of the equities tip sharply in Plaintiff's favor.**

**1.    The public interest and balance of equities tip sharply in Plaintiff's favor by law because this case raises ESA claims.**

The Supreme Court holds that "only an injunction [can] vindicate the objectives of the [ESA]." *Weinberger*, 456 U.S. at 313-14.  "[C]ourts do not have discretion to balance the parties' competing interests in ESA cases" and ESA cases constitute "an unparalleled public interest . . . ." *Cottonwood*, 789 F.3d at 1090-91 (*citing Hill*).  In other words, "Congress altered the third and fourth prongs of the traditional four-factor test for injunctive relief in ESA cases" so that plaintiffs need only demonstrate a likelihood of irreparable harm to members' interests and serious questions on the merits in order to receive injunctive relief.

*Id*; *Cottrell*, 632 F.3d at 1135.  Thus, "the equities and public interest factors always tip in favor of the protected species." *Cottonwood*, 789 F.3d at 1090-91.

In part, as set forth in detail in summary judgment briefing, this case involves ESA claims regarding the imperiled Cabinet-Yaak grizzly bear, as well as an ESA claim regarding lynx.  Doc. 26 at 5-11, 28-31, 41-45; Doc. 43 at 2-6, 30-34, 40-44.   As this Court has held: "in ESA cases, Congress intended for courts to be guided by a policy of 'institutionalized caution' when confronted with requests for injunctive relief regarding listed species under the ESA." *Marten*, 334 F. Supp. 3d at 1130.  For this reason, the balance of hardships and public interest tip sharply in Plaintiff's favor by law.  *Cottonwood*, 789 F.3d at 1090-91.

### 2.   Even if there were no ESA claims, the irreparable harm of logging would outweigh the temporary delay of economic benefit to the Defendants.

In a previous ESA case, this Court held: "[b]ecause these factors 'always tip in favor of the protected species,' the Court declines to address Defendants' balance of equities and public interest arguments." *Marten*, 334 F. Supp. 3d at 1130 n.3 (citation omitted).  Here as well, the Court need not address any balance of equities or public interest arguments from Defendants.  *Id.*

Nonetheless, even if there were no ESA claims here, the temporary delay of economic benefit to the Defendants cannot outweigh the irreparable environmental injury to Plaintiff.  In *League of Wilderness Defs v. Connaughton*, the Ninth

Circuit explained that in a case like this, the environmental harm to plaintiffs is irreparable, while the economic harm to the defendants is temporary and marginal:

> Intervenors raise two primary forms of harm: loss of jobs and loss of government revenue. If the preliminary injunction were granted, the intervenors would suffer both harms but, if the project proceeds, the harms would be mitigated in part once the [] plaintiffs' claims are resolved. Relying on the intervenors' data, the project will support about 300 directly and indirectly caused jobs and some $275,000 in revenue to the local governments. These numbers represent the benefits of the entire project, which is scheduled to take place over five years. Under Sierra Forest, *we must consider only the portion of the harm that would occur while the preliminary injunction is in place, and proportionally diminish total harms to reflect only the time when a preliminary injunction would be in place.* Because the jobs and revenue will be realized if the project is approved, the marginal harm to the intervenors of the preliminary injunction is the value of moving those jobs and tax dollars to a future year, rather than the present. The [] plaintiffs' irreparable environmental injuries outweigh the temporary delay intervenors face in receiving a part of the economic benefits of the project.

752 F.3d 755, 765-66 (9th Cir. 2014) (emphasis added).

Thus, in this case, to the extent that Defendants wish the Court to consider economic harms, they must clearly calculate and disclose only those harms that would occur during "the time when a preliminary injunction would be in place . . . ." *Id.* As noted in *Connaughton*, this type of harm is limited to "the value of moving those jobs and tax dollars to a future year, rather than the present." *Id.* When analyzed properly in this framework, the temporary delay of receiving an economic benefit cannot and does not outweigh Plaintiff's "irreparable environmental injuries . . . ." *Id; see also Cottrell,* 632 F.3d at 1137-38.

3.    **Mere speculation that a wildfire may occur in this area at some time in the future does not outweigh the irreparable environmental injury posed by the Project.**

Finally, over the past few decades, the Forest Service has routinely argued that commercial logging and road-building projects will prevent wildfire.  Thus, Plaintiff anticipates that Defendants will likely argue that a preliminary injunction should not be granted in this case because the Project area – like all forests in the Northern Rockies –  is at risk of wildfire at some unspecified point in the future. However, this Court has rejected this argument:

> The balance of equities tips in favor of Alliance because it faces permanent damage if logging activity were to proceed and the Forest Service faces only delay. [].  While mitigating the imminent risk of forest fires and insect infestation is a valid public interest,[], *there is no indication of an imminent threat here*. Without evidence of an imminent threat it would be difficult to say that the inability to mitigate such risks for a temporary period outweighs the public's interest in maintaining the environment and requiring that agencies follow proper procedures.

*Alliance for the Wild Rockies v. Marten*, 200 F.Supp.3d 1110, 1112 (D. Mont. 2016)(emphasis added).

The Ninth Circuit reached a similar holding in *Connaughton:*  "Without evidence of an imminent threat, we cannot say that the inability to mitigate such risks for a temporary period outweighs the public's interest . . . ."  752 F.3d at 766. Likewise, this Court has held: "though there is the possibility of serious fire activity within the boundaries of the Project, there is no indication that this area is

6

at risk of imminent fire activity." *All. for Wild Rockies v. Marten*, 253 F. Supp. 3d

1108, 1112 (D. Mont. 2017).

 Furthermore, the Ninth Circuit has recently taken up this boilerplate Forest

Service argument that logging reduces wildfire risk, and found that – contrary to

this widely–made representation –  there is a large body of scientific literature that

finds that commercial logging does not reduce wildfire risk:  "Throughout the

USFS's investigative process, Appellants pointed to numerous expert sources

concluding that thinning activities do not improve fire outcomes. In its responses

to these comments and in its finding of no significant impact, the USFS reiterated

its conclusions about vegetation management but did not engage with the

substantial body of research cited by Appellants." *Bark v. United States Forest

Serv.*, 958 F.3d 865, 871 (9th Cir. 2020).

 The record in this case establishes similar findings.  Logging creates open,

sunny conditions that lead to dry, windy, invasive-weed-infested conditions that

make it easier for fire to ignite and spread.  *See e.g.* FS_001164, FS_001360-1363.

Additionally, "[a]ny logging that reduces average tree size, at either the stand or

landscape scale — including clearcutting, shelterwoods, seed tree cuts, selective

cutting of larger trees, or thinning that lowers average stand diameter—will

increase the risk of stand-replacement fires rather than decrease it."  FS_001332.

Regarding one study of this issue, "the most intense fires are occurring on

private forest lands, while lands with little to no logging experience fires

with relatively lower intensity." AR_007864.

Further, research "findings demonstrate that increased logging may actually

increase fire severity," and that "decision-makers concerned about fire should

target proven fire-risk reduction measures nearest homes and keep firefighters out

of harm's way by focusing fire suppression actions near towns, not in the back

country." AR_007864.  Regarding the proven methods, "[a] report authored by

Jack Cohen, one of the Forest Service's own fire specialists, found that so-called

'fuel reduction activities' (i.e., timber sales) in national forests have no bearing on

whether homes on adjacent private lands will burn. The only things that have any

effect are removing flammable materials from within 10 to 20 meters of a home

and reducing the 'ignitability' of the home itself."  FS_001363.

When viewed in this framework, it is important to note that the nearest town

to the Ripley Project – Libby, Montana –  is miles away from most of the Project

area.  AR_483:004620.  Thus, it comes as no real surprise that even the local

Lincoln County Wildfire Community Protection Plan does not map the Project

area as one of concern in the "Libby Area Fire Severity" map:

//

//

//

8



AR_910:022185.

Finally, Congress did provide a special procedure for areas that truly fall

within the "wildland urban interface" and need to be cleared of vegetation on an

expedited basis.  16 U.S.C. §6512.  Under the Healthy Forest Restoration Act

(HFRA), the Forest Service may expedite logging, skip certain environmental reviews, and limit the duration of preliminary injunctive relief, so long as a project fits within the parameters of the HFRA.  16 U.S.C. §§6512-6516.  Thus, if the wildfire risk to the Ripley Project area was truly imminent, and if this Project area was truly within the statutorily-defined "wildland urban interface," then the Forest Service could have used the HFRA to design, approve, and implement this Project. It did not.  By failing to avail itself of the expedited process created by Congress in the HFRA, the Forest Service has waived any argument that immediate logging is necessary to reduce an imminent wildfire risk to a "wildland urban interface."

In conclusion, in addition to the fact that "the equities and public interest factors always tip in favor of the protected species," *Cottonwood*, 789 F.3d at 1090-91, any economic harm from a preliminary injunction would be marginal and temporary, *see Connaughton*, 752 F.3d at 765-66, and statements about reducing wildfire risk are speculative at best and unsupported at worst.  Accordingly, here as in *Cottrell*, "the public interest in preserving nature and avoiding irreparable environmental injury" requires a preliminary injunction.   632 F.3d at 1137-38.

For all of these reasons, the public interest and balance of equities tip sharply in Plaintiff's favor.

**B.    There is a likelihood of irreparable harm in the absence of preliminary relief.**

Regarding the next prong of the preliminary injunction test, the Supreme

Court holds that "[e]nvironmental injury, by its nature, can seldom be adequately

remedied by money damages and is often permanent or at least of long duration,

i.e., irreparable.  If such injury is sufficiently likely, therefore, the balance of

harms will usually favor the issuance of an injunction to protect the environment."

*Village of Gambell*, 480 U.S. at 545.

In this case, the challenged activities will imminently and irreparably harm

Plaintiff's members' interests.  The Executive Director of Plaintiff Alliance for the

Wild Rockies states:

> These harms are actual and imminent. On April 20, 2022, the Forest
> Service informed us, through our attorney, that Project activities
> could proceed as soon as June 1, 2022. If operations are allowed to
> proceed as planned, the area will be irreversibly degraded because
> once logging occurs, the Forest Service cannot put the trees back on
> the stumps, and our interests in the area will be irreparably harmed to
> the point that the area is no longer adequate for our esthetic,
> recreational, scientific, spiritual, vocational, and educational interests.
> In other words, this area will never look or be the same during the
> lifetimes of our members. Additionally, regarding our interests in
> grizzly bears, the displacement of grizzly bears during the 25-
> year Project duration may cause grizzlies to avoid the area for
> generations afterwards since this type of avoidance behavior is a
> learned behavior that is passed on to cubs Therefore, if the Project is
> implemented, grizzly bears may not occur in the Project area again
> during the lifetimes of our members. Therefore, this specific project
> will likely cause irreparable damage to our members' interests
> because it will harm our members' ability to view, experience, and
> utilize the area in its undisturbed state and thus prevent the

> use and enjoyment by our members of hundreds of acres of the Forest. This is the same type of harm to our members posed by the Rat Creek Project on the Beaverhead-Deerlodge National Forest and the Ninth Circuit agreed that such harm is irreparable for the purpose of requesting a preliminary injunction in Alliance for the Wild Rockies v. Cottrell.

Declaration of Michael Garrity ¶13 (April 29, 2022).

The Ninth Circuit held in *Cottrell* that this type of harm to Plaintiffs' members' interests satisfies the irreparable harm prong of the preliminary injunction test:

> AWR's members use the Beaverhead–Deerlodge National Forest, including the areas subject to logging under the Project, for work and recreational purposes, such as hunting, fishing, hiking, horseback riding, and cross-country skiing.  AWR asserts that its members' interests will be irreparably harmed by the Rat Creek Project. In particular, AWR asserts that the Project will harm its members' ability to "view, experience, and utilize" the areas in their undisturbed state.

> The Forest Service responds that the Project areas represent only six percent of the acreage damaged by fire. It argues that because AWR members can "view, experience, and utilize" other areas of the forest . . . they are not harmed by logging in the Project. This argument proves too much. Its logical extension is that a plaintiff can never suffer irreparable injury resulting from environmental harm in a forest area as long as there are other areas of the forest that are not harmed. The Project will prevent the use and enjoyment by AWR members of 1,652 acres of the forest. This is hardly a de minimus injury.

> . . .

> But actual and irreparable injury, such as AWR articulates here, satisfies the "likelihood of irreparable injury" requirement articulated in Winter.

*Cottrell*, 632 F.3d at 1135 (citations omitted).

> The Ninth Circuit reached a similar holding in *Connaughton*:

> The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage. The harm here, as with many instances of this kind of harm, is irreparable for the purposes of the preliminary injunction analysis. . . . Like the plaintiffs in *Wild Rockies*, the LOWD plaintiffs have shown that the Snow Basin project is likely to irreparably harm their members' interest in the project area, and we now must consider the third and fourth Winter prongs.

*Connaughton*, 752 F.3d at 764-65. *see also Marten*, 253 F.Supp.3d at 1111

("Plaintiffs' expressed desire to visit the area in an undisturbed state is all that is

required to sufficiently allege harm under ESA. . . . Plaintiffs have sufficiently

alleged a likelihood of irreparable injury to warrant a preliminary injunction.").

The same is true in this case: "once logging occurs, the Forest Service

cannot put the trees back on the stumps . . . . In other words, this area will never

look or be the same during the lifetime of our members.  Therefore, this specific

project will likely cause irreparable damage to our members' interests because it

will harm our members' ability to view, experience, and utilize the area in its

undisturbed state and thus prevent the use and enjoyment by our members of

hundreds of acres of the Forest."  Garrity Declaration ¶13.  Notably, while the

irreparable logging in *Cottrell* covered 1,652 acres, 632 F.3d at 1135, the

irreparable logging in this case includes 10,854 acres of commercial logging,

including 3,223 acres of clearcutting, AR_614:0077762-63.

As the Ninth Circuit reaffirmed in *Cottonwood*, "establishing irreparable injury should not be an onerous task for plaintiffs." 789 F.3d at 1090-91. That non-onerous test is satisfied here because Plaintiff has demonstrated that a "specific project[] will likely cause irreparable damage to its members' interests." *Id.* at 1092.

For all of these reasons, there is a likelihood of irreparable harm in the absence of preliminary relief.

**C.    Plaintiff raises serious questions on the merits.**

"[T]he elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Cottrell*, 632 F.3d at 1131 (citation omitted). Thus, the Ninth Circuit "has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Id.*

"Serious questions on the merits" are those that present a "fair ground for litigation and thus for more deliberative investigation*." Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). "Serious questions

14

need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Landwatch v. Connaughton*, 905 F.Supp.2d 1192, 1198 (D. Or. 2012)(citation omitted). In other words, "a fair chance of success[] is all that is required." *Marcos*, 862 F.2d at 1362.

Plaintiff satisfies the requirement of raising questions that present "fair ground for litigation" and a "fair chance of success;" therefore, they have adequately raised "serious question on the merits." Plaintiff has thoroughly briefed all claims in summary judgment briefing.  However, Plaintiff will summarize two of its key ESA claims below: (1) the agencies failed to conduct a lawful cumulative effects analysis in the ESA consultation for the grizzly bear because they failed to analyze state and private activities; and (2) the Forest Service violated the ESA by failing to prepare a biological assessment for lynx for the Project because lynx are listed on the FWS species list for this Project area.

1.    **Serious questions have been raised regarding the agencies' failure to conduct a lawful cumulative effects analysis in the ESA consultation for the grizzly bear because they failed to analyze state and private activities.**

A biological assessment prepared by the Forest Service under ESA Section 7 must include "[a]n analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies." 50 C.F.R. §402.12(f)(4).  Similarly, a biological opinion prepared by

FWS under ESA Section 7 must "evaluate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. §402.14(g)(3).

In the ESA context, cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. §402.02. Thus, State and private activities that are reasonably certain to occur in the Ripley Project area must be included in the cumulative effects analysis. *See id.*

In this case, the agencies base their grizzly bear effects analysis on an open road density calculation that excludes all State and private roads. *See, e.g.,* AR_125:000390; AR_117:000319. Based on the exclusion of State and private roads, the Forest Service concludes: "During and post-project open road density would continue to support the presence of male grizzly bears . . . ." AR_117:000312. Even if that type of exclusion of State and private roads were permissible when analyzing direct effects, it is not permissible when analyzing cumulative effects. Cumulative effects must include State and private activities. 50 C .F.R. §402.02.

In the cumulative effects sections of the Project Biological Assessment and Biological Opinion, the agencies acknowledge that there will be logging activities on State and private lands during the Ripley Project. AR_117:000338-339;

AR_125:000394.  However, the agencies fail to disclose any details on the amount

of logging on State lands.  AR_117:000338-339; AR_125:000394; *see also*

AR_122:000365.  Perhaps even more importantly, the agencies fail to disclose any

details regarding the increase in roads that will occur on State and private lands

during logging operations, which would cumulatively increase road density in the

Project area.  AR_117:000338-339; AR_125:000394; *see also* AR_122:000365.

Without disclosure of these basic facts, it is not possible to conduct a

meaningful cumulative effects analysis for grizzly bears. *See, e.g.,*

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt*., 387 F.3d 989, 994

(9th Cir. 2004)("some quantified or detailed information" is required in NEPA

cumulative effects analyses). In *Klamath-Siskiyou*, the Ninth Circuit addressed a

NEPA cumulative effects claim and found that "total number of acres to be

harvested in the watershed is a necessary component of a cumulative effects

analysis" and "a tally of the total road construction anticipated in the [] watershed

is definitely a good start to an adequate analysis," but the court further found that a

tally of acres of logging and miles of road was only the start.  *Id.* at 995. There

must also be an analysis of the effects of those activities.  *Id.*

Similarly, the Fourth Circuit recently reached a similar conclusion regarding

cumulative effects analysis in the ESA context in *Appalachian Voices v. United*

*States Dep't of Interior*.  25 F.4th 259 (4th Cir. 2022).  In *Appalachian Voices*,

there were "numerous state and private activities currently occurring within the action area," but FWS "never [told] us what these activities are, or what impact they may be having." 25 F.4th at 272. "[N]either the Fish and Wildlife Service nor [the company] adequately explain how the BiOp could account for these impacts if the activities giving rise to them are never even mentioned." *Id.* at 273.

The same is true in this case. Here, as in *Appalachian Voices*, it is unlawful for FWS to simply refuse to request the relevant information on road construction and logging from the State and corporate private land owners in the Project area. 25 F.4th at 272-273. The Project BiOp cannot account for the impacts of State and private road construction and logging if the extent of the activities are never even disclosed by FWS in the BiOp. *Id.*

As the Fourth Circuit further held:

the Fish and Wildlife Service must review all relevant information provided by the action agency or otherwise available. []. This requirement meshes with, and is partially derived from, the Act's mandate to "use the best scientific and commercial data available." []. These are not passive directives; rather, the Fish and Wildlife Service "*must seek out and consider all existing scientific data relevant to the decision* it is tasked with making."

*Appalachian Voices*, 25 F.4th at 269 (emphasis added). Here, the agencies have also failed their basic mandate to "seek out and consider all existing scientific data relevant to the decision," *id.*, because they did not seek out and consider all existing data on road construction and logging on State and corporate timber lands

in the Project area.  This basic information is necessary to analyze cumulative effects to grizzly bears.  In other words, this basic information is necessary to understand how a grizzly bear will experience the entire landscape in the Ripley Project area and be impacted by that landscape.

As discussed in summary judgment briefing, roads pose the most imminent risk to grizzly bears.  AR_1026:010365-366.  Logging also harms grizzly bears. AR_1026:010222.  Because the Project area includes lands with federal, State, and corporate ownership, grizzly bears will experience a cumulative effect from all roads and logging operations on the landscape during the Ripley Project. *See* AR_613:007444.  Accordingly, the agencies' omission of the cumulative logging acreage and cumulative road density during the Project – and the cumulative effects of those activities on grizzly bears – renders the analysis arbitrary and capricious.  *See, e.g.*, *Appalachian Voices*, 25 F.4th at 272-273.  *see also S. Yuba River Citizens League v. NMFS*, 723 F.Supp.2d 1247, 1269 (E.D. Cal. 2010) (omission of necessary cumulative effects discussion was arbitrary and capricious).

Finally, in summary judgment briefing, the agencies argued that they "incorporated that worst-case assumption *into the environmental baseline* of the Ripley Project's Section 7 analysis" but the citations they provide do not make any such statement.  Doc. 32 at 28 (emphasis added).  More importantly, FWS cannot

lawfully use the "environmental baseline" as a substitute for a "cumulative effects" analysis. The plain language of the regulation establishes that "environmental baseline" and "cumulative effects" are two separate evaluations. 50 C.F.R. §402.14 (g)(2)(3); *see also Appalachian Voices*, 25 F.4th at 278.  Both "environmental baseline" and "cumulative effects" evaluations are necessary parts of a lawful jeopardy analysis. 50 C.F.R. §402.14 (g)(4); *Appalachian Voices*, 25 F.4th at 278.  They are not one and the same.  Accordingly, in *Appalachian Voices*, the Fourth Circuit rejected a FWS Biological Opinion in part because FWS argued that cumulative effects to a listed species were "implicitly evaluated" as part of a model of the existing condition of the species.  25 F.4th at 276.  This Court should also reject FWS's similar "implicit evaluation" argument in this case.

    For these reasons, and the reasons discussed in summary judgment briefing, Plaintiff has met the low threshold of raising serious questions on the merits of its ESA cumulative effects claim.

    **2.    Serious questions have been raised regarding the Forest Service's failure to prepare a biological assessment for lynx for the Project because lynx are listed on the FWS species list for this Project area.**

    Additionally, Plaintiff has also raised serious questions on the merits regarding its lynx ESA claim.  The ESA mandates: "each Federal agency shall . . . request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the

Secretary advises, based on the best scientific and commercial data available, that

such species may be present, such agency shall conduct a biological assessment . .

. ." 16 U.S.C. §1536(c)(1)(emphases added).  As the District of Idaho recently

held:

> If USFWS advises that listed species "may be present, [the action]
> agency shall conduct a biological assessment." 16 U.S.C. §
> 1536(c)(1).  The plain language of the statute and regulation thus set
> out a simple two-step process for an action agency to comply with
> section 7(c)(1): receive an adequate list and prepare biological
> assessments for any species on that list.

*Friends of Clearwater v. Petrick*, - - - F.Supp.3d - - - -, 2022 WL 622460, at *5

(D. Id. 2022)(citation omitted).  In other words, "[t]he Forest Service must adhere

to the requirements of §1536(c)(1) – requesting a species list and preparing a BA

for species that may be present – as part of the process of determining whether the

action may affect a listed species." *Id.* at *6.

In short, "[o]nce an agency is aware that an endangered species may be

present in the area of its proposed action, the ESA requires it to prepare a

biological assessment . . . ." *Thomas v. Peterson*, 753 F. 2d 754, 763 (9th Cir.

1985), *overruled on other grounds as recognized by Cottonwood Envtl. L. Ctr. v.

USFS*, 789 F.3d 1075, 1092 (9th Cir. 2015).  The Ninth Circuit further holds: "A

failure to prepare a biological assessment for a project in an area in which it has

been determined that an endangered species may be present cannot be considered

a *de minimis* violation of the ESA." *Thomas*, 753 F.3d at 763-764.

Furthermore, as explained by FWS, the "may be present" threshold set by the ESA includes migratory species that may be present "at some point" within the action area, and the standard does not require confirmation that species are "actually known or believed to occur" in the area.  51 Fed. Reg. 19926, 19946 (June 3, 1986).  Thus, this Court previously held:  "[t]he Wildlife Service clearly rejected a standard which would require a species to be 'actually known or believed to occur' in an area because it would conflict with the statutory language."  *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1073 (D. Mont. 2013).  Similarly, the District of Idaho recently held: "the 'may be present' standard does not require actual occurrence or occupancy. []. Rather the plain text of the statute requires *only the possibility* that a listed species is present."  *Friends of the Clearwater*, 2022 WL 622460, at *7 (internal citation and quotation marks omitted, emphasis added).

### a.    The FWS species list in the record for this Project includes lynx; therefore a biological assessment is mandatory.

In this case, there is a FWS species list in the administrative record that applies specifically to the Ripley Project area.  AR_1048:029194, 029196.  This FWS species list specifically delineates this Project area as an area where lynx may be present:

//



## Mammals

| NAME | STATUS |
|------|--------|
| Canada Lynx  Lynx canadensis<br>There is **final** critical habitat for this species. The location of the critical habitat is not available.<br>https://ecos.fws.gov/ecp/species/3652 | Threatened |
| Grizzly Bear  Ursus arctos horribilis<br>There is **proposed** critical habitat for this species. The location of the critical habitat is not available.<br>https://ecos.fws.gov/ecp/species/7642 | Threatened |

AR_1048:029194, 029196.  As Intervenors concede: "FWS's resource list (species

list) identified the lynx as a species that 'may be present' in the Project area."

Doc. 36 at 34.

Nonetheless, the Forest Service argues that the FWS species list, and other

FWS findings, should be disregarded and that the Court should instead defer to

"the *Forest Service's* conclusion that lynx will not be present in the Ripley Project

action area."  Doc. 32 at 39-43 (emphasis added).  The Forest Service's suggestion

violates the plain language of the ESA:  FWS makes the "may be present"

determination, not the Forest Service. "If the Secretary advises, based on the best

scientific and commercial data available, that such species may be present, such

agency shall conduct a biological assessment . . . ." 16 U.S.C. §1536 (c)(1). The

Forest Service does not have authority to ignore the plain language of the ESA by

ignoring a FWS species list for the Project area:  "[t]he Forest Service must adhere

to the requirements of §1536(c)(1) – requesting a species list and preparing a BA

for species that may be present . . . ." *Friends of the Clearwater*, 2022 WL

622460 at *6.

       **b.**     **Defendants' "no effect" argument puts the cart before the horse.  A "no effect" determination can only be made in a biological assessment, which has not yet been prepared here for lynx.**

In summary judgment briefing the Forest Service mischaracterized

Plaintiff's lynx claim.  The Forest Service argued: "Claim Five takes issue with the

Forest Service's 'no effect' determination regarding listed Canada lynx but fails to identify any deficiency." Doc. 32 at 38; *see also* Doc. 36 at 32-34 (arguing at length against a strawperson about "may effect" [sic] and "no effect").

Contrary to these representations, Plaintiff's argument as discussed above is that the "may be present" finding in the FWS species list compels a biological assessment. There is a distinct two-step process required by the statute. 16 U.S.C. §1536 (c)(1). The first step is the "may be present" inquiry. *Id.* If a species "may be present," the agency "shall" prepare a biological assessment. *Id.* The second step is the "may affect" inquiry, and that inquiry happens in the biological assessment. *Id.*

In other words, as this Court has previously held: "a no effect determination does not obviate the need for a BA,[] as the BA is the mechanism by which an agency concludes that its proposed action will have 'no effect,' 'may affect,' or 'is likely to adversely affect' a listed or proposed species." *Native Ecosystems Council v. Marten*, - - - F.Supp.3d - - - -, 2020 WL 1479059, at *6 (D. Mont. 2020)(emphasis added); *see also Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006) (explaining the process: (1) receive species list, (2) prepare biological assessment, (3) make effects determination). As the District of Idaho recently held in rejecting the same agency (and intervenor) argument: "Simply put, the federal agencies' argument puts the cart before the horse—in a way not

consistent with the statutory language." *Friends of Clearwater*, 2022 WL 622460, at *6.

Plaintiff respectfully requests that this Court again reject the collective Defendants' attempt to conflate the two distinct statutory inquiries. As set forth above, the species list reached a "may be present" conclusion for lynx. AR_1048:029194, 029196. Therefore, the Forest Service must prepare a biological assessment for lynx. 16 U.S.C. §1536 (c)(1). And, as this Court recently acknowledged in a different case: "Allowing the Project to proceed before consultation is complete would be improper under the ESA which prohibits the 'irreversible or irretrievable commitment of resources' during consultation." *All. for Wild Rockies v. Marten*, 2021 WL 3561178, at *15 (D. Mont. 2021)(citing 16 U.S.C. §1536(d)), *report and recommendation adopted*, 2021 WL 4551496; *see also Lane Cty. Audubon Soc. v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994) ("timber sales constitute per se irreversible and irretrievable commitments of resources under § 7(d) and thus could not go forward during the consultation period').

## IV. CONCLUSION

The mandatory application of institutionalized caution in this case requires a preliminary injunction to maintain the status quo until the Court issues its determination on the merits. The Ninth Circuit held in *Cottonwood*: "As the

[Supreme] Court made unmistakably clear: 'Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.' That fundamental principle remains intact and *will continue to guide district courts when confronted with requests for injunctive relief in ESA cases*." 789 F.3d at 1091 (*quoting Hill*, 437 U.S. at 194)(emphasis added).

For all of the reasons discussed above and in summary judgment briefing, Plaintiff respectfully requests that the Court preliminarily enjoin implementation of the Ripley Project.  Briefing on cross-motions for summary judgment is already complete; thus, a preliminary injunction would likely be in place for less than one year and would simply maintain the status quo while the Court decides the merits of this case.

Respectfully submitted this 29th Day of April, 2022.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiff

CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is 6,250 words, excluding the caption, table of contents, table of authorities, signature blocks, and certificate of compliance. Pursuant to Local Rule 7.1, a table of contents and table of authorities are included in this brief.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Attorney for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned certifies that all counsel have filed notices of appearance in this case and therefore will be served via ECF.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Attorney for Plaintiffs