IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV 21–105–M–DLC–KLD |
| Plaintiff, | |
| vs. | ORDER |
| NATHAN GASSMANN, District Ranger, Kootenai National Forest, Libby Ranger District; CHAD BENSON, Forest Supervisor, Kootenai National Forest; KEITH LANNOM, Deputy Regional Forester, U.S. Forest Service Region One; U.S. FOREST SERVICE; and U.S. FISH & WILDLIFE SERVICE, | |
| Defendants, | |
| and | |
| AMERICAN FOREST RESEARCH COUNCIL, LINCOLN COUNTY, and KOOTENAI FOREST STAKEHOLDERS COALITION, | |
| Intervenor-Defendants. | |

Before the Court is Plaintiff's Motion for Preliminary Injunction and/or Temporary Restraining Order.  (Doc. 49.)  For the reasons stated herein, the motion will be granted.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Alliance for the Wild Rockies filed this lawsuit on September 21, 2021 against Nathan Gassmann, Chad Benson, Keith Lannom, and the United States Forest Service (collectively, "USFS").  (Doc. 1.)  Plaintiff's Amended Complaint, filed October 12, 2021, added the U.S. Fish & Wildlife Service ("FWS") as a defendant.  (Doc. 4.)  Plaintiff's Amended Complaint alleges that Defendants' approval of the Ripley Project within the Kootenai National Forest violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331, the National Forest Management Act (NFMA), 16 U.S.C. § 1600, Executive Order 11644, the Travel Management Rule, 36 C.F.R. § 212.55, the Administrative Procedure Act (APA), 5 U.S.C. § 701, and the Endangered Species Act (ESA), 16 U.S.C. § 1531.  (Doc. 4 at 2.)

The parties filed briefing on cross-motions for summary judgment, which have been referred to U.S. Magistrate Judge DeSoto, from January 20, 2022 through April 12, 2022.  On April 20, 2022, Defendants filed notice "that new road construction and timber harvest activities authorized by the Ripley Project are anticipated to begin on or shortly after June 1, 2022."  (Doc. 48.)  Nine days later, Plaintiff filed the instant motion for a preliminary injunction or temporary restraining order.  (Doc. 49.)  Defendants subsequently represented that they would

voluntarily delay activities authorized by the Ripley Project until July 5, 2022.
(Doc. 52.)

The Ripley Project area consists of 29,180 acres located in Lincoln County, Montana, in the Libby Ranger District of the Kootenai National Forest. FS_613:007443–44.  The Project area includes 18,180 acres of National Forest System lands, 215 acres of Army Corps of Engineer lands, 2,475 acres of Montana Department of National Resources and Conservation lands, 3,075 acres of Stimson Lumber Company lands, 60 acres of Weyerhauser lands, and 4,545 acres of other private lands.  FS_613:007510.  The Project is estimated to take 25 years to complete.  FS_613:007459.  The Project includes 10,854 acres of commercial logging, including at least 238 acres of clearcutting[1]; commercial-logging related burning, mastication, and site preparation on 5,334 acres; pre-commercial logging on 829 acres; and tree-cutting and burning on 715 acres.  FS_613:007461–65, FS_614:007762–64.  The Project also includes new construction of 13 miles of permanent roads and 6 miles of temporary roads; maintenance or reconstruction on 93 miles of existing roads; addition of 11 miles of undetermined roads to the National Forest Road System; "storage" of 23 miles of roads, including 5 miles of already "stored" roads that will be re-opened for the Project; reconstruction of 12

---

[1] Plaintiff contends that the Project includes 3,223 acres of clearcutting, but Defendants dispute this characterization of certain "treatment types."  (Doc. 34 at 5.)

miles of existing National Forest roads and new construction of one mile of road to allow the State to conduct logging activities on State land in the Project area; and 35 miles of closed, stored, or barriered roads re-opened to public motorized use. FS_614:007763; FS_613:007467–767.  The stated goals of the Project in the Decision Notice include promoting resilient vegetation conditions, reducing the potential for high intensity wildfire, and improving big game winter range conditions.  FS_614:007761.

The Ripley Project area is approximately two miles from the Cabinet-Yaak Grizzly Recovery Zone and less than one mile from the Cabinet Face Bears Outside Recovery Zone (BORZ) area.  FS_117:000318.  The locations of at least three different radio-collared male grizzly bears have been recorded within the Ripley Project area in the past five to seven years.  FS_117:000312.  The parties dispute whether Canada lynx are or may be present in the Ripley Project area, but FWS documents in the administrative record indicate that lynx generally are present on the Kootenai National Forest and may be affected by activities in the Ripley Project area.  FS_108:000269; FS_1048:029195–96.

Although Plaintiff's complaint raises many claims, two are emphasized in its motion for a preliminary injunction.  First, Plaintiff argues that the agencies violated the APA and ESA by failing to conduct a lawful cumulative effects analysis in their ESA consultation for the grizzly bear because they failed to

analyze state and private activities.  (Doc. 50 at 15–20.)  In particular, Plaintiff asserts that the agencies' decision to base their grizzly bear effects analysis on "an open road density calculation that excludes all State and private roads" violates the regulatory requirement to consider effects of future State or private activities that are reasonably certain to occur within the action area.  (*Id.* at 15–16.)  Second, concerning Canada lynx, Plaintiff argues that USFS violated the ESA by skipping the essential statutory steps of requesting a species list from FWS to determine whether lynx may be present in the project area and, if present, conducting a biological assessment to determine the potential effects of the project on lynx; USFS instead concluded on its own that lynx will not be present in the project area and that the project therefore would have no effect on them.  (*Id.* at 20–26.)

Defendants and Intervenor-Defendants filed responses to Plaintiff's motion for a preliminary injunction, and the Court held a hearing on the motion on May 6, 2022.  Because Defendants had notice and an opportunity to respond, the Court treats Plaintiff's motion as one for a preliminary injunction rather than a temporary restraining order.  *See* Fed. R. Civ. P. 65(a)–(b).

Additional facts in the record are discussed as they become relevant in the analysis below.

## LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). However, the Endangered Species Act "strips courts of at least some of their equitable discretion in determining whether injunctive relief is warranted"; "when evaluating a request for injunctive relief to remedy an ESA procedural violation, the equities and public interest factors always tip in favor of the protected species." *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090–91 (9th Cir. 2015). Where a plaintiff demonstrates that the balance of hardships "tips sharply toward the plaintiff," likelihood of irreparable injury, and that the injunction is in the public interest, "serious questions going to the merits" of the plaintiff's claims "can support issuance of a preliminary injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

ESA claims are reviewed under the APA standard, "[i]rrespective of whether an ESA claim is brought under the APA or the citizen-suit provision." *All. for the Wild Rockies v. Krueger*, 664 F. App'x 674, 675 (9th Cir. 2016) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011)). The APA requires a reviewing court to set aside an agency's decision if it is "arbitrary,

6

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Id.* A court may not accept an agency's post hoc rationalizations for its action. *Id.* at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*

Section 7(a)(2) of the ESA provides:

Each Federal agency shall, in consultation with and with the assistance of the Secretary[ of Interior], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2).  In relevant part, Section 7(c)(1) of the ESA provides:

> To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on November 10, 1978, request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action.

16 U.S.C. § 1536(c)(1).

The ESA's implementing regulations expand upon these requirements.  The regulations provide two alternative options for compliance with Section 7(c)(1): "The Federal agency or the designated non-Federal representative shall convey to the Director[ of FWS] either (1) a written request for a list of any listed or proposed species or designated or proposed critical habitat that may be present in the action area; or (2) a written notification of the species and critical habitat that are being included in the biological assessment."  50 C.F.R. § 402.12(c).  Within 30 days, "the Director shall either concur with or revise the list or, in those cases where no list has been provided, advise the Federal agency or the designated non-Federal representative in writing whether, based on the best scientific and commercial data available, any listed or proposed species or designated or proposed critical habitat may be present in the action area."  50 C.F.R. § 402.12(d).

If FWS advises that a listed species may be present, the statutory requirement to conduct a biological assessment is triggered.  16 U.S.C. § 1536(c)(1).  "A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary."  50 C.F.R. § 402.12(a).  "The contents of a biological assessment are at the discretion of the Federal agency and will depend on the nature of the Federal action" and may include "[a]n analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies."  50 C.F.R. § 402.12(f).  The regulations define "cumulative effects" as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  50 C.F.R. § 402.02.

The action agency must submit the completed biological assessment to the Director of FWS of review, and the Director must respond in writing within 30 days as to whether he or she concurs with the assessment's findings.  50 C.F.R. § 402.12(j).  The action agency and Director may use the biological assessment's findings concerning whether a listed species or critical habitat is likely to be adversely affected by the agency action to determine whether formal consultation

is required.  50 C.F.R. §§ 402.12(k), 402.14.  If the action agency determines that its action may affect a listed species or critical habitat, formal consultation is required unless "as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat" or unless a preliminary biological opinion issued after early consultation is confirmed as the final biological opinion.  50 C.F.R. § 402.14(a)–(b).  An agency requesting formal consultation "shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat."  50 C.F.R. § 402.14(d).

As succinctly summarized by another District Court within this Circuit: "The plain language of the statute and regulation thus set out a simple two-step process for an action agency to comply with section 7(c)(1): receive an adequate list and prepare biological assessments for any species on that list."  *Friends of Clearwater v. Petrick*, No. 2:20-CV-00243-BLW, 2022 WL 622460, at *5 (D. Idaho Mar. 2, 2022).

10

## DISCUSSION

### I.      Likelihood of Success on the Merits

Plaintiff is likely to succeed on the merits of both claims raised in its motion for a preliminary injunction.

#### A. Grizzly Bear

The ESA's implementing regulations require FWS to consider cumulative effects on a listed species or its critical habitat during formal consultation.  50 C.F.R. § 402.14(g)(3).  While the regulations provide that the contents of a biological assessment are at the discretion of the action agency, they may include cumulative effects analysis.  50 C.F.R. § 402.12(f)(4).  USFS included a cumulative effects analysis in its biological assessment for the grizzly bear in this case.  FS_117:000338–39.

Here, the agencies engaged in formal consultation concerning the grizzly bear at USFS's request after USFS's biological assessment found that the Ripley Project may affect and is likely to adversely affect the grizzly bear. FS_119:000352.  USFS's biological assessment, dated May 7, 2020, provides no details about potential road construction and management or land development on privately owned land; instead, it states, "[b]ecause the roads analysis focuses on roads under Forest Service management on National Forest System lands, any road construction and management occurring on private land would not cumulative [sic]

11

contribute to open road densities for this analysis[,]" and "[a]ny of the activities that may occur on the private property parcels can only be estimated as all activities are outside the control of the Forest Service."  FS_117:000338.  The biological assessment describes the general location and/or acreage of five ongoing or future timber harvests by Stimson Lumber Company or Montana DNRC within or near the project area and acknowledges that "there is a possibility that certain locations within the project area would be affected by proposed Ripley activities as well as other on-going or proposed federal and private actions simultaneously." FS_117:000338–39.  The cumulative effects section of FWS's May 13, 2021 Biological Opinion—which spans approximately one-half of a single page— largely echoes the same information, makes no mention of roads, states that "[n]o further site-specific, non-federal actions are known to be reasonably certain to occur in the future[,]" and concludes: "While some activities on non-federal land may contribute to cumulative effects at some point in the future, large Forest ownership within which human access is restricted by regulation and topography would help to reduce the impacts of larger residential human populations on grizzly bears."  FS_125:000394.

Plaintiff argues that the agencies' failure to disclose details concerning logging activities or changes to roads that are reasonably certain to occur on State and private lands during the Ripley Project precludes the agencies from conducting

12

a meaningful cumulative effects analysis for grizzly bears, and "the agencies'
omission of cumulative logging acreage and cumulative road density during the
Project – and the cumulative effect of those activities on grizzly bears – renders the
analysis arbitrary and capricious." (Doc. 50 at 17–19.)

Defendants do not dispute Plaintiff's contention that "roads pose the most
imminent risk to grizzly bears." (Doc. 50 at 19.) Indeed, the biological assessment
acknowledges that "[t]he availability of secure habitat is primarily influenced by
motorized access management[,]" and the biological opinion likewise states that
"[m]otorized access has long been recognized as a major factor affecting grizzly
bears." FS_117:000311–12; FS_125:000381. Nor do they dispute the limited
nature of the data from State and private activities in their cumulative effects
analyses. (Doc. 55 at 7–8.) They attribute this absence to the difficulty of
gathering information from State and private actors about activities reasonably
certain to occur during the long-lasting Ripley Project. (*Id.*) And in briefing
before the Court, they contend that they *did* assess the cumulative effects of
activity on State and private lands within the project area by assuming that those
lands provide no secure habitat for grizzly bears and incorporating that assumption
into the environmental baseline, and, as a result, FWS "did not need to know or
mention or discuss the specifics associated with timber harvest or motorized access
and their effects on State and private lands because the Agencies already assumed

the worst-case scenario[.]"  (*Id.* at 8–9.)  They readily concede that this "no secure habitat" assumption is factually false.  (*Id.* at 8.)  Indeed, they rely on contrary facts—that grizzly bears within or near the Project area primarily use private lands—to rebut Plaintiff's argument that part of the Ripley Project area should have been designated a BORZ area in their summary judgment briefing.  (Doc. 32 at 17–19; Doc. 46 at 9.)  Notably, this "no secure habitat" assumption appears nowhere in the cumulative effects analyses of the Biological Assessment or the Biological Opinion.  FS_117:000338–39; FS_125:000394; *see also* FS_122:000365 (noting in supplement to biological assessment that no additional cumulative effects are expected beyond those disclosed in original biological assessment).  Rather, Defendants cite to a different section of USFS's supplement to the terrestrial biological assessment, which describes the data and methodology USFS used to determine open and total road routes and to calculate secure habitat and explains that secure habitat is calculated by removing a 500-meter buffer around all non-Forest-Service lands to "reflect th[e] potential" that "roads could be built right up to the edge of the boundary" on those lands.  FS_122:000359–60.

Plaintiff has shown a likelihood of success on its claim that Defendants' cumulative effects analyses concerning the grizzly bear are arbitrary and capricious.  Even if Defendants' "worst-case scenario" argument did not appear to be an impermissible post-hoc justification for their actions, *State Farm*, 463 U.S. at

50, it would require the Court to endorse the agencies' approach of relying on factual assumptions the agencies *know* to be incorrect to dodge their statutory and regulatory duties to obtain, disclose, and analyze the best scientific and commercial data available concerning reasonably certain State or private activities within the action area during the formal consultation process.  50 C.F.R. §§ 402.02, 402.14(d), 402.14(g)(1), 402.14(g)(3); *see also Appalachian Voices v. United States Dep't of Interior*, 25 F.4th 259, 275–76 (4th Cir. 2022) (holding that FWS improperly evaluated cumulative effects where administrative record indicated that action area was likely to be impacted by numerous non-Federal future activities, but none of those impacts was expressly addressed in the BiOp); *id.* at 269 (emphasizing that FWS must affirmatively seek out and consider existing data under 50 C.F.R. § 402.14(g)(1)).  Plaintiff is likely to succeed in proving that FWS's decision to not attempt to obtain and disclose data concerning reasonably certain State and private activities, and the agencies' decision to rely on a factual assumption they know to be incorrect in assessing the Project's cumulative effects on the grizzly bear, violated the ESA and were arbitrary and capricious.  *See State Farm*, 463 U.S. at 43 (explaining that agency action is arbitrary and capricious if the agency has "offered an explanation for its decision that runs counter to the evidence before the agency").

15

### B. Canada Lynx

Plaintiff also is likely to succeed on the merits of its claim that USFS failed to comply with the ESA concerning Canada lynx. The statute plainly requires the action agency, here USFS, to request a list of species that may be present in the action area. 16 U.S.C. § 1536(c)(1). USFS concedes that it did not do so, nor did it avail itself of the regulatory alternative to provide a list to FWS and seek FWS's concurrence or revision, 50 C.F.R. § 402.12(c). (Doc. 59 at 36.) Instead, USFS defends its approach by claiming that it "did prepare and adopt a lynx biological assessment" that determined that "lynx would not be present in the Ripley action area and that the Ripley Project would therefore have no effect on lynx." (Doc. 55 at 10–11.)

Defendants' approach in this case repeats a similar error identified by the district court in *Friends of Clearwater v. Petrick*, in which the same agencies argued that they did not need to prepare a biological assessment for the grizzly bear "because the Forest Service determined in its wildlife report that the action would have no effect on the grizzly bear." 2022 WL 622460, at *6. As that court found, "the federal agencies' argument puts the cart before the horse—in a way not consistent with the statutory language . . . . The Forest Service must adhere to the requirements of § 1536(c)(1)—requesting a species list and preparing a BA for species that may be present—as part of the process of determining whether the

16

action may affect a listed species." *Id.*   Under the ESA and its implementing

regulations, FWS makes the determinative "may be present" determination, not the

action agency.   16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c).   Plaintiff is likely to

succeed on its claim that Defendants' backwards approach in this case violates the

ESA.

Moreover, the Court is skeptical of Defendants' efforts to distinguish this

case from *Friends of Clearwater* by claiming that USFS did, in fact, prepare a

biological assessment for lynx.   The portions of the administrative record they cite

to as the "biological assessment" consist of the Wildlife Specialist Report for the

Ripley Project, which contains less than three total pages about Canada lynx and

their habitat, FS_531:005045, 005077–79; the Terrestrial Biological Assessment

for the Ripley Project, which simply states that the Project "would have no effect

to Canada lynx or Canada lynx critical habitat" because "[t]he analysis area is

located outside any Lynx Analysis Units" and "outside designated critical

habitat[,]" FS_117:000291; the cover letter to the Biological Assessment, which

repeats the finding that the Project would have no effect on lynx or lynx habitat,

FS_119:000352; and a letter to file dated September 22, 2021—the day after this

lawsuit was filed—stating that the wildlife specialist report "serves as the 'no

effect' biological assessment (BA) for Canada lynx and designated lynx critical

habitat[,]" FS_1023:004642.   (Doc. 55 at 11.)   The purported biological assessment

17

in this case is the legally insufficient wildlife report in *Friends of Clearwater* by another—retroactively assigned—name.  *See* 2022 WL 622460, at *6 (rejecting argument that "no effect" determination for grizzly bear in wildlife report excused USFS from preparing biological assessment).  Accordingly, the Court finds that Plaintiff is likely to succeed on the merits of its claim that the agencies violated the ESA by failing to follow the two-step statutory process of obtaining a list of endangered and threatened species and preparing a biological assessment for any listed species.  16 U.S.C. § 1536(c)(1).

## II.    Likelihood of Irreparable Injury

Plaintiff has established a likelihood of irreparable injury absent injunctive relief.  While irreparable harm cannot be presumed in ESA cases, "establishing irreparable injury should not be an onerous task for plaintiffs."  *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  A district court need not find an extinction-level threat to a listed species before issuing an injunction under the ESA; "[t]he ESA accomplishes its purpose in incremental steps, which include protecting the

18

remaining members of a species . . . .   Harm to those members is irreparable[.]" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818–19 (9th Cir. 2018).

The Ripley Project area is roughly two miles from the Cabinet-Yaak Ecosystem (CYE), which is a grizzly bear recovery zone.  FS_117:000316.  USFS's biological assessment described the estimated CYE grizzly bear population as at least 54 bears, *id.*; FWS's most recent population count in the 2020 monitoring year was 45 bears, FS_1058:027916.  FWS's Grizzly Bear Recovery Plan requires approximately 100 grizzly bears as the minimum viable population for the CYE.  FS_1026:10301.  A 2016 peer-reviewed published study found that the Cabinet and Yaak populations were demographically and reproductively isolated from each other, the Cabinet population was highly inbred, and in these populations, "the difference between growth and decline is 1 or 2 adult females being killed annually or not."  FS_1032:027484, 027499.  There have been 30 instances of known human-caused mortalities in the CYE from 2007 to 2020, FS_1058:027950, and two human-caused mortalities of female grizzly bears within 16 kilometers of the CYE in 2020, with one described as "under investigation," FS_1058:027933.  FWS's 2021 Species Status Assessment for grizzly bears concludes that the CYE population has "low" resiliency, which is defined as "the ability for populations to persist in the face of stochastic events, or for populations

19

to recover from years with low reproduction or reduced survival[.]"
FS_1037:028145, 028162.  In short, the CYE population of grizzly bears is
especially vulnerable.

At least three different collared male grizzly bears have been recorded
within the Ripley Project area in the past five to seven years, including two males
that pass through the area in the spring and fall between the Cabinet Mountains and
the Fisher River, and another male whose home range overlaps the Ripley Project
area along portions of Lower Libby Creek.  FS_117:000312, 000317.

Defendants and Intervenors rely on the biological opinion's findings to
argue that "any adverse effects on individual bears as a result of the
implementation of the Ripley project would not have negative effects on the status
of the species" (Doc. 54 at 21–22; Doc. 55 at 12–14), but those findings rest on
Defendants' knowingly false assumptions of no impacts on grizzly bears from
State and private activities near the Project area during the Project's duration.  The
Court cannot credit those findings where the agencies' apparent failure to comply
with the ESA leaves no scientific basis on which the Court could conclude that
grizzly bears' habitat choices or movement patterns are not likely to be affected by
the Ripley Project *and* the reasonably certain future State and private activities in
the area, particularly because the agencies counterintuitively decided to assume
that activities on private land—which they assert the bears primarily use—would

20

have *no* effect.  Moreover, Defendants' argument that "Plaintiff must demonstrate 'a definitive threat of future harm' to the species as a whole" (Doc. 55 at 13 (quoting *Nat'l Wildlife Fed'n*, 886 F.3d at 819)), grossly misstates the applicable law.  The case they rely on for that proposition makes clear that harm to *individual members* of a listed species is irreparable harm that can warrant issuance of an injunction under the ESA.  *Nat'l Wildlife Fed'n*, 886 F.3d at 818–19.

As to lynx, the wildlife specialist report finds that the Ripley Project area lacks the vegetative condition that would support snowshoe hares and, by extension, Canada lynx because of their close association to habitat types and structural conditions that support snowshoe hares.  FS_531:005078–79.  However, the same report acknowledges that lynx use "non-lynx habitat for travelling between patches of boreal forest"; thus, the assertion that the Project area does not contain preferred lynx habitat does not suffice to foreclose the possibility of irreparable injury to lynx, as Defendants assert, particularly considering the fact that the Project area is surrounded on three sides by Lynx Analysis Units, two of which contain FWS-designated critical habitat.  *Id.*; FS_492:004646.

Although not essential to the Court's findings or opinion, the Court observes the evidentiary sandbagging effect Defendants' apparent non-compliance with the ESA places on plaintiffs seeking injunctive relief for ESA violations.  Defendants' underdeveloped cumulative effects analyses for the grizzly bear and so-called

21

"biological assessment" for the lynx deprive Defendants, the public, and the Court of sufficient information on which to conclude those species will not be jeopardized by the Ripley Project, while Defendants rely on the information vacuum of their own making to refute Plaintiff's assertions of likely irreparable injury to those species.  The ESA places the burden on *Defendants* to prove that their actions will not jeopardize an endangered or threatened species, 16 U.S.C. § 1536(b); a plaintiff should not be forced to bring its own biological opinion to court to hold Defendants to that burden on the irreparable harm prong of the *Winter* test.  *See Cottonwood Env't L. Ctr.*, 789 F.3d at 1091 ("[E]stablishing irreparable injury should not be an onerous task for [ESA] plaintiffs.").

Michael Garrity, the Executive Director of Plaintiff Alliance for the Wild Rockies, submitted a declaration in support of the instant motion describing his and Plaintiff's members' interests.  (Doc. 50-1.)  The declaration asserts that "Alliance's members and I intend to continue to use and enjoy the lands within the Project analysis areas, frequently and on an ongoing basis in the future[,]" and the Ripley Project "will harm Plaintiff's members ability to view, experience, and utilize the areas in their undisturbed state."  (*Id.* ¶ 8–9.)  In particular, "[l]ogging, burning, road-building, road use, and road reconstruction" threatens injury to Mr. Garrity's and Alliance's members' "esthetic, recreational, scientific, spiritual, vocational, and educational interests in the area and the wildlife in that area,

including grizzly bears, lynx, mature forests and other wildlife species." (*Id.* ¶ 10.)
The declaration emphasizes that "the displacement of grizzly bears during the 25-year Project duration may cause grizzlies to avoid the area for generations afterward since this type of avoidance behavior is a learned behavior that is passed on to cubs[.] Therefore, if the Project is implemented, grizzly bears may not occur in the Project area again during the lifetimes of our members." (*Id.* ¶ 13.)

Plaintiff has shown irreparable harm to its members' recreational and aesthetic interests, which depend in part upon the health of the grizzly bear and lynx populations, stemming from the irreparable harm to those listed species. *Nat'l Wildlife Fed'n*, 886 F.3d at 822. Defendants argue that Plaintiff's assertions of harm are insufficiently tailored to the portions of the Project that were scheduled to begin in 2022, such as the two already-awarded timber sales and non-commercial fuel reduction activities. (Doc. 55 at 14–15.) To the extent Defendants' argument is construed as attacking the sufficiency of injury to a plaintiff's use or interest in use of a project area in its undisturbed state for wildlife viewing, this Court has rejected such arguments as inconsistent with Ninth Circuit case law and will do so again in this case. *Native Ecosystems Council v. Marten*, 334 F. Supp. 3d 1124, 1132–33 (D. Mont. 2018). To the extent the argument is construed as an attack on the causal link between Project activities set to begin in 2022 and Plaintiff's interests (Doc. 55 at 15 ("Indeed, the two awarded sales and

the non-commercial fuels reduction activities are all targeted in these areas that already have heavy human use.")), the argument fares no better. A plaintiff must show that the requested injunction would forestall irreparable harm but need not show that the action sought to be enjoined is the exclusive cause of the injury, particularly where effects on listed species from individual agency actions "cannot be cleanly divorced from the effects" of broader operations, because "[l]isted species are exposed to the combined operations of the entire system." *Nat'l Wildlife Fed'n*, 886 F.3d at 819–20.[2]  Plaintiff has satisfied this causation requirement.

Defendants' final argument against Plaintiff's assertion of irreparable harm—that Plaintiff unduly delayed filing the instant motion—is meritless. (Doc. 55 at 16–17.)  Plaintiff filed the instant motion a mere nine days after Defendants filed notice with the Court that new road construction and timber harvest activities were expected to begin on or after June 1, 2022. (Docs. 48, 49.)  Defendants assert

---

[2] The Court notes that at the hearing on the present motion, the parties expressed willingness to confer concerning the scope of an injunction, particularly as it relates to 396 acres of noncommercial activities for which USFS received federal funding that will expire by the end of 2022, but that Plaintiff did not have sufficient information about those activities to represent that those activities should be excluded from the injunctive relief it seeks. (Doc. 59 at 28–30, 44, 48.) Although the Court finds that Plaintiff has established a likelihood of irreparable harm sufficient to enjoin the Ripley Project's activities in their entirety pending resolution of this litigation, the Court encourages the parties to confer and move to modify the injunction as appropriate to the extent that further disclosure of information between the parties reveals that specific activities scheduled to begin during the pendency of this litigation would not irreparably harm Plaintiff's interests.

that project activities could have begun as early as 2021, and that Plaintiff's

counsel was notified in November 2021 that road construction and timber harvest

activities *could* begin as soon as June 1, 2022 (Doc. 55 at 16), implying that

Plaintiff could have sought preliminary injunctive relief sooner, but Defendants'

*first* argument against Plaintiff's assertion of imminent irreparable harm is that

"none of the on-the-ground activities . . . will occur until at least July 5, 2022."

(Doc. 55 at 12.)  Defendants do not acknowledge the tension between their

arguments that activities *confirmed* to begin within three months of Plaintiff's

motion are insufficiently imminent to warrant injunctive relief and that Plaintiff

should have filed a much earlier motion based on notification of *possible* project

activities beginning more than seven months in the future.  Plaintiff's prompt filing

of the instant motion after notification that Defendants would move forward with

road construction and timber harvest activities despite the pendency of this

litigation supports rather than undermines the assertion of irreparable harm.  *See*

*Native Ecosystems Council*, 334 F. Supp. 3d at 1133 (holding that "delay of

months" did not undermine assertion of imminent irreparable harm).

### III.    Balance of Equities and the Public Interest

"There is no question, as firmly recognized by the Supreme Court, that the

ESA strips courts of at least some of their equitable discretion in determining

whether injunctive relief is warranted."  *Cottonwood Env't L. Ctr.*, 789 F.3d at

1090.  In particular, the third and fourth *Winter* factors—the balance of equities

and the public interest—"always tip in favor of the protected species."  *Id.* at 1091.

As discussed above, Plaintiff has proven a likelihood of success on the merits and

likelihood of irreparable harm on its ESA claims concerning the grizzly bear and

the Canada lynx.  Accordingly, preliminary injunctive relief is warranted.

Defendants dispute that this rule should apply "where the alleged harms are

speculative or there are questions about the effectiveness of the requested remedy

in preventing the alleged harm."  (Doc. 55 at 17.)  For the reasons discussed above

concerning Plaintiff's establishment of a likelihood of irreparable injury,

Defendants have not demonstrated that either of those purported exceptions applies

here.

Intervenors, relying primarily on cases involving non-ESA claims, argue that

harms that would flow from the injunction Plaintiff seeks—namely economic

impacts to companies involved with the Project's timber sales and to the broader

Lincoln County community and forest health and wildfire concerns—outweigh the

"speculative harm to AWR from Project implementation."  (Doc. 54 at 22–28; *see*

*also* Doc. 55 at 18–27 (describing public interest in these goals and others,

including infrastructure protection and the opportunity to use an expiring federal

grant).)  However, as the Ninth Circuit has explained, economic harm resulting

from temporary delay of a project can be mitigated in part once a plaintiff's claims

are resolved, and the proportional economic harm of temporary injunctive relief in this case is particularly diminished because of the Project's 25-year duration. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765–66 (9th Cir. 2014). And although preventing catastrophic wildfire undoubtedly is a goal in the public interest, Plaintiff has set forth significant evidence in the administrative record calling into question the imminence of that concern in the Ripley Project area, specifically. (Doc. 50 at 6–10.) The Project's 25-year duration, and the relatively modest delay resulting from a preliminary injunction, further undercuts the urgency Intervenors assign to wildfire mitigation as a basis for allowing the entire Project to proceed while this litigation is pending.

## IV.   Bond

Defendants assert that Plaintiff should be required to post a compensatory security bond prior to the issuance of injunctive relief. (Doc. 55 at 27–28.) The Court will not require Plaintiff to post a bond. "The court has discretion to dispense with the security requirement . . . where requiring security would effectively deny access to judicial review[,]" and "special precautions to ensure access to the courts must be taken where Congress has provided for private enforcement of a statute." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985). Moreover, Plaintiff's

strong showing of likelihood of success on the merits "tips in favor of . . . no bond at all." *Id.*  To the extent Defendants raise concerns about the loss of the time-limited $600,000 federal grant for non-commercial fuels reduction work (Doc. 55 at 28), the Court again encourages the parties to confer concerning the scope of the preliminary injunction as to that work and file any appropriate motions. *See supra*, n.2.

## CONCLUSION

IT IS ORDERED that Plaintiff's motion (Doc. 49) is GRANTED. Defendants are enjoined from implementing the Ripley Project until this case has reached a decision on the merits.

DATED this 25th day of May, 2022.

Dana L. Christensen, District Judge
United States District Court