IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV-21-105-M-DLC-KLD |
| Plaintiff, | |
| vs. | |
| NATHAN GASSMAN, District Ranger, Kootenai National Forest, Libby Ranger District; CHAD BENSON, Forest Supervisor, Kootenai National Forest; KEITH LANNOM, Deputy Regional Forester, U.S. Forest Service Region One; U.S. FOREST SERVICE; and U.S. FISH & WILDLIFE SERVICE, | FINDINGS AND RECOMMENDATION |
| Defendants. | |
| and | |
| AMERICAN FOREST RESOURCE COUNCIL; LINCOLN COUNTY; and KOOTENAI FOREST STAKEHOLDERS COALITION, | |
| Intervenor-Defendants | |

Plaintiff Alliance for the Wild Rockies ("Alliance") brings this action

against Defendants Nathan Gassman, Chad Benson, Keith Lannom, the United

States Forest Service, and the United States Fish and Wildlife Service (collectively

"Defendants") challenging the approval of the Ripley Project ("Project") in the Kootenai National Forest. Alliance's Amended Complaint alleges that Defendants' approval of the Project violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, Executive Order 11644, the Travel Rule, 36 C.F.R. § 212.55, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531. (Doc. 4, at 2).  This matter comes before the Court now on  Alliance's Motion for Summary Judgment (Doc. 25), the Federal Defendants' Cross-Motion for Summary Judgment (Doc. 31), and a Cross-Motion for Summary Judgment by Intervenor-Defendants American Forest Resource Council, Lincoln County, and Kootenai Forest Stakeholders Coalition ("Intervenor Defendants") (Doc. 35).[1]

On May 25, 2022, presiding United States District Court Judge Dana L. Christensen entered an order granting Alliance's motion for a preliminary injunction and enjoining Defendants from implementing the Project until Alliance's claims have been resolved on the merits (Doc. 60). On September 9, 2022, the Court heard oral argument on all pending motions. The Court

---

[1] Montana Department of Natural Resources & Conservation ("Montana DNRC") has filed an Amicus Curiae Brief advocating for the Project to move forward as planned (Doc. 39), and the Yaak Valley Forest Council has submitted an Amicus Curiae Brief in support of Alliance's Amended Complaint. (Doc. 42).

recommends that the parties' cross-motions for summary judgment be granted in part and denied in part as set forth below.

## I.   **Background**

The Project area consists of 29,180 acres located in Lincoln County, Montana, in the Libby Ranger District of the Kootenai National Forest. FS_613:007443-44.[2] The Project area is located to the east of Libby, Montana and Highway 2, and south of the Kootenai River. FS_613:00744. Due to its proximity to the town of Libby, the area experiences regular recreational use, including both motorized and non-motorized activities. FS_613:007446.

Ownership within the Project area is diverse, and includes a mixture of Forest Service lands, private lands, and lands that are managed by other federal or state agencies. FS_613:007510, 007444.  More specifically, the Project area includes 18,810 of National Forest System lands; 215 acres of Corp of Engineer lands; 2,475 acres of Montana DNRC lands; 3,075 acres of Stimson Lumber Company lands; 60 acres of Weyerhaeuser timber company lands, and 4,545 acres of other private lands. FS_613:007510. Roughly 44 percent of the National Forest System land within the Project area is within the wildland urban interface. FS_613:007535.

---

[2] Citations to the administrative record will consist of (1) an "FS" prefix for the Forest Service portion of the record, or an "FWS" prefix for the United States Fish & Wildlife Service portion; (2) the exhibit number; and (3) the bates page number.

The Forest Service estimates that the Project will take 25 years to complete. FS_613:007459. The Project includes 10,854 acres of commercial logging; commercial-logging related burning, mastication, and site preparation on 5,334 acres; pre-commercial logging on 829 acres; and tree-cutting and burning on 715 acres. FS_613:007461-65, FS_614:007762-64.

The Project also includes new construction of 13 miles of permanent roads and 6 miles of temporary roads; maintenance or reconstruction on 93 miles of existing roads; addition of 11 miles of undetermined roads to the National Forest Road System; "storage" of 23 miles of roads, including 5 miles of already "stored" roads that will be re-opened for the Project; reconstruction of 12 miles of existing National Forest roads and new construction of one mile of road in order to allow the State to conduct logging activities on State land in the Project area; and re-opening of 35 miles of closed, stored, or barriered roads to public motorized use for gathering firewood. FS_614:007763; FS_613:007467-7474.

The stated goals of the Project are to promote resilient vegetation conditions; reduce the potential for high intensity wildfire; improve big game winter range conditions; improve habitat conditions for certain wildlife; provide a safe and efficient transportation system; provide a variety of wood products to the American public and contribute to the local economy, and develop motorized and non-motorized recreation opportunities. FS_614:007761.

Pursuant to its obligations under NEPA, the Forest Service issued a scoping notice for the Project in July 2019. FS_613:007457; FS_317:002820-2882. The scoping comment period ended in August 2019, and on May 1, 2020, the Forest Service released a draft Decision Notice along with an April 2020 Environmental Assessment. FS_614:007778. In April 2021, the Forest Service issued an Updated Environmental Assessment (EA) containing a Finding of No Significant Impact. FS_613:007434-7757. On May 17, 2021, the Forest Service issued its Final Decision Notice implementing the Modified Proposed Action as described in the Modified Proposed Action and Alternatives section of the EA. FS_614:007758-80; FS_613:007459.

The Kootenai National Forest operates under the 2015 Revised Land Management Plan ("Forest Plan"), which guides the programs, practices, uses, and site-specific projects that occur. FS_613:007448; FS_930:024024-024212; Doc. 30-4. The 2015 Forest Plan incorporates the Forest Service's 2011 Forest Plan Amendment for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones ("Access Amendments"). FS_897:021284; FS_930:024038. Within the Cabinet-Yaak Grizzly Bear Recovery Zone, the Access Amendments set specific numeric limits on total motorized route density and open motorized route density, and require a specific numeric minimum of secure habitat. FS_897:021294, 021300, 021349. The Access Amendments also set

standards for linear miles of open and total road for areas outside the recovery zones that are experiencing recurring use by grizzly bears, referred to as Bears Outside of Recovery Zones ("BORZ"). FS_930:024038. For BORZ areas, the Access Amendments prohibit any net increase in total roads and prohibits any net increase in open roads. FS_897:021294, 021351.

The April 2021 Project EA states that the Project area is not within a Grizzly Bear Recovery Zone, and no portion of the Project area is designated as a BORZ. FS_613:7534, 7674. The Project area is, however, approximately two miles from the Cabinet-Yaak Grizzly Recovery Zone, and less than one mile from the Cabinet Face BORZ. FS_117:000318. Pursuant to Section 7 of the ESA, the Forest Service engaged in consultation with the FWS regarding the effects of the Project on grizzly bears. FS_125:000398. In May 2021, FWS issued a Biological Opinion concluding "that the effects of the proposed Ripley project on grizzly bears are not likely to jeopardize the continued existence of the grizzly bear." FS_125:000395. A Forest Service Wildlife Specialist Report for the Project concludes that lynx would not be present in the action area and that the Project would therefore have no effect on the lynx. FS_531:005077-79.

Alliance commenced this action on September 21, 2021 (Doc. 1), and the Amended Complaint it filed on October 12, 2021 asserts five claims for relief. (Doc. 4). Claim one alleges that the Forest Service's determination in January 2020

6

and May 2021 that the Project area does not satisfy BORZ criteria violates the ESA, NEPA and APA. (Doc. 4, at ¶¶ 123-126). Claim two alleges that the agencies' analysis of the Project's impact on grizzly bears was insufficient under NEPA and the ESA. (Doc. 4, at ¶¶ 127-135). Claim three alleges that the Project EA does not provide the road analysis required by the Travel Management Rule and NEPA. (Doc. 4, at ¶¶136-146). Claim four alleges that the Forest Service's refusal to prepare a full Environmental Impact Statement (EIS) for the Project violates NEPA and the APA. (Doc. 4, at 147-156). Claim five alleges that the Forest Service's failure to prepare a Biological Assessment for lynx for the Project violates the ESA. (Doc. 4, at ¶¶ 157-163.

## II.   **Legal Standards**

### A.   **NEPA**

NEPA is a procedural statute requiring government agencies to "take a hard look" at the "environmental consequences" of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). An agency adequately conducts a "hard look" "by providing a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a proposed action. *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)). NEPA "does not mandate particular results", but "prescribes

the necessary process" agencies must follow to identify and evaluate "adverse environmental effects of the proposed action." *Robertson*, 490 U.S. at 350. The court's review is complete if upon review of the record the court is satisfied the agency took a "hard look" at the proposed action's environmental impacts. *Idaho Conservation League v. Mumma*, 965 F.2d 1508, 1519 (9th Cir. 1992).

NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA's implementing regulations provide that an agency may prepare an EA to determine whether a proposed federal action will have a significant impact and to determine whether preparation of an EIS will be necessary. 40 C.F.R. § 1508.9. An EA is a "concise public document" that include[s] brief discussions of the need for the proposal, or alternatives as required by [42 U.S.C. § 4332(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. §§ 1508.9(a), (b). If the agency concludes in the EA that there is no significant effect from the proposed project, the federal agency may issue a finding of no significant impact in lieu of preparing an EIS. 40 C.F.R. § 1508.9(a)(1); § 1508.13.

**B.    NFMA**

NFMA provides a two-tiered approach for forest planning and management. *2-Bar Ranch Limited Partnership v. United States Forest Service*, 996 F.3d 984,

986 (9th 2021). The first tier involves planning at the forest level through the Forest Service's development of a forest plan. *2-Bar Ranch Limited Partnership*, 996 F.3d at 986. "Forest plans are broad, programmatic documents that 'guide sustainable, integrated . . . management of the resources within the plan area in the context of the broader landscape.'" *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (quoting 36 C.F.R. § 219.1(b)). The second tier involves implementation of the forest plan to individual site-specific projects, which "must be consistent with the forest plan." *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (internal quotations omitted); 16 U.S.C. § 1604(i).

"It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005). The Forest Service must show that a project it undertakes complies with the governing forest plan. *Native Ecosystems Council*, 418 F.3d at 961 (citing 16 U.S.C. § 1604(i)). "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management." *Alliance for the Wild Rockies v. United States Forest Service*, 907 F.3d 1105, 1110 (9th Cir. 2018). The Court will award "substantial deference" to the "Forest

Service's interpretation and implementation of its own forest plan." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

### C.    ESA

Forest Service actions must comply with the ESA. Congress enacted the ESA to protect and conserve endangered and threatened species and the ecosystems they depend upon. 16 U.S.C. §1531(b). The Supreme Court has deemed the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174, 180 (1978). The hallmark of the ESA is its solemn resolve that endangered species "be afforded the highest of priorities" with the goal to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority*, 437 U.S. at 174, 184.

The ESA and its implementing regulations require agencies proposing actions to engage in consultation with the FWS to ensure the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2). To effectuate consultation, the ESA requires action agencies to "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." 16 U.S.C. §1536(c)(1). After consultation is completed between the FWS and the

action agency, the FWS will issue a Biological Opinion "detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the [FWS] shall suggest" reasonable and prudent alternatives the action agency can employ in implementing the proposed action. 16 U.S.C. § 1536(b)(3)(A).

### D.    Summary Judgment

Courts review agency decisions under NFMA, NEPA, and the ESA by applying the standard of review set forth in the APA. *Center for Biological Diversity v. Zinke*, 868 F.3d 1054, 1058 (9th Cir. 2017); *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1065 (9th Cir. 2004). The Rule 56 summary judgment standard is therefore modified in cases requiring review of an administrative record pursuant to the APA; courts are required to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" or "without observance of procedure required by law." *Center for Biological Diversity*, 868 F.3d at 1057; 5 U.S.C. § 706(2)(A); 5 U.S.C. § 706(2)(D).

The APA standard of review is deferential. A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs.*, 463 U.S. at 43. A court may not accept an agency's post hoc rationalizations for its action. *Motor Vehicle Mfrs.*, 463 U.S. at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50.

## III. **Discussion**

Alliance alleges the Forest Service's approval of the Project was arbitrary and capricious, in violation of NEPA, NFMA, the ESA, the Travel Management Rule, and the APA.

### A. **BORZ Areas (Claim I)**

In its first claim for relief, Alliance asserts that the Forest Service denied BORZ designation to the Project area in January 2020 and/or May 2021 in violation of the ESA, NEPA and APA. (Doc. 4, at ¶¶ 123-126).

As part of the analysis leading up to adoption of the 2011 Access Amendment that is part of the Forest Plan, the agencies developed a process to identify BORZ areas based on the number and type of observations and the use of

an objective mapping unit boundary to help define the areas.[3] FS_461:004183.

Delineation of a BORZ area is generally based on three or more credible

observations within the last 16 years in individual 6th order watershed Hydrologic

Unit Codes ("HUCs"). FS_461:004183. In addition to grizzly bear data,

considerations in selecting HUCs for inclusion into a BORZ area include proximity

to the recovery area boundary, recurring use in adjacent HUCs, suitable habitats,

and the importance of identified and potential linkages zones. FS_461:004192. The

agencies also identified potential exceptions to inclusion of entire 6th order HUCs,

such as areas with high concentrations of private lands or recreational residences

on Forest Service lands where it has been determined that grizzly bear use should

be discouraged, and HUCs that are split by major highways that include little or no

observational data or habitat on one side of the highway. FS_461:004912. The

agencies applied the BORZ mapping criteria to the data available in 2011 and

designated seven BORZ, two of which are the West Kootenai BORZ and the

Cabinet Face BORZ. FS_461:004193-201.

The Project area includes portions of the Cedar Creek-Kootenai River sub-

watershed, the Mitchell Creek-Kootenai River sub-watershed, the Lower Fisher

---

[3] This process is described in a 2011 agency memorandum titled *A Review of Grizzly Bear Recurring Use Areas Associated with the Selkirk and Cabinet-Yaak Ecosystems*, authored by Lydia Allen ("Allen Report"), and the criteria used to delineate BORZ areas are described in Appendix A to the report. FS_461:004182-201.

River sub-watershed, and the Lower Libby Creek sub-watershed. FS_122:000361.
The Cedar Creek-Kootenai River sub-watershed was added to the West Kootenai
BORZ in 2019, but the portion of that watershed that falls within the Project area
does not include any National Forest System land. FS_122:000361, 368. The
Cabinet Face BORZ includes the portion of the Lower Libby Creek sub-watershed
that lies on the west side of U.S. Highway 2, but it does not include the portion of
the Lower Libby Creek sub-watershed east of Highway 2, which is within the
Project area. FS_122:000362, 368.

The Access Amendments that are part of the Forest Plan require annual
review of whether grizzly bear recurring use monitoring data outside of designated
BORZ areas supports the possible inclusion of a sub-watershed into a designated
BORZ area. FS_122:000360; FS_897:021352. Specifically, the Access
Amendments contain a reporting requirement stating that the Forest Service "shall
coordinate with State and federal agency biologists to collect credible grizzly bear
observations that occur outside of the Recovery Zone boundaries and add this
information to the 6th-order HUC database for inclusion into the annual report" due
every April. FS_897:021352.

On January 15, 2020, agency biologists conducted an annual review of
grizzly bear sightings using the BORZ criteria set forth in Appendix A to the Allen
Report. FS_472:004401-14. The discussion regarding the Lower Libby Creek sub-

watershed centered on the portion of the HUC east of Highway 2. FS_472:004406.
The annual review found that "currently recurring use on [National Forest System]
land east of highway 2 does not meet criteria, so will not add that portion of the
HUC in at this point in time" and stated the agencies would "[r]elook closely at
end of 2020." FS_472:004406-07. The annual review also found that the portions
of the Mitchell Creek-Kootenai River sub-watershed and Lower Fisher River sub-
watershed located in the Project area did not satisfy the BORZ criteria.
FS_472:004405, 4408.

On March 18, 2021, agency biologists conducted another annual review of
grizzly bear sightings using the BORZ criteria. FS_1038:028499-513. With respect
to the Lower Libby Creek sub-watershed, the annual review again found that
"currently recurring use" on National Forest System land east of Highway 2 did
not meet the criteria for inclusion in the Cabinet Face BORZ. FS_1038:028505-06.
And again, the annual review found that the portions of the portions of the Mitchell
Creek-Kootenai River sub-watershed and Lower Fisher River sub-watershed
located in the Project area did not satisfy the BORZ criteria. FS_1038:028504,
0285506, 028507.

Consistent with these two annual reviews,[4] the Project EA states that the Project area is not located within any BORZ areas. FS_613:007559. Consequently, the Project EA does not apply the Access Amendments' BORZ standards, which would have prohibited the Project from resulting in any net increase in permanent linear miles of total and open roads. FS_897:021294, 021351. The Project is expected to result in a "net increase in open road density post-project for those roads legally open to public use." FS_1024:029236; FS_613:007542.

As Alliance thus frames it, the primary issue raised in its first claim for relief "is whether the agencies may make a non-BORZ designation with no public process under NEPA and no ESA consultation when that non-BORZ designation has the effect of allowing increases in road density that may affect grizzly bears, while, in contrast, a positive BORZ designation would trigger application of the Access Amendment and thereby prevent that increase in road density." (Doc. 43, at 11-12).

---

[4] Alliance contends these documents are not actually "annual reviews" and instead refers to them as "non-BORZ designations" or "non-BORZ designation documents" (See e.g. Doc. 26, at 10; 43, at 18). Alliance claims the documents are not "annual reviews" because they do not appear to have been conducted on an annual basis following implementation of the 2011 Access Amendments, and the "annual report" required by the Access Amendments is a different document. (Doc. 43, at 18-21). The Court will nevertheless refer to the documents as "annual reviews" simply because of their shared title: "Annual Review of Grizzly Bear sightings outside the Selkirk and Cabinet-Yaak Recovery Zones Idaho Panhandle NF, Kootenai NF, and Lolo NF." FS_472:004401; FS_1038:028499.

Alliance advances four main arguments in support of its first claim for relief. First, Alliance argues the January 2020 and March 2021 annual review findings that no sub-watersheds in the Project area satisfy the BORZ criteria are "agency action" that require Section 7 consultation under the ESA. (Doc. 26, at 13-19). Second, Alliance argues that the January 2020 and March 2021 annual reviews are "major federal actions" under NEPA, thus requiring the Forest Service to prepare an EIS for each annual review. (Doc. 26, at 19-24). Third, Alliance maintains that the Project EA impermissibly tiers to the January 2020 and March 2021 annual reviews without providing the requisite NEPA analysis. (Doc. 26, at 24-26). Finally, and alternatively, Alliance argues that instead of remanding to the agencies for the procedural remedies requested above, the Court should engage in a substantive review under the APA of the 2021 annual review's findings that no sub-watersheds in the Project area satisfy the BORZ criteria and set those findings aside as arbitrary and capricious.

Defendants disagree on all fronts, and counter with the threshold argument that Alliance failed to exhaust its administrative remedies as to the statutory violations alleged in its first claim for relief.

### 1.   Exhaustion of Administrative Remedies

To challenge an agency action in federal court, a plaintiff must first exhaust all available administrative remedies. *Darby v. Cisneros* k 590 U.S. 137, 146-47

(1993); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006).

"The purpose of the exhaustion doctrine is to permit administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010).

The Department of Agriculture, of which the Forest Service is a part, requires a person to exhaust all administrative appeal procedures before bringing an action in court. 7 U.S.C. § 6912(e). Forest Service regulations governing project-level pre-decisional administrative review are found in 36 C.F.R. Part 218. These regulations establish an objection process pursuant to which "objections will be accepted only from those who have previously submitted specific written comments regarding the proposed project during scoping or other designed opportunity for public comment...." 36 C.F.R. § 218.7(c)(2)(i). The public comment period for an EA includes during scoping or any other instances where the responsible official seeks written comments. 36 C.F.R. § 218.5(a). The regulations further provide that "[i]issues raised in objections must be based on previously submitted specific written comments regarding the proposed project or activity and attributed to the objector, unless the issue is based on new information that arose after the opportunities for comment." 36 C.F.R. § 218.8(c). The burden is on the objector to demonstrate the connection between issues raised in

18

objections and previously submitted written comments. 36 C.F.R. § 218.8(c). The party making an objection must provide, among other things, "[a] description of those aspects of the proposed project addressed by the objection" and "if applicable, how the objector believes the environmental analysis or draft decision specifically violates law, regulation, or policy." 36 C.F.R. § 218.8(d)(5).

As documented in the Project EA, planning efforts for the Project started during the summer of 2017 and the Forest Service later provided the public with opportunity to comment on the Project. FS_613:007457-58. In a section addressing the grizzly bear, the July 2019 Scoping Notice states:

> The project is not within a recovery zone, nor is it within any reoccurring use area (Bears Outside Recovery Zone polygons). Grizzly bears have moved through the project area, and the project would not reduce the ability to provide connectivity between recovery zones.

FS_317:002865. Defendants argue this disclosure was sufficient to put Alliance on notice that the Project area did not satisfy the BORZ criteria. But in its written comments on the July 2019 Scoping Notice, Alliance did not specifically raise any BORZ issues or claim that the Project area met the BORZ criteria.[5] FS_293:002753-58. Alliance first notified the Forest Service of the BORZ issues

---

[5] Alliance did not raise the BORZ issue in any of its earlier written comments either. FS_043:000116-18 (September 2017); FS_63:000173-74 (November 2018).

raised in its first claim for relief in its June 2020 objections to the April 2020 EA.

FS_643:007955. Alliance objected as follows:

> The project area is not within a BMU or BORZ and grizzly bear presence here is a recent occurrence, with documentation by three male grizzly bears over the past 5-7 years. (EA p. 123.)

> By law if there is documentation of 3 or more grizzly bears the area shall be included in a BORZ. The BORZ has not been created therefore the project is in violation of the NFMA, NEPA, the Kootenai Forest Plan, the APA, and the ESA.

FS_643:007955. Because this objection is not based on any previously submitted specific written comments, Defendants argue, Alliance has not satisfied the regulatory requirements for exhausting its administrative remedies.

Alliance's response is twofold. First, it points out that the January 2020 and March 2021 annual review findings that are the subject of its first claim for relief had not been issued when it submitted its written comments on the July 2019 Scoping Notice. (Doc. 43, at 35). Alliance has carefully pled its first claim for relief one challenging the January 2020 and March 2021 annual review findings, not the Project or the Forest Plan. Whether this is ultimately a viable claim for relief is discussed below. But because, as pled, Alliance's claim is based on January 2020 and March 2021 annual review findings, it could not have raised any claims related to those findings when it submitted its written comments to the Project's 2019 Scoping Notice.

Second, Alliance argues the agencies did not disclose the fact that three radio-collared bears had been using the Project area on a recurring basis over the past 5-7 years, which is an important factor in delineating BORZ areas, until the initial April 2020 EA. (Doc. 43, at 35). As set forth in the Allen Report, BORZ delineation is "generally based on three or more credible observations within the last 16 years" with "radio collar documentation being given a high priority." FS_461:004183, 004192. The April 2020 EA specifically disclosed that "[t]he project area is not within a BMU or BORZ and grizzly bear presence here is a recent occurrence, with documentation by three male grizzly bears over the past 5-7 years." FS_612:007236. Alliance notified the Forest Service of the BORZ issues it is now seeking to litigate at its next public comment opportunity, in its June 2020 objections to the April 2020 EA.  FS_643:007955.

While it is true, as the Forest Service is quick to note, that the July 2019 Scoping Notice indicated generally "[g]rizzly bears have moved through the project area," it did not disclose the number of credible observations during any particular period. FS_317:002865. Because the Forest Service disclosed that information for the first time in the initial April 2020 EA, and Alliance promptly objected at the first available opportunity, the objection is not waived. See *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1034 (9th Cir. 2018) (citing 36 C.F.R. § 218.8(c) and concluding that the plaintiff did not waive an objection that

21

it raised at the first available opportunity following the Forest Service's disclosure of new information regarding an aspect of the project).

2.     Section 7 ESA Consultation

Alliance takes the position that the January 2020 and March 2021 annual review findings that no sub-watersheds in the Project area satisfy the BORZ criteria constitute "agency action" requiring Section 7 consultation under the ESA. (Doc. 26, at 13-19).

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Because the ESA provides such a remedy, "final agency action is not required to invoke jurisdiction under the ESA's citizen suit provision." *Center for Biological Diversity v. U.S. Dept. of Housing and Urban Development*, 241 F.R.D. 495, 503 (D. Ariz. 2006) (citing *Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005), abrogated on other grounds as recognized in *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1089 (9th Cir. 2015)). Alliance's claim for failure to consult under Section 7 of the ESA arises under the ESA's citizen suit provision. See *Western Watersheds Project v. Kraaayenbrink*, 632 F.3d 472 (9th Cir. 2011)

Section 7 of the ESA requires a federal agency to consult with FWS when it takes "any agency action" that "may affect" a listed species in an area where a

22

listed species "may be present." 16 U.S.C. § 1536(b), (c). ESA consultation is required "to insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species…." 16 U.S.C. §1536(a)(2). Section 7(a)(2) defines agency action as "any action authorized, funded or carried out by" a federal agency. 16 U.S.C. § 1536(a)(2).

The Ninth Circuit has held "[t]here is little doubt that Congress intended agency action to have a broad definition in the ESA" and follows "the Supreme Court's lead by interpreting its plain meaning in conformance with Congress's clear intent." *Karuk Tribe of Cal. v. U.S. Forest Service*, 681 F.3d 1006, 1020 (9th Cir. 2012). *Karuk Tribe* established a two-part test that guides the court's "agency action" inquiry. *Karuk Tribe*, 681 F.3d at 1020. First, the court asks "whether a federal agency affirmatively authorized, funded, or carried out the underlying activity. *Karuk Tribe*, 681 F.3d at 1020. Second, the court determines "whether the agency had some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe*, 681 F.3d at 1020.

Alliance argues both parts of the *Karuk Tribe* test are satisfied here. Alliance characterizes the January 2020 and March 2021 annual review findings as "non-BORZ designations," and contends they satisfy the first part of the *Karuk*

*Tribe* test because they were authorized, funded, and carried out by two federal agencies. Alliance argues the second part of the *Karuk Tribe* test is also satisfied because the agencies had the discretion to increase grizzly bear protections by issuing BORZ designations, or withholding grizzly bear protections by issuing non-BORZ designations. (Doc. 26, at 15).

As argued by Intervenor-Defendants, however, the first prong of the *Karuk Tribe* test additionally requires some affirmative agency action or authorization. *Karuk Tribe* holds that "[a]n agency must consult under Section 7 only when it makes an 'affirmative' act or authorization." *Karuk Tribe*, 682 F.3d at 1021 (citing *Western Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006)). *Matejko* held that the ESA "confers authority and responsibility on agencies to protect listed species when the agency engages in *affirmative* action that is both within the decisionmaking authority and unconstrained by earlier agency commitments. *Matejko*, 468 F.3d at 1108 (quoting *Defenders of Wildlife v. EPA*, 420 F.3d 946, 967 (9th Cir. 2005) (emphasis in original). Thus, while "agency action" under the ESA is construed broadly, an affirmative agency action is still necessary to trigger ESA Section 7 consultation.

Here, the January 2020 and March 2021 annual reviews cited by Alliance do not constitute "agency action" within the meaning of the ESA. Rather, the annual reviews of monitoring data implement a process required of the Forest Service by

FWS. FS_896:021168. When the Forest Service consulted with FWS on the Access Amendments in 2011, FWS issued a biological opinion approving the Forest Plan amendments with an incidental take statement for conforming actions. FS_896:021162-68. As part of the incidental take statement, FWS required the Forest Service to comply with certain monitoring and reporting requirements. FS_896:021168. Consistent with those requirements, biologists from the Forest Service and FWS reviewed data related to grizzly bear sightings in January 2020 and March 20201 for inclusion in the Forest Service's annual reports to FWS. FS_896:021168.

The January 2020 and March 2021 annual reviews Alliance relies on compared available bear recurring use monitoring data in particular sub-watersheds to the established BORZ criteria and did not result in any change to previously established BORZ designations within the Project area. If at some point during the life of the project the Forest Service determines that any of the watersheds that overlap the Project area "meet the definition of recurring use," then Section 7 "consultation would be reinitiated at that time." FS_122:00361. See also FS_125:00398 ("Should any part of the Ripley action area meet the criteria to become part of a BORZ ... at any time during implementation, the Forest will need to reconsult on the Ripley action; and land management standards for BORZ as

defined within the Forest Plan will become the overarching management standards.").

The primary case that Alliance relies on to support its argument that the January 2020 and March 2021 annual reviews constitute agency action triggering ESA consultation is distinguishable because it involved affirmative agency action. In *Native Ecosystems Council v. U.S. Forest Service*, 866 F.Supp.2d 1209 (D. Idaho 2012), the Forest Service adopted a map amending habitat protections for the lynx. Because the Forest Service did not consider whether adoption of the map would jeopardize the lynx or its habitat, the court held that the agency was required to consult with FWA under Section 7 of the ESA before adopting it. *Native Ecosystems Council,* 866 F.Supp.2d at 1232-33. Unlike the map in *Native Ecosystems*, which removed hundreds of thousands of acres of land designated as Lynx Analysis Units, the annual reviews at issue here did not result in any change to previously established BORZ designations within the Project area. In addition, unlike the map in *Native Ecosystems,* which did not undergo a NEPA analysis, the Forest Service designated the maps for existing BORZ areas in the 2011 Access Amendments and 2015 Forest Plan, both of which were subject to NEPA.

Here, BORZ areas were first established in 2004 as part of the original Access Amendments, and then re-evaluated and re-mapped as part of the ESA consultation and supplemental EIS for the 2011 Access Amendments.

26

FS_1053:027019, 027026. The BORZ mapping underwent ESA consultation at that time, and annually applying the most current monitoring data to examine whether a BORZ designation is appropriate is not an agency action triggering ESA consultation. Because Alliance has not demonstrated that the January 2020 and March 2021 annual reviews constitute "agency action" under the ESA, its first claim for relief fails to the extent it alleges a violation of the ESA's consultation requirements.

### 2.   NEPA and the APA

Alliance's first claim for relief also alleges that the agencies' January 2020 and March 2021 annual reviews violate NEPA and the APA. (Doc. 4, at 29). Focusing on its NEPA claim, Alliance argues that the BORZ findings are "major federal actions" under NEPA, thus requiring the Forest Service to prepare an EIS for each annual review.

Because NEPA does not expressly provide for judicial review, judicial review of Alliance's NEPA claims "is governed by the APA, which limits review to 'final agency action.'" *Environmental Defense Center v. Bureaus of Ocean Energy Management*, 36 F.4th 850, 867 (9th Cir. 2022) (quoting 5 U.S.C. § 704). Thus, "[i]n the NEPA context, the 'final agency action' required by the APA must also be a 'major federal action' under NEPA." *Audubon of Kansas Inc., v. United*

*States Department of Interior*, 568 F.Supp.3d 1167, 1183 (D. Kan. 2021) (quoting

*Karst Envtl. Educ. & Prot., Inc. v. E.P.A.*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).

a.     *Final Agency Action under the APA*

"Agency action is final and reviewable under the APA when two conditions

are met. *Environmental Defense Center*, 36 F.4th at 867. "First, the action must

'mark the consummation of the agency's decision-making process," meaning that

"it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520

U.S. 154, 177-78. "And second, the action must be one by which rights or

obligations have been determined, or from which legal consequences will flow."

*Bennett*, 520 U.S. at 178 (internal quotations omitted).

There is no dispute that the May 2021 Ripley Project Decision Notice

constitutes final agency action for purposes of the APA. (FS_614:00758-007780).

As discussed above, however, Alliance's first claim for relief is premised on the

January 2020 and March 2021 annual reviews. Alliance argues the annual reviews

satisfy both prongs of the *Bennett* test because: (1) they denied BORZ designation

for the portions of all watersheds that overlay National Forest lands within the

Project area, and; (2) as a direct consequence of the "non-BORZ designations," the

Forest Service was relieved of the burden of complying with the Access

Amendments. (Doc. 26, at 27).

28

Defendants take the contrary position that the annual reviews do not satisfy either prong of the *Bennett* test. The Court agrees with Defendants. First, the annual reviews do not mark the consummation of the agency's decision-making process. Annual monitoring and reporting of credible grizzly bear observations is an ongoing requirement of the Forest Plan.  FS_897:020103; FS_930:024037-38. The Ninth Circuit has held that monitoring and reporting activities carried out pursuant to a forest plan are interim advisory "steps leading to an agency decision, rather than the final action itself." *Ecology Center, Inc. v. U.S. Forest Service*, 192 F.3d 922, 925 (9th Cir. 1999). See also 36 C.F.R. § 219(a)(2) ("The responsible official shall develop a monitoring program for the plan area and include that in the plan. Monitoring information should enable the responsible official to determine if a change in plan components or other plan content that guide management of resources on the plan area may be needed.) Consistent with *Ecology Center*, and as the regulatory language above suggests, monitoring and reporting activities like those carried out by the biologists reviewing grizzly bear data "to see if any additional HUCs met the recurring use criteria," FS_1038:028499, do not mark the culmination of the agency's decision-making process.

Alliance nevertheless claims that the annual reviews made a "yes" or "no" agency decision for each watershed, and in doing so decided whether to include each watershed in a BORZ. (Doc. 43, at 28, citing FS_1038:028502-28513). The

annual reviews are stamped "final" and contain a table with headings titled

"Grizzly Bear Use Criteria Met? Yes or No?" and "Recurring Use Area Yes or

No." But the documents did not implement any change in BORZ designations for

any watershed in the Project area. FS_1038:028502-13. As explained by

Intervenor-Defendants, implementing a change in a BORZ designation would

require a Forest Plan amendment and reinitiation of ESA consultation. (Doc. 36, at

21 (citing 36 C.F.R. § 219.13 (discussing amendment of Forest Plans),

FS_125:000398 (discussing need for reinitiation of consultation in the event the

Forest Service were to modify BORZ areas), and FS_122.00361)). The annual

reviews are simply part of the Forest Plan's requirement to monitor and report on

grizzly bear observations. FS_897:021303.

Second, the annual reviews do not determine any legal obligations and no

legal consequences flow from the annual reviews' application of the BORZ criteria

under the circumstances. The annual reviews do not authorize or restrict any

specific action in the Project area. While Alliance claims that the annual reviews

relieved the Forest Service "of the burden of complying with" the Access

Amendments, the Forest Service has never been obligated to comply with the

Access Amendments' requirements within the Project area because no watershed

in the Project area has ever been designated as a BORZ area. The annual reviews

thus maintained the status quo for all watersheds in the Project area. As argued by

30

Defendants, the Project decision notice, not the annual review, is the final agency action that provides this Court with jurisdiction over any claim about the management of the National Forest System lands in the Project area. But Alliance's first claim for relief does not challenge the decision notice for the Project. Instead, it challenges the annual reviews, which are not final agency actions under the APA.

b.   *Major Federal Action under NEPA*

Alliance's first claim for relief fails for the additional reason that the annual reviews are not "major federal action" under NEPA. NEPA requires an agency to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The term "major federal action" is defined in NEPA's implementing regulations. 40 C.F.R. § 1508.1(q) (effective Sept. 14, 2020); 40 C.F.R. 1508.18 (superseded effective Sept. 14, 2020).

The parties disagree on whether the current or superseded NEPA regulations apply to Alliance's first claim for relief. The 2020 regulations apply "to any NEPA process begun after September 14, 2020." 40 C.F.R. § 1506.13 (2020). Because the Forest Service initiated scoping for the Project in July 2019, Defendants argue the 2020 regulations do not apply. (Doc. 46, at 16 n. 3). Alliance's first claim for relief is not based on the Project, however, but rather challenges the January 2020 and March 2021 annual review findings. Regardless of whether the current or prior

regulations apply, the analysis here is the same because both versions define the term "major federal action" in materially the same way. The regulations state that major federal actions "include projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures."40 C.F.R. 1508.1(q)(2); 40 C.F.R. § 15081.18(a). Relevant to Alliance's argument, the regulations further provide that major federal actions tend to fall within one of four categories, including:

> (ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.
>
> (iii) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

40 C.F.R. § 1508.1(q)(3)(ii),(iii). See also 40 C.F.R. § 1508.18(b)(2), (3).

Alliance argues that the January 2020 and March 2021 annual reviews constitute "major federal action" under both of these regulatory subsections. First, Alliance argues under subsection (ii) that the reviews are "official documents" prepared by the Forest Service and FWS upon which future agency actions will be based. Specifically, Alliance contends the documents' "non-BORZ designations allow the agencies to avoid compliance with the Forest Plan Access Amendment in future site-specific logging, roading, and mining projects – without any further

analysis of the impact of denying BORZ protections to those site-specific areas."

(Doc. 26, at 20). 40 C.F.R. § 1508.1(q)(3)(ii); 40 C.F.R. § 1508.18(b)(2).

Alternatively, Alliance maintains under subsection (iii) that the annual reviews

"implement a specific policy or plan," namely, the BORZ protections in the Forest

Plan Access Amendment. (Doc. 26, at 20). 40 C.F.R. § 1508.1(q)(3)(iii); 40 C.F.R.

§ 1508.18(b)(3).

Alliance's argument that the January 2020 and March 2021 annual reviews

are "major federal action" requiring compliance with NEPA procedures fails for

two main reasons. First, as discussed above, the annual reviews are not "agency

action" with the meaning of the ESA. Where, as is the case here, "there is no

'agency action' under what is probably the more liberal standard of the ESA, there

is no 'major federal action' under the more exclusive standard of NEPA." *Marbled*

*Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1999). See also *Grand Canyon*

*Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1022 (9th Cir. 2012) (citing

*Marbled Murrelet* and holding that where there is no "agency action" under the

ESA, there is no "major federal action" requiring compliance with NEPA

procedures).

Second, as argued by Intervenor-Defendants, the annual reviews of grizzly

bears sightings are not "major federal action" because they do not change the status

quo. The Ninth Circuit has held that "where a proposed federal action would not

change the status quo, an EIS is not necessary." *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990). See also *Idaho Conservation League v. Bonneville Power Administration*, 826 F.3d 1173, 1176-78 (9th Cir. 2016) (reaffirming that "the time for an EIS is when an agency undertakes a significant shift of direction in operating policy" and major federal action must change the status quo).

In *Upper Snake River*, the Ninth Circuit considered whether the agency was required to prepare an EIS before periodically adjusting the flow of water from the Palisades Dam and Reservoir. *Upper Snake River*, 921 F.2d at 233. The court concluded the agency was not required to prepare an EIS because reducing the flow of water did not constitute a major federal action under NEPA, and reaffirmed that no EIS is necessary "where a proposed federal action would not change the status quo." *Upper Snake River*, 921 F.2d at 235. The court characterized the adjustments in flow as "routine managerial actions" that the agency had been carrying out regularly for years and reasoned that the agency was "doing nothing new, nor more extensive, nor other than that contemplated when the project was first operational." *Upper Snake River*, 921 F.2d at 235.

In a more recent case out of this district, the court held in part based on *Upper Snake River* that FWS's administration of a wildlife export program under the Convention on International Trade in Endangered Species ("CITES") was not

major federal action requiring an EIS because there was "no identifiable agency action that alter[ed] the status quo." *WildEarth Guardians v. United States Fish & Wildlife Service*, 342 F.Supp.3d 1047, 1058-1059 (D. Mont. 2018). The plaintiffs argued that the agency's "annual review[s] of the status of Appendix II species for CITES-approved statutes and tribes" constituted major federal action requiring NEPA compliance and the preparation of an EIS. *WildEarth Guardians*, 342 F.Supp.3d at 1059. The court disagreed, reasoning that requiring the agency to perform NEPA analysis "every time it approve[d] an individual state or tribe for export of an individual species" would not be "consistent with NEPA's baseline requirement for 'major Federal action'." *WildEarth Guardians*, 342 F.Supp.3d at 1059. The court further found that the agency's "continuing administration of the CITES Program [was] not consistent with those categories of 'action' listed in NEPA's implementing regulations," such as "adopting official policies, plans or programs and approving specific projects." *WildEarth Guardians*, 342 F.Supp.3d at 1059-60 (citing 40 C.F.R. § 1508.18(b)). Noting that the agency's annual reviews simply "implement[ed] the procedural rules outlined in the CITES Program," the court concluded there was no major federal action under NEPA. *WildEarth Guardians*, 342 F.Supp.3d at 1060.

Here, the annual reviews of grizzly bear sightings do not change the status quo and do not result in any change to the BORZ boundaries established by the

2011 Access Amendments, which were subject to full NEPA review. As in *WildEarth Guardians*, the annual reviews performed by the agencies implement the procedural monitoring and reporting requirements of the Forest Plan; they are not formal plans or programs within the meaning of NEPA. Furthermore, the agencies' continuing administration of Forest Plan's monitoring and reporting requirements is not consistent with the categories of "major federal action" listed in NEPA's implementing regulations. While Alliance argues the annual reviews are "official documents" under 40 C.F.R. § 1508.1(q)(3)(ii), the documents are not "formal plans" upon which future agency action will be based, as specified by the regulatory definition. Because the annual reviews do not change the status quo, they are not major federal action under NEPA.

The cases that Alliance relies on to support its argument to the contrary are materially distinguishable. First, Alliance relies on *Oregon Natural Resources Fund v. Forsgren,* 252 F.Supp.2d 1088, 1104 (D. Or. 2003), in which the court agreed with plaintiffs that "new mapping direction" eliminating "thousands of acres of previously-recognized lynx habitat, and as a result, decreased protection for the lynx," was major federal action under NEPA. The court found that "[t]he new mapping direction was far more than the result of day-to-day inventory-taking" and had been used by the Forest Service "to reduce the recognized primary lynx habitat with the Forest by thousands of acres," thereby enabling the Forest

Service to conclude in its biological assessment for timber sale projects that "the sales would not occur within primary lynx habitat and, therefore, would not impact the lynx adversely." *Forsgren*, 252 F.Supp.2d at 1105.

Unlike the new mapping direction in *Forsgren*, which had not undergone NEPA analysis, the Forest Plan direction for reviewing and monitoring grizzly bears outside the recovery zone was adopted in the 2011 Access Amendments and incorporated in to the 2015 Forest Plan, both of which underwent NEPA analysis and public comment. Also unlike the new mapping direction in *Forsgren*, which decreased protection for the lynx by eliminating thousands of areas of previously protected habitat, the annual reviews at issue here resulted in no change to existing BORZ boundaries and do not decrease protection for grizzly bears.

Alliance also analogizes to *State of California v. Bergland*, 483 F.Supp.2d 465 (E.D. Cal. 198) and the Ninth Circuit case affirming that decision, *State of California v. Block*, 690 F.2d 753 (9th Cir. 1982). In *Bergland*, the Forest Service inventoried roadless areas for possible inclusion in the Wilderness Preservation System, and categorized each area as "wilderness," "nonwilderness," or "further planning." *Bergland*, 483 F.Supp.2d at 471. The Forest Service designated several areas that had previously "been managed to preserve their "wilderness character" as "nonwilderness," thereby foreclosing their use for wilderness purposes. *Bergland*, 483 F.Supp.2d at 473. The court found that the "nonwilderness"

designations constituted major federal action under NEPA because they changed the way the areas were managed and were "tantamount to a decision to engage in development activities on the individual areas." *Bergland*, 483 F.Supp. at 479.

Alliance argues the "non-BORZ" designations in the annual reviews are analogous to the "nonwilderness' designations at issue in *Bergland* because they are tantamount to a decision to engage in development activities on the individual areas. This is so, Alliance claims, because the "non-BORZ" designations in the annual reviews ensure that logging roads can be built without the limitations that are required in BORZ areas pursuant to the Access Amendments' no net increase standards for open and total roads. (Doc. 26, at 22).

But unlike the "nonwilderness" designations at issue in *Bergland*, the annual reviews of grizzly bear sightings at issue here do not change the way any watersheds in the Project area are managed because they do not alter the original 2011 BORZ designations. No portion of the Project area has ever been designated as a BORZ area, and the annual reviews do not change that fact. Because the annual reviews do not change the status quo in any way, they are not major federal action.

As Defendants and Intervenor-Defendants both submit, the major federal action here is the Forest Service's decision approving the Project, not the agencies' annual reviews of grizzly bears sightings in the area. Alliance may challenge the

Project EA's analysis of, and the Project Decision Notice's authorization of,

activities in the Project area because the Decision Notice is a major federal action

subject to NEPA. (Doc. 46, at 17). But the same cannot be said of the annual

reviews of grizzly bear sightings, which merely implement the monitoring and

reporting requirements of the Access Amendments to the Forest Plan.

4.    Tiering to the annual review documents

Alliance next argues the Project EA impermissibly tiers to the January 2020

and March 2021 annual reviews and fails to supply the missing NEPA analysis.

Tiering under NEPA is a process whereby an agency evaluates the potential

environmental impacts of a proposed action based on prior NEPA environmental

analysis. See 40 C.F.R. § 1508.28[6] ("Tiering refers to the coverage of general

matters in broader environmental impact statements…with subsequent narrower

statements or environmental analyses…incorporating by reference the general

discussions and concentrating solely on the issues specific to the statement

subsequently prepared."). Tiering thus allows an agency to "avoid[] detailed

discussion by referring to another document" and "is expressly permitted by

federal regulation." *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062,

---

[6] The 2020 NEPA regulations apply "to any NEPA process begun after September 14, 2020." 40 C.F.R. § 1506.13 (2020). Because this aspect of Alliance's first claim for relief challenges the Project EA, and the Forest Service began scoping for the Project in July 2019, the 2019 NEPA regulations apply.

1073 (9th Cir. 2002) (citing 40 C.F.R. § 1502.20).  "However, tiering to a document

that has not itself been subject to NEPA review is not permitted, for it circumvents

the purpose of NEPA." *Kern*, 284 F.3d at 1073. "Alternatively, where an agency

merely incorporates material 'by reference,' without impeding agency and public

review of the action, the agency is not improperly tiering" *Alliance for the Wild*

*Rockies v. USFS*, 907 F.3d 1105, 1119 (9th Cir. 2018) (citing 40 C.F.R. § 1502.21).

Alliance relies primarily on *Kern* to support its tiering argument. In *Kern*,

the plaintiffs challenged a resource management plan EIS and a site-specific

project EA on the ground that they illegally tiered to a programmatic document

called the Port Orford Cedar Management Guidelines ("Guidelines"), which

described strategies to minimize the spread of a tree fungus and had never been

subject to NEPA review. *Kern*, 284 F.3d at 1068-69. In a prior case, the Ninth

Circuit had determined that the Guidelines did not constitute a major federal action

and no NEPA review was necessary. *Kern*, 284 F.3d at 1069. "Although the

Guidelines in and of themselves were not subject to NEPA," the Ninth Circuit had

cautioned that "if they were incorporated into a specific agency action they would

be subject to NEPA in the context of that action." *Kern*, 284 F.3d at 1069. The

*Kern* plaintiffs argued that the resource management plan EIS and site-specific

project EA impermissibly tiered to the Guidelines because they referred to and

relied on the Guidelines, but did not independently analyze the impact of the agency actions on the fungus and the tree species. *Kern*, 284 F.3d at 1069.

The Ninth Circuit agreed, and held that the EIS and EA "may not tier to the Guidelines, for which an EIS has never been prepared." *Kern,* 284 F.3d at 1073. The court then analyzed the EIS and EA, standing alone, and found that neither document provided the analysis required under NEPA, including the requisite cumulative impact analysis. *Kern*, 284 F.3d at 1077-78.

If, as the Court has decided for the reasons set forth above, the annual review documents themselves do not constitute a major federal action and are not subject to NEPA, Alliance maintains that under *Kern*, the Project EA must supply the missing NEPA analysis. Alliance argues the Project EA fails to satisfy NEPA because it simply states that the Project is not within any BORZ area and provides no explanation for the "non-BORZ designations" in the annual review documents. (Doc. 26, at 26). The appropriate remedy, Alliance contends, is for the Court to remand for the Forest Service to provide the missing NEPA analysis and evaluate the effects, including the cumulative effects of the "non-BORZ designations" as part of the Project analysis. (Doc. 43, at 26). To do otherwise, Alliance argues, would be to allow the "agencies' decision to deny Access Amendment protections to the Ripley Project area" to "escape review under NEPA." *Kern*, 284

F.3d at 1069 (refusing to create "a 'catch 22' situation in which the Guidelines

would escape review under NEPA).

Alliance's argument is fundamentally flawed, however, because the Project

EA does not actually tier to the annual review documents. While the Project EA

tiers to the monitoring program established in the 2011 Access Amendments and

the 2015 Forest Plan, both of which underwent NEPA review, it does not refer to,

rely on, or incorporate the January 2020 and March 2021 annual review

documents. As discussed above, no portion of the Project area was designated as a

BORZ area at the time of the 2011 Access Amendments and the 2015 Forest Plan,

and the annual reviews did nothing to change the status quo. Because the Project

EA tiers to the programmatic monitoring program established in the 2011 Access

Amendments and the 2015 Forest Plan, not to the January 2020 and March 2021

annual review documents, Alliance's reliance on *Kern* is misplaced.

     5.    Substantive Review under the APA

Finally, and alternatively, Alliance argues that instead of the remanding to

the agencies for the procedural remedies requested above, the Court should engage

in a substantive review of the March 2021 annual review's "non-BORZ

designation" and set it aside as arbitrary and capricious. (Doc. 43, at 27). Alliance

maintains that the Court may undertake this review pursuant to the APA, which

authorizes judicial review of "final agency action for which there is no other

adequate remedy in a court." 5 U.S.C. § 704. As discussed above, however, the annual review documents are not final agency decisions, which means they are not subject to judicial review under the APA.

### B.  Grizzly Bears: NEPA and the ESA (Claim II)

Alliance's second claim for relief alleges that the agencies' analysis of the Project's impacts on grizzly bears was insufficient under NEPA and the ESA.

### 1.  Project EA's Hard Look Analysis under NEPA

Alliance argues the Forest Service violated NEPA because the Project EA fails to take a "hard look" at how road closure ineffectiveness may impact grizzly bears. (Doc. 26, at 32).

"NEPA requires agencies to take a 'hard look' at the environmental effects of a proposed action before implementing it." *Environmental Defense Center v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022). In order "[t]o take the requisite hard look, an agency 'may not rely on incorrect assumptions or data' in arriving at its conclusion of no significant impacts." *Environmental Defense Center*, 36 F.4th at 872-73 (citing *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 954 (9th Cir. 2005)). It thus "follows that the data the Forest Service provides to the public to substantiate its analysis and conclusions must also be accurate." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018).

Alliance contends the EA is insufficient because the Forest Service relied on erroneous assumptions about the effectiveness of road closures when considering impacts of the Project on the grizzly bear. Alliance relies on *Alliance for the Wild Rockies v. Probert,* which considered whether the Forest Service adequately considered the impact of ineffective road closures on grizzly bears when approving a logging project in the Kootenai National Forest. 412 F.Supp.3d 1188, 1198 (D. Mont. 2012). The project EIS "assumed that all road closures would be effective following the completion of the Project," but eight years of monitoring data in the record showed ineffective closures and illegal road use. *Probert*, 412 F.Supp.3d at 1207. While the Forest Service had "considered bear disturbance and displacement" in the EIS, "the actual effects analyzed were limited by its assumption that public use would be effectively restricted." *Probert*, 412 F.Supp.3d at 1207-08. Because that assumption had been "shown false," the court held that "the incorrect assumptions of the NEPA documents coupled with the uncertainty of the extent of ineffective closures [were] sufficient to trigger a supplemental analysis." *Probert*, 412 F.Supp.3d at 1208.

Alliance argues the same result is required here because, as in *Probert,* the EA assumes that all road closures will be effective following implementation of the Project. The EA contemplates several types of road related activities, including road storage after completion of the Project for roads that "are not expected to be

needed for land management in the near future but would be needed for the long-term management of the project area." FS_613:007470. Altogether, the Project proposes that 23 miles of roads be placed into storage. FS_613:007470. The EA states that to accomplish this, "[a]t a minimum, an earthen berm would be installed at or near the beginning of proposed stored roads at a location that would be effective at preventing motorized access including both public and administrative use." FS_613:007470. The EA also proposes decommissioning six road segments totaling approximately two miles and explains that these roads "would have the entrance blocked to motorized use, including both public and administrative access." FS_613:007471, 72. For additional details the EA refers to Appendix C, which clarifies that an "earth barrier" or "carsonite sign" will be installed to decommission the road segments. FS_613:007700-01, 05. Assuming these road closures and decommissioning are effective, the EA calculates that road "densities currently and post-project would be between 2.0 and 2.2, which, according to the threshold values and objects described in Table 42,[7] supports the presence of male grizzly bears and also reflects the current knowledge of grizzly bear use in the vicinity." FS_613:007541.

_____

[7] Table 42 states in part: "Grizzly bear presence – distribution of collared bears shows most bears occurred within road densities of 2.4 mi/mi$^2$ or less." FS_613:007534.

Alliance takes issue with the underlying assumption that the proposed road closures and decommissioning will be effective, however, and argues that, as in *Probert*, monitoring data in the record shows the road closure methods identified in the EA have been ineffective in the Project area. Alliance cites a 2021 Ripley Device Monitoring Summary Report that it claims establishes a high failure rate for the Forest Service's closure devices and shows that "65 out of 90 monitored points in the Ripley Project area alone required repairs when surveyed in 2021." (Doc. 26, at 34-35). Of the 65 entries Alliance points to, many describe ATVs driving over and around berms, while others refer to general ATV use, missing locks, or gates in need of repair. (Doc. 27, at 34-37, citing FS_1051:4639). Based on these entries, Alliance maintains the EA's assumption that post-Project road storage and decommissioning will effectively restrict public use is demonstrably false. Based on *Probert*, Alliance contends "'the incorrect assumptions of the NEPA documents coupled with the uncertainty of the extent of ineffective closures' requires a remand for a supplemental NEPA analysis to take a hard look at this issue." (Doc. 26, at 36 (quoting *Probert*, 412 F.Supp.3d at 1208).

Defendants respond that Alliance's reliance on *Probert* is misplaced because its holding has since been limited to cases involving "documented historic" evidence of ineffective road closures. *Alliance for the Wild Rockies v. Marten*, 464 F.Supp.3d 1169, 1176 (D. Mont. 2020). In *Marten*, another case involving a timber

project in the Kootenai National Forest, the plaintiff argued based on *Probert* that

remand was required because the post-project road closure methods identified by

the agency would not be effective. *Marten*, 464 F.Supp.3d at 1176. But unlike

*Probert*, which "dealt with documented historic road closures," the plaintiff in

*Marten* simply speculated that the project's temporary roads would "not be

effectively obliterated in the future." *Marten,* 464 F.Supp.3d at 1176. The court

found the plaintiff's position "untenable" and declined to apply *Probert* "based on

the mere possibility that planned road closures will be ineffective." *Marten*, 464

F.Supp.3d at 1176.

The record here is more analogous to *Marten* than *Probert.* The record in

*Probert* contained eight years of monitoring data showing ineffective closures and

illegal road use, whereas the monitoring report at issue here contains five months

of data from the 2021 bear season. *Probert*, 412 F.Supp.3d at 1207. The Forest

Service monitored 60 road closure devices in the Project area during that period

and made 90 road related checks. FS_1051:004636-39. For many of the entries

listed by Alliance, other columns not cited by Alliance reflect that the closure

device was found functional despite some evidence of breach or need of repair.

FS_1051:4639. Thus, the monitoring report does not provide the sort of

documented historic evidence of ineffective road closures that *Probert* found

warranted remand for further NEPA analysis.

2.    ESA Consultation and Cumulative Effects Analysis

Alliance next claims that agencies failed to conduct a lawful cumulative effects analysis in their ESA consultation for grizzly bears because they did not analyze State and private activities that are reasonably certain to occur in the Project area. (Doc. 26, at 36-37). As discussed in more detail below, this is one of two claims that serve as the basis for the preliminary injunction order previously entered in this case. (See Doc. 60, at 11-15).

Under the ESA's implementing regulations, the Forest Service must conduct a biological assessment to determine whether any endangered species or critical habitat are likely to be adversely affected by the action. 50 C.F.R. § 402.12(a). The contents of a biological assessment are at the discretion of the Forest Service and may include "consideration of cumulative effects." 50 C.F.R. § 402.12(f)(4). A biological opinion prepared by FWS must "evaluate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3). For purposes of the ESA, cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

On May 7, 2020, the Forest Service issued a biological assessment for the Project that included a cumulative effects analysis for the grizzly bear.

FS_117:000336-39. The Forest Service's cumulative effects analysis determined that the Project "may affect, is likely to adversely affect grizzly bears" based on several factors, including that "open road densities would temporarily increase during project, but would remain at levels supporting bear presence and return to the existing condition post-project." FS_117:000339. In reaching its cumulative effects determination, the biological assessment does not provide any details about potential road construction and management or land development on privately owned land, however, and instead states that "[b]ecause the roads analysis focuses on roads under Forest Service management on National Forest System lands, any road construction and management occurring on private land would not cumulative[ly] contribute to open road densities for this analysis." FS_117:000338. The biological assessment further explains that "[a]ny of the activities that may occur on the private property parcels can only be estimated as all activities are outside the control of the Forest Service." FS_117:000338. The biological assessment also identifies five ongoing or future timber harvests by Stimson Lumber Company or Montana DNRC within or near the Project area and acknowledges "there is a possibility that certain locations within the project area would be affected by proposed Ripley activities as well as other on-going or proposed federal and private actions simultaneously. FS_117:000338-39.

At the Forest Service's request, the agencies then engaged in formal consultation concerning the grizzly bear, and FWS issued its biological opinion on May 13, 2021. FS_125:000374-408. The cumulative effects section of the biological opinion recognizes that roughly 36 percent of the Project area is privately owned, and briefly describes ongoing and proposed future timber harvests by Stimson Lumber Company and Montana DNRC. FS_125:000394. The cumulative effects analysis concludes: "While some activities on non-federal land may contribute to cumulative effects at some point in the future, large Forest ownership within which human access is restrict by regulation and topography would help to reduce the impacts of larger residential human populations on grizzly bears." FS_125:000394.

Alliance asserts that the agencies' cumulative effects analysis is deficient because it is based on "an open road density calculation that excludes all State and private roads," thereby violating the regulatory requirement to consider effects of future State or private activities that are reasonably certain to occur within the action area. (Doc. 26, at 36-37). The Biological Assessment and Biological Opinion both cite to and rely on an open road density calculation that excludes all State and private roads in the Project area. FS_117:000319; FS_125:000389.  For example, the Biological Assessment states that because "the Forest Service does not have any jurisdiction over roads outside of National Forest System lands within

the Ripley project area, only the 107 miles of roads on National Forest System lands are used" in calculating existing open road densities. FS_117:000319. Based on the exclusion of State and private roads, the Forest Service's Biological Assessment concludes that "[d]uring and post-project open road density would continue to support the presence of male grizzly bears ..." FS_117:000312. Alliance does not take issue with using this approach when analyzing direct effects, but contends it is not permissible when analyzing cumulative effects, which must consider State and private activities.

While the cumulative effects sections of the Biological Assessment and Biological Opinion acknowledge that there will be logging activities on State and private lands while the Project is ongoing, Alliance argues the agencies fail to disclose any details regarding the amount of logging on State lands or, even more importantly, the increase in roads that will occur on State and private lands during logging operations, which would cumulatively increase road density in the Project area. (Doc. 26, 37-38 citing FS_117:000338-339; FS_125:000394). Alliance cites undisputed evidence that "increased human access on open roads and continued human use of closed roads have overall detrimental effect on grizzly populations." FS_1026:010365. The Biological Assessment acknowledges that "[t]he availability of secure habitat is primarily influenced by motorized access management[,]" and the biological opinion likewise states that "[m]otorized access has long been

51

recognized as a major factor affecting grizzly bears." FS_117:000311-12;

FS_125:00381. Because roughly the Project area "is checkerboarded" with State

and private lands, Alliance argues, "the agencies' omission of the cumulative

logging acreage and cumulative road density during the Project – and cumulative

effects of those activities on grizzly bears – renders the analysis arbitrary and

capricious." (Doc. 26, at 38).

Defendants do not disagree that the cumulative effects sections in the

Biological Assessment and Biological Opinion provide little detail about State and

private activities reasonably certain to occur in Project area. (Doc. 46, at 25). The

Biological Assessment touches on this, explaining that some risks and threats "that

might impact grizzly bears if not managed or mitigated and some are outside of

Forest Service control, such as activities that occur on adjacent private land."

FS_117:000313. The Biological Assessment further explains that the "[a]ny of the

activities that may occur on the private property parcels can only be estimated as

all activities are outside the control of the Forest Service." FS_117:000338.

Defendants point to "the difficulty of obtaining secure habitat information

for State and private land" (Doc. 32, 38) and explain that to account for these

issues they took a more conservative approach in their cumulative effects analysis

by assuming that State and private lands within the Project area provide no secure

habitat for grizzly bears and incorporating that assumption into the environmental

baseline. (Doc. 46, at 26-27). Because they assumed a worst-case scenario in which State and private lands provide no secure habitat, Defendants argue they adequately accounted for the effects of any State or private activities and take the position that FWS "did not need to know or mention or discuss the specifics associated with timber harvest or motorized access and their effects on State and private lands." (Doc. 46, at 27). Defendants maintain that by using this conservative approach, they adequately assessed the cumulative effects of State or private activities that are reasonably certain to occur within the Project area.

But the Court soundly rejected this exact argument in its order granting Alliance's motion for a preliminary injunction. (Doc. 60, at 14-15). To begin with, the Court noted that Defendants concede their "no secure habitat" assumption is factually false, and pointed out that the assumption appears nowhere in the cumulative effects analyses of the Biological Assessment or the Biological Opinion. (Doc. 60, at 14; FS_117:000338-39; FS_125:000394). "Even if Defendants' 'worst-case scenario' argument did not appear to be an impermissible post-hoc justification for their actions," the Court reasoned, the argument "would require the Court endorse the agencies' approach of rely on factual assumptions the agencies *know* to be incorrect to dodge their statutory and regulatory duties to obtain, disclose, and analyze the best scientific and commercial data available

concerning reasonably certain State or private activities within the action area during the formal consultation process." (Doc. 60, at 15).

In a recent Fourth Circuit case, the Court of Appeals emphasized that FWS must affirmatively seek out and consider existing data under 50 C.F.R. § 402.14(g)(1) and held that FWS improperly evaluated cumulative effects where the administrative record indicated the action area was likely to be impacted by numerous non-federal future activities that were not expressly addressed in the biological opinion. *Appalachian Voices v. United States Dep't of Interior*, 25 F.4th 259, 275-76 (4th Cir. 2022). The Court's preliminary injunction order relies on *Appalachian Voices* in concluding that Alliance "is likely to succeed in proving that FWS's decision to not attempt to obtain and disclose data concerning reasonably certain State and private activities, and the agencies' decision to rely on a factual assumption they know to be incorrect in assessing the Project's cumulative effects on the grizzly bear, violated the ESA and were arbitrary and capricious." (Doc. 60, at 15).

Defendants make the same unsuccessful arguments in their summary judgment briefing and rely on the same evidence that the Court found was insufficient to defeat Alliance's motion for a preliminary injunction. At oral argument, Defendants again conceded that their "no secure habitat" assumption was factually false and failed to point to any evidence in the record demonstrating

that they affirmatively sought out and considered all "otherwise available" relevant information concerning reasonably certain State and private activities in the Project area. As predicted at the preliminary injunction stage, Alliance has thus demonstrated that Defendants' cumulative effects analyses concerning the grizzly bear violate the ESA and are arbitrary and capricious.

**C.    Sufficiency of Road Analysis under the Travel Management Rule and NEPA (Claim III)**

Alliance's third claim for relief alleges that the Project violates Executive Order 11644, Subpart B of the Travel Management Rule, NEPA, and the APA because the EA fails to take a hard look at undetermined roads and does not adequately analyze the effectiveness of proposed mitigation measures. (Doc. 4, at 38).

1.    <u>Travel Management Rule</u>

Subpart B of the Travel Management Rule, which includes Executive Order 11644 and is codified at 36 C.F.R. part 212, requires that in designating National Forest System roads and motorized trails, the Forest Service shall consider several factors including "the need for maintenance and administration of roads, trails, and areas that would arise if the uses under consideration are designated; and the availability of resources for that maintenance and administration." 36 C.F.R. § 212.55(a). When designating motorized trails, the Forest Service must also act with

55

the objective of minimizing "[h]arassment of wildlife and significant disruption of wildlife habitats." 36 C.F.R. § 212.55(b)(2)

The Project authorizes the addition of 13 miles of new permanent roads and 11 miles of undetermined roads to the National Forest System, for a total of 24 miles of additional roads. [8] FS_614:007763. The Project also authorizes the addition of a four-mile trail for motorized off-road vehicles and a two-acre parking lot for the public to access those routes. FS_614:007763; FS_613:007475. Alliance asserts that in making those designations, the Forest Service failed to address the availability of resources for maintenance and administration of 24 miles of new roads; and failed to demonstrate that the location of four miles of ATV trails will minimize harassment of grizzly bears and big game. Neither argument is persuasive.

### a.   *Availability of Resources*

Alliance contends the EA fails to discuss "the need for maintenance and administration" and "the availability of resources for that maintenance and administration" for the 24 miles of new roads designated by the Project, in plain

---

[8] Undetermined roads are "[r]oads on National Forest system lands that are not managed as part of the forest transportation system, such as unplanned roads, abandoned travel way, and off-road vehicle tracks that have not been designated and managed as a trail; and those roads that were once under permit or other authorization and were not decommissioned upon the termination of the authorization." FS_603:007051.

violation of the Travel Management Rule. (Doc. 26, at 40). Alliance cites three

internal agency meeting notes in the record that it claims demonstrate the Forest

Service will not have the resources to maintain and administer the new roads: (1)

"How do we fund storage work if the proposed roads needs [sic] to be kept open

for awhile following harvest? Was looking at purchaser for most of this work, but

sound like that won't be an option with the other activities." FS_20:000063; (2)

"Only a couple of roads that possibly could be completed by purchaser."

FS_21:000069; (3) "Can't do any decommissioning work through the timber sale

contract needing to be done for those needs to be outside the sales."

FS_22:000073. Alliance also cites two internal agency meeting notes reflecting

that the Forest Service failed to store one road as promised following completion

of a different project and claims that if the Forest Service "cannot complete road

maintenance promised in prior NEPA documents it strains credulity to assume that

the agency will have the resources to maintain 24 miles of new permanent roads

for this project." (Doc. 26, at 41). See FS_21:000069 (meeting note stating: "Road

14407 was planned to be stored as part of the Swede McMillan project, but it

didn't happen. Do we want to proceed with the storage of this portion of the road

now? Conversation moved on and did not make decision."); FS_24:000083 (follow

up meeting note regarding Road 14407 stating: "Agree to keep as is.").

The Forest Service responds by citing to a Travel Analysis Report it prepared to inform decisions relating to the designation of roads and motorized trails in the Project area under Subpart B of the Travel Management Rule. FS_603:006986. The Report contains a section specifically addressing available resources for road and trail maintenance and operation, and discusses annual and deferred maintenance costs.  FS_603:007011-12, 007017-18. As the Forest Service also points out, the Report assesses individual travel routes in the Project area for maintenance cost concerns, and assigned a value of high, medium or low concern. FS_ 603:007023-24, 007025-28 (Table 4), 007037-39 (Appendix A). The administrative record also contains a Transportation Management Report that considers available funding and explains that revenue from timber sales will "maintain a portion of the existing road system that may otherwise have to wait until funding became available." FS_604:007062. As is permitted under NEPA, the Project EA considered and disclosed both the Travel Analysis Report and the Transportation Management Report. FS_613:007467; 007471-72, 007489, 007747. See *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1214 (9th Cir. 2004) (recognizing that under 40 C.F.R. § 1502.21, material may be incorporated by reference if it is reasonably available for inspection and its content is briefly described).

To the extent Alliance suggests that the Forest Service has a maintenance backlog will not have the resources to maintain the new roads that are part of the

Project, its argument is little more than pure speculation. To the extent the few comments Alliance has taken from the record acknowledge that the Project's timber sale contracts alone will not be sufficient to fully fund road maintenance and administration, Alliance does not cite any authority for the proposition that Subpart B imposes such a requirement. Nor does Alliance cite any authority to support its apparent position that the Forest Service must engage in a road-specific quantification of maintenance costs for each newly designated road. Section 212.55(a) establishes a more general obligation to consider the need for maintenance and administration of roads and trails, and the availability of resources to accomplish that maintenance and administration. The record demonstrates that the Forest Service satisfied this regulatory obligation, and Alliance's claim to the contrary fails.

b.   *Minimization Criteria*

Subpart B of the Travel Management Rule requires the Forest Service to act with the objective of "minimizing harassment of wildlife and significant disruption of wildlife" when designating trails where off-road vehicle use is permitted. 36 C.F.R. § 212.55(b)(2); *WildEarth Guardians v. Steele*, 545 F.Supp.3d 855, 882 (D. Mont. 2021) (listing all "minimization criteria"). The Forest Service must "document how it evaluated and applied [pertinent] data on an area-by-area basis with the objective of minimizing impacts as specified in the [Travel Management

Rule]." *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 931 (9th Cir. 2015).

Alliance argues the Forest Service has not shown that it acted with the objective of minimizing harassment to wildlife when designating a four-mile off-road vehicle trail in the Project area. Alliance notes that EA's discussion of the proposed trail refers to the "project file" for "[d]ocumentation of how the project would minimize impacts to the five [minimization] criteria" listed in 36 C.F.R. § 212.55(b). FS_613:007475. Alliance argues the document to which the EA refers "fails to establish that locating a motorized trail within big game winter range – and a known grizzly bear movement area – meets the requirement to act with the objective of minimizing wildlife harassment." (Doc. 26, at 42). Alliance claims that if the Forest Service truly was acting with the objective of minimizing wildlife harassment, it would have located the motorized "trail outside of a wildlife movement zone, and outside of big game winter range." (Doc. 26, at 43).

Contrary to Alliance's argument, the record adequately demonstrates that the Forest Service considered and applied the minimization criteria when designating the off-road vehicle trail at issue and acted with the objective of minimizing harassment to wildlife. The EA explains that the trail would be located near the Libby Airport on existing, undetermined roads that already receive motorized use, and the area was already proposed for timber harvest. FS_613:007475. As

60

documented in the record, the Forest Service minimized harassment to wildlife by ensuring that the trail was not in a grizzly bear management area and placing it adjacent to a well-used county road and Libby Airport, and in an area that already experiences off-road vehicle use. FS_404:003496-97. Alliance provides no authority for its apparent position that Subpart B required the Forest Service to minimize effects to the greatest extent possible by locating it outside of a known wildlife movement area and big game range. See *Central Sierra Environmental Resource Center v. U.S. Forest Service*, 916 F.Supp.2d 1078, 1096 (E.D. Cal. 2012) (explaining that the Forest Service "must show that it aimed to minimize environmental damage when designating trails and areas," but the final outcome of the designation process need "not necessarily minimize environmental damage to the greatest extent possible"). The record reflects that the Forest Service adequately documented its evaluation of motorized trail designation with the objective of minimizing harassment to wildlife, which is what Subpart B requires.

##   2.    NEPA: Mitigation Measures

Under NEPA, "an agency must … consider appropriate mitigation measures that would reduce the environmental impact of the proposed action." *Protect Our Communities Foundation v. Jewell*, 815 F.3d 571, 581 (9th Cir. 2016). The agency's "proposed mitigations measures 'need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements.'" *Protect*

*our Communities*, 815 F.3d at 581 (quoting *Nat'l Parks & Conservation Ass'n v.*
*U.S. Dep't of Transportation,* 222 F.3d 677, 681 n.4 (9th Cir. 2000)

While NEPA does not require that any environmental harms actually be
mitigated, it does require the agency to "discuss mitigation measures[] with
'sufficient detail to ensure that environmental consequences have been fairly
evaluated.'" *South Fork Band Council of Western Shoshone of Nevada v. U.S.*
*Dept. of Interior,* 588 F.3d 718, 727 (9th Cir. 2009) (quoting *Robertson v. Methow*
*Valley,* 490 U.S. 332 (1989)). One "essential element of a reasonably complete
mitigation discussion is an assessment of whether the proposed mitigation
measures can be effective." *South Fork Bend Council,* 588 F.3d at 727.

Alliance claims that the Forest Service failed to satisfy NEPA because the
Project EA does not analyze the effectiveness of proposed mitigation measures,
including particularly the use of berms, gates, and signs, to mitigate the effects of
road density on grizzly bears. This argument relates back to Alliance's claim that
the Forest Service failed to take a "hard look" at how road closure ineffectiveness
may impact grizzly bears. Alliance reiterates its position that the EA's analysis of
effects on grizzly bears is inaccurate because it is premised on the false assumption
that berms will be effective at preventing motorized use on roads stored after the
Project is completed. (Doc. 26, at 43). As with the proposed use of berms, Alliance
similarly argues 2021 monitoring report provides evidence that gates are not an

effective means of restricting motorized access during the Project because it identifies various gates in need of repair and instances of ATVs driving around gates meant to block road access. (Doc. 26, at 45).

As discussed above, however, the 2021 monitoring report identifies few devices on National Forest System roads that were considered non-functional, and indicates that many of the devices were found functional despite some evidence of breach or need of repair. See supra at page, citing FS_1051:4639. The 2021 monitoring report and a 2020 monitoring report also indicate that the Forest Service responds to unauthorized use by repairing or improving closure devices if necessary. FS_1051:004647; FS_489_004634-35. As reflected in the EA, the Forest Service has developed a set of mitigation measures in reliance upon the Travel Analysis Report for the Project and the monitoring reports that are part of the administrative record. (Doc. 32, at 44 citing FS_603:007022-03, 007025-31) FS_1051:4636-4639. The EA additionally indicates that the Forest Service has plans to monitor the effectiveness of the gates, berms, and other barriers that deter unauthorized use in the Project area. (Doc. 32, at 44 citing FS_613:007477).

To the extent Alliance argues the Forest Service cannot rely on access mitigation measures like gates and berms unless their efficacy is 100 percent "assured" and are certain to exclude unauthorized users, the cases it relies on are distinguishable and do not establish such a bright line rule. (Doc. 26, at 44). In

*Foundation for North American Wild Sheep v. USDA*, the Forest Service granted an application for a special use permit to reopen a road that provided access to a mine and passed directly through an area occupied by one of the few remaining herds of Desert Bighorn Sheep. 681 F.2d 1172, 1175 (9th Cir. 1982). The Forest Service drafted an EA and adopted an alternative that provided for, among other things, seasonal closure of the road using a locked gate during the three-month period during which the sheep used the area for lambing. *Foundation for North American Wild Sheep*, 681 F.2d at 1176. The Ninth Circuit found the seasonal road closure was not a sufficient mitigation measure after wrestling with what one court recently described as "complex qualitative information" related to impact on the lambing area. *Friends of Clearwater v. Petrick*, 2022 WL 622460, at *19 (D. Idaho March 2, 2022). The Ninth Circuit did not, as Alliance suggests, hold that in all cases road closure must be entirely assured in order to effectively mitigate the environmental impact of a proposed action. Here, as discussed above, the Forest Service reasonably relied on the Travel Analysis Report for the Project and the 2021 monitoring report in considering access mitigation measures.

In *Sierra Club v. Bosworth*, 352 F.Supp.2d 909, 925 (D. Minn. 2005), the plaintiffs argued the Forest Service's decision to approve a timber project was arbitrary and capricious because the EA did not analyze the environmental impact of illegal road use. The district court agreed and found the omission significant

because the record demonstrated "the questionable efficacy of road closures through use of berms and gates" and the Forest Service conceded that illegal use occurred in the area as a result. *Sierra Club*, 352 F.Supp.2d at 925. But here, as discussed above, the 2021monitoring report Alliance relies on does not call into question the efficacy of road closures as did the evidence in *Sierra Club*.

When the court reviews "an agency's discussion of mitigation measures" under NEPA, it "need only be satisfied that the agency took the requisite 'hard look' at the possible mitigating measures." *Great Basin Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1106. See also *Friends of the Clearwater v. Petrick*, 2022 WL 622460, at *19 (D. Idaho Mar. 2, 2022) (finding that "[t]he Forest Service's proposed mitigation measure satisfied NEPA's requirement that a plan be developed to a reasonable degree" where the Forest Service selected a road "for closure, a mechanism to close it, and a monitoring system to accommodate for possible lapses or breaches"). Here, Forest Service has identified the roads on which motorized access will be restricted, the mechanisms to do so, and a plan to monitor the to monitor the effectiveness of the devices used to deter unauthorized use. The EA, which relies on the Travel Analysis report and monitoring reports, contains "sufficient detail to ensure that environmental consequences have been fairly evaluated" as NEPA requires. *South Fork Band Council*, 588 F.3d at 727.

The Court is thus satisfied that the Forest Service took the requisite "hard look" at mitigation measures.

### D.    Compliance with NEPA's EIS Requirement (Claim IV)

Claim four alleges that the Forest Service's refusal to prepare a full Environmental Impact Statement (EIS) for the Project violates NEPA and the APA. (Doc. 4, at 147-156).

Under NEPA, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A plaintiff need only raise substantial questions as to whether a project may have a significant effect to trigger the requirement for an EIS and need not show that significant effects will in fact occur. *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005); *Bark v. USFS*, 958 F.3d 865, 868 (9th Cir. 2020).

To determine whether an action significantly affects the environment, the agency must consider the context and intensity of the project. 40 C.F.R. 1508.27. Context means "that the significance of an action must be analyzed in several contexts such as society as a whole, the affected region, the affected interests, and the locality. 40 C.F.R. § 1508.27(a) (2019). Intensity "refers to the severity of impact" and is evaluated using ten factors. 40 C.F.R. § 1508.27(b)(1)-(10). The

presence of just "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates*, 402 F.3d at 865.

For purposes of determining whether an action requires an EIS, an agency may prepare an EA. 40 C.F.R. § 1501.4(b) (2019). The Forest Service considered the context and impact of the Project in the EA and summarized its finding of no significant impact. FS_613:007669-76. Alliance argues three of the intensity factors require preparation of an EIS.

First, Alliance maintains there are substantial questions as to "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). Alliance points to the fact that the Project authorizes commercial logging of 10,854 acres over 25 years and the addition of 24 miles of permanent roads in a Project area that includes more than 5,000 acres of State lands and private timber company lands. FS_614:0077762-63; FS_613:007444; 007510.  The Project EA recognizes that there will be logging activities on State and private lands during the Project. FS_613:007558. For example, the EA recognizes that "Stimson Lumber Company is in the process of and [has] proposed to harvest approximately 605 acres of their timbered lands within or near the project area," one timber sale consisting of 130 acres is currently being harvested near the Project area, and two other timbers sales totaling 475 acres are set to occur within the next five years. FS_613:007558.

The EA acknowledges that because these and other timber sales within or near the Project "are likely to overlap at times, implementation of these planned activities would be expected to cause temporary disturbance or avoidance of activity areas, or both, to grizzly bears who may be present in the area." FS_613:007558. The EA recognizes that Montana DNRC is also in the process of wrapping up a timber harvest on its lands and has proposed another harvest within or near the Project area, but the EA does not specify the location or number of acres involved. FS_613:007558. See also FS_117:00038039 (Biological Assessment providing the same information). The EA also does not provide any details regarding the number of roads that will be built in the Project area on State and private lands during the Projects. FS_613:007558. The EA does acknowledge, however, that "there is a possibility that certain location within the project area would be affected by proposed Ripley activities as well as other on-going or proposed federal and private actions simultaneously." FS_613:007558. See also FS_117:00038039 (Biological Assessment providing same information).

Because the Forest Service has not provided any details regarding the acres that will be logged during the State's logging operations or the number of roads that will be built in the Project area on State and private lands during the Project, Alliance argues it is not possible to assess the cumulative impacts of the Project along with these other actions on the grizzly bears in the Project area. As discussed

above in Section III(B)(2) of this Findings & Recommendation, the agencies failed

to conduct a lawful cumulative effects analysis in their ESA consultation for

grizzly bears for essentially the same reason – they did not attempt to obtain and

did not disclose details regarding the amount of logging on State lands or the

increase in roads that will occur on State and private lands during logging

operations in the Project area, and thus failed to consider the cumulative effects of

those activities on the grizzly bear.

Consistent with this reasoning, Alliance has likewise raised substantial

questions as to whether the Project is related to other actions on State and private

lands in the Project area with the potential for cumulatively significant impacts on

the grizzly bear. See *Te-Moak Tribe v. Shoshone of Nevada v. U.S. Department of

Interior*, 608 F.3d 592, 605 (9th Cir. 2010) (concluding that a plaintiff "must only

show the potential for cumulative impact" to meet its burden of demonstrating

"that an agency should have analyzed the cumulative impacts of a proposed project

along with other projects"). This intensity factor thus weighs in favor of requiring

the Forest Service to prepare an EIS.

Second, Alliance contends the Project will undisputedly have an adverse

effect on grizzly bears. See 40 C.F.R. § 1508.27(b)(9) (identifying "[t]he degree to

which the action may adversely affect an endangered or threatened species or its

habitat" as a factor for the agency to consider in evaluating intensity). The Project

EA concludes that "implementation of the Ripley Project's proposed activities would result in a determination of *may affect, likely to adversely affect* to grizzly bears. The potential for adverse effects would be to individuals and not the species." FS_613:007532 (emphasis in original). While the agencies determined that the Project alone would not jeopardize the entire Cabinet-Yaak grizzly population, that analysis was not complete because, as concluded above in Section III(B)(2), it did not adequately analyze State and private activities that are reasonably certain to occur in the Project area, and excluded State and private roads in the Project area road density calculations. Thus, this intensity factor also weighs in favor of requiring the Forest Service to prepare an EIS.

Third, Alliance argues there are substantial questions as to "[w]hether the action threatens a violation of Federal . . . law . . ." 40 C.F.R. § 1508.27(b)(10). Again, as discussed above, the Court has concluded that the agencies failed to conduct a lawful cumulative effects analysis in their ESA consultation for grizzly bears because they did not adequately analyze State and private activities that are reasonably certain to occur in the Project area. And, as discussed below, the Forest Service failed to comply with the ESA concerning Canada lynx because it failed to follow the two-step statutory process of obtaining a list of endangered and threatened species and preparing a biological assessment for any listed species.

Alliance met its burden of raining substantial question on this issue, and this factor also weighs in favor of requiring the Forest Service to prepare an EIS.

Because three of the intensity factors from 40 C.F.R. § 1508.27(b) raise substantial questions about whether the Project will have a significant environmental effect, an EIS is required and the Forest Service's decision not to prepare one was arbitrary and capricious. See *Bark v. United States Forest Service*, 958 F.3d 865, 871 (9th Cir. 2020).

### E.   Lynx: Compliance with the ESA's Biological Assessment Requirement (Claim V)

Alliance's fifth claim for relief alleges that the Forest Service's failure to prepare a Biological Assessment for lynx for the Project violates the ESA. (Doc. 4, at ¶¶ 157-163. As discussed in more detail below, this is the second of two claims that provide the basis for the Court's order granting a preliminary injunction enjoining implementation of the Project. (Doc. 60, at 16-18).

The ESA requires that a federal agency "shall conduct a biological assessment" if an ESA-listed species "may be present" in the area of a proposed action. 16 U.S.C. § 1536(c)(1). To determine whether a species "may be present," the ESA provides:

> each Federal agency shall...request of the Secretary [of Interior, acting through FWS,] information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data

available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered or threatened species which is likely to be affected by such action.

16 U.S.C. § 1536(c)(1). The statute thus sets "out a simple two-step process for an action agency to comply with section 7(c)(1) [of the ESA]: receive an adequate list and prepare biological assessment for any species on that list." *Friends of Clearwater v. Petrick*, 2022 WL 622460, at *5 (D. Idaho March 2, 2022).

To obtain a list of species that may be present in the action area, the ESA regulations require that the Forest Service "shall convey" to FWS "either (1) a written request for a list of any listed or proposed species . . . that may be present in the action area; or (2) a written notification of the species . . .that are being included in the biological assessment." 50 C.F.R. § 4012.12(c). If the Forest Service conveys its own list to FWS, FWS "shall either concur with or revise the list . . . ." 50 C.F.R. § 402.12(d).

"Once an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment to determine whether the proposed action is 'likely to affect' the species and therefore requires formal consultation with the [FWS]." *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985), overruled on other grounds as recognized by *Cottonwood Envtl. Law Center v. USFS*, 789 F.3d 1075, 1092 (9th Cir. 2015). The biological assessment "is the mechanism by which an agency concludes that its

proposed action will have 'no effect,' 'may affect,' or 'is likely to adversely affect'

a listed or proposed species." *Native Ecosystems Council v. Marten*, 2020 WL

1479059, at *6 (D. Mont. March 26, 2020). In other words, the Forest Service

"must first determine whether a species 'may be present,'" and only then should it

"consider the likelihood that the species will be affected" in a biological

assessment. *Native Ecosystems Council v. Krueger*, 946 F.Supp.2d 1060, 1074 (D.

Mont. 2013).

Here, Alliance points to three documents in the record from FWS that it

describes as addressing whether lynx "may be present" in the Project area: (1) a

Project-specific list generated by FWS's online species list system ("IPaC") that

includes lynx as a species that may be present in the Project area, FS_1048:02194,

029196; (2) a "current range" map from FWS's website showing virtually all of

western Montana, including the Project area, as lynx "current range,"

FS_1049:029205; and (3) a forest-wide species list from FWS that includes lynx as

a species that may be present on the Kootenai National Forest, FS_108:000269.

(Doc. 26, at 51-52).

During the preliminary injunction hearing in this case, however, Defendants

conceded that the Forest Service did not follow the ESA regulatory procedures

because it did not request a list of species that may be present in the Project area,

and did not avail itself of the regulatory alternative to provide a list to FWS and

seek FWS's concurrence or revision. (Doc. 59, at 36). See 50 C.F.R. § 402.12(c).

Instead, as it did at the preliminary injunction stage, Defendants maintain that any

failure to follow the regulatory procedure is immaterial because the Forest Service

nevertheless prepared a biological assessment for the lynx in which it concluded

that that the lynx would not be present in the action area and the Project would

therefore have no effect on lynx. FS_531:005145, 005077-79; FS_1023:0042;

FS_117:000291; FS_119:0000352).

The Court addressed this argument in its preliminary injunction order and

rejected it for two reasons. (Doc. 60, at 16-18). First, the Court found that

"Defendants' approach in this case repeats a similar error identified by the district

court in *Friends of Clearwater v. Petrick,* in which the same agencies argued they

did not need to prepare a biological assessment for the grizzly bear 'because the

Forest Service determined in its wildlife report that the action would have no effect

on the grizzly bear.'" (Doc. 60, at 16, quoting *Friends of Clearwater*, 2022 WL

622460, at *6)). The *Friends of Clearwater* court found that "the federal agencies'

argument puts the cart before the horse – in a way not consistent with the statutory

language . . . the Forest Service must adhere to the requirements of § 1536(c)(1) –

requesting a species list and preparing a [biological assessment] for species that

may be present – as part of the process of determining whether the action may

affect a listed species." *Friends of Clearwater*, 2022 WL 622460, at *6. The ESA

and its implementing regulations make clear that FWS is to make the critical "may be present" determination, not the action agency. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c). The agencies in this case bypassed this first step, with the Forest Service instead making its own determination that lynx would not be present in the action area and the Project would therefore have "no effect" on lynx. FS_531:005077-79. Consistent with the reasoning of the preliminary injunction order, the Court finds the agencies' approach in this case violates the ESA.

Second, the Court was not persuaded at the preliminary injunction stage by Defendants' attempt to distinguish this case from *Friends of Clearwater* by claiming that the Forest Service did in fact prepare a biological assessment. (Doc. 60, at 17-18). Defendants make the same attempt on summary judgment, arguing that the Forest Service did complete a biological assessment for lynx. (Doc. 46, at 33). And again, they cite to the same portions of the administrative record as comprising the biological assessment: (1) the Wildlife Specialist Report for the Ripley project, which contains less than three total pages about Canada lynx and their habitat, FS_531:005045, 005077-79; (2) the Terrestrial biological assessment for the Ripley Project, which simply states that the Project "would have no effect to Canada lynx or Canada lynx critical habitat" because "[t]he analysis area is located outside any Lynx Analysis Units' and "outside designated critical habitat[,]" FS_117:000291; (3) the cover letter to the Biological Assessment,

which repeats the finding that the Project would have no effect on lynx or lynx habitat, FS_119:000352; and (4) a Letter to File dated September 22, 2021 – the day after this lawsuit was filed – stating that the wildlife specialist report "serves as the 'no effect' biological assessment (BA) for Canada lynx and designated lynx critical habitat[,]" FS_1023: 004642. (Doc. 46, at 33; Doc. 32, at 49, citing Doc. 33, ¶¶ 183-187 (SUF)). The Court's preliminary injunction order found "[t]he purported biological assessment in this case is the legally insufficient wildlife report in *Friends of Clearwater* by another – retroactively assigned – name." (Doc. 60, at 18, citing *Friends of Clearwater*, 2022 WL 622460, at *6 (rejecting argument that "no effect" determination for grizzly bear in wildlife report excuse the Forest Service from preparing biological assessment)).

Defendants provide no new arguments or evidence on summary judgment that would lead the Court to now hold otherwise. Accordingly, the Court concludes the agencies violated the ESA by failing to follow the two-step statutory process of obtaining a list of endangered and threatened species and preparing a biological assessment for any listed species. 16 U.S.C. § 1536(c)(1).

In closing, Alliance takes the position that the Project should be remanded for the Forest Service to prepare a biological assessment for lynx. (Doc. 43, a 54). Alliance's request for this remedy is premised on its argument that the IPaC resource list, current range map, and forest-wide species list constitute a

76

determination by FWS that lynx "may be present" in Project area, which means all that is left is for the Forest Service to prepare a biological assessment. As outlined above, however, the problem here is that the agencies did not follow the necessary two-step statutory process, and bypassed the first step pursuant to which the FWS must make a determination as to whether lynx "may be present" in the Project area. Thus, instead of remanding for preparation of a biological opinion, the Project should be remanded for the agencies to follow this two-step process, pursuant to which the Forest Service must either request that FWS provide a list of species that may be present in the Project area or, in the alternative, provide a list to FWS and seek FWS's concurrence or revision. See 50 C.F.R. § 402.12(c).

## IV.    Conclusion

For the reasons discussed above,

IT IS RECOMMENDED that the Cross Motions for Summary Judgment be GRANTED in part and DENIED in part, as set forth below:

1.      Claim 1: Defendants and Intervenor-Defendants are entitled to summary judgment on Alliance's claim that the January 2020 and May 2021 annual review findings relating to BORZ designations violate the ESA, NEPA, and the APA;

2.      Claim 2: Defendants and Intervenor-Defendants are entitled to summary judgment on Alliance's NEPA claim that the agencies failed to take a

hard look at how road closure ineffectiveness may impact grizzly bears, and Alliance is entitled to summary judgment on its ESA claim that the agencies failed to conduct a lawful cumulative effects analysis because they did not analyze State and private activities that are reasonably certain to occur in the Project area;

    3.      Claim 3: Defendants and Intervenor-Defendants are entitled to summary judgment on Alliance's claim that the Project EA fails to take hard look at undetermined roads and does not adequately analyze the effectiveness of proposed mitigation measures;

    4.      Claim 4:  Alliance is entitled to summary judgment on its claim that the Forest Service's decision not to prepare an EIS violates NEPA and the APA; and

    5.      Claim 5: Alliance is entitled to summary judgment on its ESA claim related to the lynx.

    IT IS FURTHER RECOMMENDED that this matter be remanded to the agencies to remedy the NEPA and ESA violations identified above.

    NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or

objection is waived.

DATED this 30th day of September, 2022.

Kathleen L. DeSoto
United States Magistrate Judge