IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV 21–105–M–DLC |
| Plaintiff, | |
| v. | |
| NATHAN GASSMANN, District Ranger, Kootenai National Forest, Libby Ranger District; CHAD BENSON, Forest Supervisor, Kootenai National Forest; KEITH LANNOM, Deputy Regional Forester, U.S. Forest Service Region One; U.S. FOREST SERVICE; and U.S. FISH & WILDLIFE SERVICE, | ORDER |
| Defendants, | |
| and | |
| AMERICAN FOREST RESOURCE COUNCIL; LINCOLN COUNTY; and KOOTENAI FOREST STAKEHOLDERS COALITION, | |
| Intervenor-Defendants. | |

Before this Court is United States Magistrate Judge Kathleen L. DeSoto's
Findings and Recommendations ("F&R"). (Doc. 71.) Judge DeSoto entered the
F&R on September 30, 2022, recommending that the parties' cross-motions for
summary judgment be granted in part and denied in part. (Doc. 71 at 77–79.) The

1

F&R recommended granting Plaintiff Alliance for the Wild Rockies' ("Plaintiff")
motion for summary judgment on its Endangered Species Act (ESA) claims that
Defendants Nathan Gassmann, Chad Benson, Keith Lannom, U.S. Forest Service
("USFS"), and U.S. Fish and Wildlife Service ("FWS") (collectively,
"Defendants") failed to conduct a lawful cumulative effects analysis with respect
to the grizzly bear and failed to comply with the ESA's procedures with respect to
Canada lynx. (Doc. 71 at 78.) It then recommended granting Plaintiff's motion for
summary judgment on its claim that Defendants violated the National
Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA)
by failing to prepare an environmental impact statement (EIS). (*Id.*) As to all
other claims, the F&R recommended granting summary judgment to Defendants
and Intervenor-Defendants American Forest Resource Council, Lincoln County,
and Kootenai Forest Stakeholders Coalition ("Intervenor-Defendants"). (Doc. 71
at 77–79.)

Defendants, Plaintiff, and Intervenor-Defendants each filed objections to the
F&R. (Docs. 72, 73, 74.) Upon the filing of an objection, the district court must
undertake a de novo review of those portions of the magistrate judge's findings and
recommendations to which a party specifically objects. 28 U.S.C. § 636(b)(1).
Such review is necessary only if a party objects within fourteen (14) days after
being served with the findings and recommendations. *Id.*; *see Shiny Rock Mining
Corp. v. United States*, 825 F.2d 216, 218 (9th Cir. 1987). A proper objection must
"itemize" each factual finding and recommendation to which objection is made,
"identifying the evidence in the record the party relies on to contradict that finding

. . . [and] setting forth the authority the party relies on to contradict that recommendation." D. Mont. L.R. 72.3(a). The Court reviews for clear error those findings and recommendations to which no party timely objects. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *McDonnell Douglas Corp. v. Commodore Bus. Machs., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981). Clear error exists if the Court is left with a "definite and firm conviction that a mistake has been committed." *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000) (internal quotation omitted). Unless otherwise noted, the discussion contained in this Order is based on the Court's de novo review of the F&R and the entire record in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

This litigation stems from Defendants' approval of the Ripley Project ("Project"). (Doc. 1 at 1). The Project is a vegetation management project planned to occur in Lincoln County, Montana, on the Libby Ranger District of the Kootenai National Forest. FS_613:007443–44. The Project area is approximately 29,180 acres in size. FS_613:007444. It is located east of Libby, Montana and Highway 2 and south of the Kootenai River. *Id.* Approximately 18,810 acres of the Project area are National Forest System lands. *Id.* The remaining lands in the Project area include 2,475 acres managed by the Montana Department of Natural Resources and Conservation, 215 acres managed by the Army Corps of Engineers, 3,075 acres owned by Stimson Lumber Company, 60 acres owned by Weyerhauser, and 4,545 acres that are otherwise privately owned. FS_613:007510.

The Project is designed to last up to 25 years, with 10 to 20 years of harvest activities and an additional 5 years for non-commercial vegetation treatments and other activities.  FS_613:007459.  The Project's Decision Notice proposes commercial logging on 10,854 acres, harvest related site preparation and treatments including burning and mastication on 5,334 acres, and non-commercial vegetation treatments on 1,544 acres including 829 acres of pre-commercial thinning and 715 acres of tree-cutting and burning.  FS_614:007762–63.  The Project also proposes the following road construction and management activities: construction of 13 miles of permanent roads and 6 miles of temporary roads, maintenance of 93 miles of existing roads, addition of 11 miles of undetermined roads to the National Forest Road System, storage of 23 miles of roads, decommissioning of 2 miles of existing roads, maintenance and reconstruction of 12 miles of existing road and construction of one additional mile of road, for a total of 13 miles of road to allow the State to conduct logging activities on State land in the Project area, and seasonal opening of 35 miles of barriered or gated roads to public motorized use for firewood gathering.  FS_613:007467–76; FS_614:007763.  The goals of the Project, as stated in the Decision Notice, are to promote resilient vegetation conditions, reduce the potential for high intensity wildfire, improve habitat conditions for wildlife adapted to open forest structure and drier habitats, provide a variety of wood products to the American public, contribute to the local economy, and develop recreational opportunities. FS_614:007761.

A revised forest management plan was adopted for the Kootenai National Forest in 2015 ("Forest Plan" or "LRMP"). FS_613:007448; *see also* FS_930. This plan provides direction for the management of the forest and guidance for project level decision-making. FS_930:024034. The Forest Plan incorporated previous standards and guidance, including the 2011 Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones ("Access Amendments"). FS_930:024038. The Access Amendments set standards for motorized access in Cabinet-Yaak and Selkirk Recovery Zone Bear Management Units (BMUs) by limiting total motorized road density and open motorized road density and requiring certain levels of core habitat area. *Id.*; FS_897:021294. The Access Amendments also set standards for motorized access in areas outside the recovery zones that are experiencing recurring use by grizzly bears—Bears Outside Recovery Zones (BORZ)—limiting total and open linear road miles within these areas. FS_930:024038; FS_897:021294. The Access Amendments further require the Kootenai National Forest to "submit annual reports to the [Forest] Service that detail progress made toward achieving and maintaining the standards . . . within Recovery Zones" by April 15 of each year. FS_897:021303. As part of this process, the Access Amendments require the Forest to "coordinate with state and federal agency biologists to collect credible grizzly bear observations that occur outside of the Recovery Zone boundaries" and "add this information to the 6th-order HUC [hydrological unit code] database for inclusion into the annual report." *Id.*

The Project area is located outside of any existing BMU or BORZ. FS_117:000315.  However, the Project area is located approximately 2 miles from the Cabinet-Yaak Ecosystem grizzly bear recovery zone ("CYE") and within 1 mile of the Cabinet Face BORZ polygon.  FS_613:007535, 007537.  Within the Project area, there has been grizzly activity observed.  At least three different radio-collared male grizzly bears have been recorded within the Project area in the last 5 to 7 years.  FS_613:007536.  Two male grizzly bears pass through the area during the spring and fall as they move between the Cabinet Mountains and the Fisher River drainage.  FS_117:000312.  The third grizzly bear has a home range that overlaps the Project area along lower Libby Creek.  *Id.*  The Kootenai National Forest, Idaho Panhandle National Forest, and Lolo National Forest (collectively, the "Forests") reviewed monitoring data in 2020 and 2021 concerning this use of the area by grizzly bears.  *See* FS_472; FS_1038.  However, the Forests reported that this monitoring data did not meet all recurring use criteria set forth in the Access Amendments to designate the area as BORZ as of Bear Year 2020. FS_472:004405–08; FS_1038:028504–07.

Pursuant to its obligations under NEPA, USFS issued a scoping notice for the Project in July of 2019 that described the Project area, the Project's purpose, and the proposed actions in the Project area.  FS_317:002820–82; *see also* FS_613:007457–58.  USFS sent a draft biological assessment (BA) concerning the Project's effect on grizzly bears to FWS on March 23, 2020.  FS_125:000377.  The draft BA found that the Project "may affect, but is not likely to adversely affect" the grizzly bear.  *Id.*  A final BA submitted to FWS on May 7, 2020, had a

6

different determination of "may affect, likely to adversely affect" grizzly bears. FS_117:000312.  A supplemental BA submitted on January 25, 2021, made the same determination.  FS_122:000365.  On May 13, 2021, FWS issued a biological opinion (BiOp) that determined that the Project is "not likely to jeopardize the continued existence of the grizzly bear."  FS_125:000395.

USFS issued an environmental assessment (EA) in April of 2020 that concluded the project would have no significant impact on the environment. FS_612:007346–47.  An updated EA issued in April of 2021 made the same finding of no significant impact (FONSI).  FS_613:007670.  Based upon the EA and the FONSI, on May 17, 2021, USFS issued a final notice of decision to implement the Project with the modifications set forth in the updated EA. FS_614:007762, 007779.

This litigation ensued, with Plaintiff filing its Complaint on September 1, 2021.  (Doc. 1.)  Plaintiff's Amended Complaint, filed on October 12, 2021, asserts five claims for relief: (1) USFS's January 2020 and May 2021 determinations that the Project area does not meet the criteria for a BORZ violated NEPA, the National Forest Management Act (NFMA), ESA, and APA; (2)  Defendants' analyses of the Project's impact on grizzly bears was insufficient under NEPA, NFMA, APA, and ESA; (3) the EA provided a deficient road analysis under the Travel Management Rule (TMR), NEPA and APA; (4) USFS's refusal to provide an environmental impact statement (EIS) for the Project violated NEPA and APA; and (5) USFS's failure to prepare a BA for the Canada lynx violated the ESA.  (*See generally* Doc. 4.)

7

Plaintiff filed a motion for summary judgment on January 20, 2022.  (Doc. 25.)  Defendants filed a cross-motion for summary judgment on February 16, 2022. (Doc. 31.)  Intervenor-Defendants filed a cross-motion for summary judgment on February 24, 2022.  (Doc. 35.)  While these motions were pending, this Court issued a preliminary injunction prohibiting implementation of the Project, finding that Plaintiff was likely to succeed on two of its ESA claims.  (*See generally* Doc. 60.)  Judge DeSoto held a hearing on the motions for summary judgment on September 9, 2022, and entered the Court's F&R on September 30, 2022.  (Doc. 71.)

In the F&R, Judge DeSoto found that Defendants failed to conduct a lawful cumulative effects analysis as to the grizzly bear because they did not analyze private and State activities reasonably certain to occur in the Project area.  (Doc. 71 at 78.)  Thus, Judge DeSoto recommended that summary judgment be granted to Plaintiff on its claim that the grizzly bear analysis was insufficient under the ESA. (*Id.*)  Judge DeSoto also recommended that Plaintiff be granted summary judgment on Plaintiff's claim that Defendants violated the ESA by failing to prepare a BA for the Canada Lynx and on Plaintiff's claim that the failure to prepare an EIS for the Project violated NEPA and the APA.  (*Id.*)  Based upon a finding that Defendants' BORZ reviews did not constitute major federal action, agency action, or final agency action, Judge DeSoto recommended that the Defendants and Intervenor-Defendants be granted summary judgment on the claim that such designations violated NEPA, ESA, and APA.  (Doc. 71 at 22–39, 77.)  Judge DeSoto further recommended that the Defendants and Intervenor-Defendants be

granted summary judgment on the claim that Defendants failed to take a hard look at how road closure ineffectiveness would affect grizzly bears in violation of NEPA.  (Doc. 71 at 78.)  Finally, Judge DeSoto recommended that Defendants and Intervenor-Defendants be granted summary judgment on Plaintiff's claim that the EA's road analysis violated the TMR and NEPA.  (*Id.*)

All parties timely filed objections to the F&R.  The parties' objections to the F&R are discussed in detail below.

## LEGAL STANDARDS

### National Environmental Policy Act (NEPA)

NEPA declares a national policy of protecting environmental quality and encouraging a "productive and enjoyable harmony between man and his environment."  42 U.S.C. §§ 4321, 4331.  NEPA "does not mandate particular results[.]"  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Rather, it "prescribes the necessary process" that federal agencies must follow when considering "major Federal actions significantly affecting the quality of the human environment."  *Id.* at 348–50.  "NEPA's central requirement is that agencies must take a 'hard look' at the environmental consequences of [their] proposed action."  *California v. Block*, 690 F.2d 753, 776 (9th Cir. 1982).

In considering major federal actions significantly affecting the quality of the human environment, federal agencies must provide a detailed statement on:

(i)    the environmental impact of the proposed action,

(ii)   any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii)  alternatives to the proposed action,

(iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C) (2022).[1]

The implementing regulations of NEPA allow for federal agencies to prepare an EA in order to determine if preparation of an EIS is necessary. 40 C.F.R. § 1501.4(b)–(c) (2018).[2]  An EA is a "concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a) (2018).  It must discuss the need for the proposed action, available alternatives to the proposed action, and the environmental impacts of the proposed action and of the alternatives.  40 C.F.R. § 1508.9(b).  It must also list the agencies and persons consulted.  *Id.*  If, as a result of the EA, the agency finds that the proposed action will not have a significant impact on the environment, the agency need not prepare an EIS.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010).

In reviewing allegations that agency action violates NEPA, the Court employs the "arbitrary and capricious standard" set forth in § 706(2)(A) of the APA.  *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1008–09 (9th Cir. 2006).  The Court looks to "whether the agency has taken a 'hard look' at the

---

[1] An amended version of this provision went into effect on June 3, 2023.
[2] NEPA's implementing regulations were updated effective September 14, 2020.  However, pre-2020 regulations are the operative regulations for the Project, as its planning began in 2019.

consequences of its actions, 'based [its decision] on a consideration of the relevant factors,' and provided a 'convincing statement or reasons to explain why the project's impacts are insignificant.'" *Id.* at 1009 (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co.*, 561 U.S. at 157–58).

### **Endangered Species Act (ESA)**

The ESA declares a national policy of conserving endangered and threatened species. 16 U.S.C. § 1531(c). In enacting the ESA, Congress intended to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). In doing so, Congress adopted an approach of "institutionalized caution" that affords endangered species "the highest of priorities," even over the primary missions of federal agencies. *Id.* at 185, 194. To accomplish its purpose, the ESA requires that all federal agencies "insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of such species' critical habitat. 16 U.S.C. § 1536(a)(2).

The ESA mandates that federal agencies request information from the Secretary of the Interior on the potential presence of species listed or proposed to be listed as threatened or endangered in the area of the proposed agency action. 16 U.S.C. § 1536(c)(1). The ESA's implementing regulations likewise require federal agencies to convey to the Director of FWS "either (1) a written request for a list of

11

any listed or proposed species or designated or proposed critical habitat that may be present in the action area; or (2) a written notification of the species and critical habitat that are being included in the biological assessment." 50 C.F.R. § 402.12(c). If such species may be present in the area, the agency must prepare a BA to identify any endangered or threatened species that is likely to be affected by the agency's proposed action. 16 U.S.C. § 1536(c)(1).

If the BA concludes that the proposed project is likely to adversely affect a listed species, the action agency must then engage in informal or formal consultation with FWS. *Forest Guardians v. Johanns*, 450 F.3d 455, 457–58 (9th Cir. 2006). If the agency concludes in the BA or through informal consultation that the action is not likely to adversely affect a listed species or critical habitat, and FWS concurs, the consultation process ends as to that species. *See* 50 C.F.R. § 402.14(b)(1). Otherwise, formal consultation must commence, which requires FWS to issue a BiOp evaluating the effects on the listed species and making a "jeopardy" or "no jeopardy" determination. 50 C.F.R. § 402.14(h)(iv). If the BiOp concludes that the proposed action is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat" the BiOp must also propose reasonable and prudent alternatives and measures that could minimize or avoid the adverse effects. *Id.* at § 402.14(g)(5), (h)(2).

### National Forest Management Act (NFMA)

NFMA sets forth "a two-stage approach to forest planning." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996). In the

first stage, the Secretary of Agriculture must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System[.]" 16 U.S.C. § 1604(a). Land and resource management plans (LRMPs) "guide sustainable, integrated resource management" and promote forest lands that are "ecologically sustainable and contribute to social and economic sustainability" and that "consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities[.]" 36 C.F.R. § 219.1(b), (c). In developing LRMPs, the Secretary must comply with NEPA. 16 U.S.C. § 1604(g)(1).

In the second stage, the LRMPs are directly implemented as projects are proposed and assessed. *Inland Empire Pub. Lands Council*, 88 F.3d at 757; *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1512 (9th Cir. 1992). Any proposed projects, permits, resource plans, or other instruments allowing use and occupancy of the forest lands must be consistent with the provisions of the LRMPs. 16 U.S.C. § 1604(i); *Inland Empire Pub. Lands Council*, 88 F.3d 754 at 757. "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan[.]" *All. For the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018). The Court gives "substantial deference" to the "Forest Service's interpretation and implementation" of the LRMP. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). However, USFS's failure to comply with the LRMP constitutes a violation of NFMA. *Id.*

13

**Travel Management Rule (TMR)**

President Nixon issued Executive Order 11644 in 1972, directing federal land management agencies to adopt regulations governing the use of off-road vehicles on public lands. *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 881 (D. Mont. 2021) (citing Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 8, 1972)), *aff'd in part, vacated in part, and remanded on other grounds sub nom. Swan View Coal. v. Steele*, No. 22-35137, 2023 WL 3918686 (9th Cir. June 9, 2023). To carry out this order, the Secretary of Agriculture promulgated the TMR in 2005. *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 929 (9th Cir. 2015). The TMR provides for the establishment of a system of designated roads, trails, and areas permitting motor vehicle use throughout National Forest System lands. *Id.* at 929; 36 C.F.R. § 212.50(a). Subpart B of the TMR permits the responsible official in a ranger district or administrative unit of the National Forest System to designate motor vehicle use on forest lands by vehicle type and time of year. 36 C.F.R. § 212.51(a). The responsible official's designations are subject to regulatory criteria, including consideration of the effects on natural resources, "the need for maintenance and administration" of the roads and areas, and "the availability of resources for that maintenance and administration." 36 C.F.R. § 212.55(a). Further, in designating roads, trails, and areas on forest lands for motor vehicle use, the responsible official must consider, with the objective of minimizing several potential negative effects on the environment, including "harassment of wildlife and significant disruption of wildlife habitats." 36 C.F.R. § 212.55(b)(2) (the "minimization criteria").

14

**Administrative Procedure Act (APA)**

The APA provides for judicial review of "agency action made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. Courts review agency decisions alleged to have violated NEPA, NFMA, ESA, and the TMR under the standard of review set forth in the APA in 5 U.S.C. § 706(2)(A). *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled in part on other grounds by Winter v. Nat'l Res. Def. Council*, 555 U.S. 7 (2008); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014); *Mont. Snowmobile Ass'n*, 790 F.3d at 924, 929–33 (applying 5 U.S.C. § 706(2)(A) to a claim under the TMR).

The APA's standard permits a court to hold agency action, findings, and conclusions unlawful and set them aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601. This is a narrow standard. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency," especially where the agency's decision "implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).

In reviewing agency decisions under the arbitrary and capricious standard, the Court considers whether the decision was "'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-*

*Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).  The decision is arbitrary and capricious if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*  An "agency's action must be upheld, if at all, on the basis articulated by the agency itself"; the Court "may not accept . . . counsel's post hoc rationalizations for agency action."  *Id.* at 50 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

## DISCUSSION

## I.    Claims Involving BORZ Determinations

Judge DeSoto recommended granting Defendants and Intervenor-Defendants summary judgment on Plaintiff's claim that USFS's January 2020 and March 2021 determinations that the Project area does not meet the BORZ criteria (collectively, the "BORZ reviews") violated NEPA, the NFMA, the ESA, and the APA.  (Doc. 71 at 12–43.)  Specifically, Judge DeSoto concluded: (1) Plaintiff objected to the 2020 BORZ review at the first available opportunity, so its objection was not waived[3]; (2) the BORZ reviews did not constitute "agency action" under the ESA; (3) the BORZ reviews did not constitute "final agency action" under the APA; (4) the BORZ reviews did not constitute "major federal action" under NEPA; (5) the Project EA did not tier to the 2020 or 2021 BORZ

---

[3] Neither party timely objected to this conclusion, and reviewing for clear error, the Court finds none and adopts this finding in full.

reviews; and (6) the Court could not undertake a substantive review of the 2021 BORZ review because it was not final agency action.  (*Id.*)

Plaintiff raises several objections to the F&R on this issue: (1) the Access Amendments require monitoring and reporting of grizzly observation data, not an "annual review" of BORZ designations, and thus the BORZ review document is a decision document; (2) the agencies' written denial of BORZ protections is an agency action under the ESA; (3) the BORZ review is a final agency action under the APA; (4) the BORZ review is a major federal action under NEPA; and (5) the Project EA tiers to the BORZ review by adopting and relying upon the non-BORZ conclusion in that document.  (Doc. 73 at 1–11.)

A.    **Overview of the BORZ Reviews**

During the consultation process for the Access Amendments, agency biologists reviewed the BORZ areas that had been mapped years prior and refined the BORZ maps based on a set of guidelines ("BORZ Criteria"). FS_1052:026804, 026965–66.  This process identifies BORZ areas based on the number and type of grizzly bear observations and the use of an objective mapping unit boundary (6th order Hydrologic Unit Codes ("HUCs")).  FS_461:004183, 004192.  Delineation of a BORZ area is generally based on 3 or more credible observations of grizzly bears in an HUC in the last 15 to 16 years. FS_461:004183; FS_1052:026965–66.  In selecting HUCs for inclusion into a BORZ area, additional factors to consider include the proximity to a recovery zone boundary, recurring use in adjacent HUCs, suitable habitat, and the importance of identified and potential linkage zones.  *Id.*  A potential exception for including an

entire HUC into a BORZ area include where areas in the HUC have high concentrations of private lands or recreational residences on Forest Service lands where it has been determined that grizzly bear use should be discouraged. *Id.* Another potential exception is where an HUC is split by a major highway and has little to no observational data or habitat on one side of the highway. FS_461:004192.

Four 6th order HUCs overlap the Project area with the following acreage: the Mitchell Creek – Kootenai River HUC (7,197 acres), the Cedar Creek – Kootenai River HUC (88 acres), the Lower Fisher River HUC (131 acres), and the Lower Libby Creek HUC (21,763 acres). FS_122:000358, 000361. The Cedar Creek – Kootenai River HUC was included in the West Kootenai BORZ in 2019. FS_122:000361. However, none of the 88 acres of this HUC that overlap the Project area are Forest Service lands. *Id.* Additionally, a portion of the Lower Libby Creek HUC was included in the Cabinet Face BORZ in the original Access Amendments in 2011. *Id.* However, only the portion of the HUC west of the highway was included in the BORZ, meaning that none of the 21,763 acres in this HUC that overlap the Project area are included in the Cabinet Face BORZ. FS_461:004195; FS_122:000362, 000368.

As previously noted, the Access Amendments and Forest Plan require USFS to "coordinate with State and federal agency biologists to collect credible grizzly bear observations that occur outside of the Recovery Zone boundaries and add this information to the 6th-order HUC database for inclusion into the annual report."

18

FS_897:021303, 021352; FS_930:02184.  The Forest Plan Reinitiation BA

explains how the agencies have implemented this requirement:

> Since the Access Amendment ROD was signed, the Forests have met
> several times with USFWS to review credible grizzly bear observations
> to determine if recurring use has expanded beyond the original BORZ
> boundaries (per 2011 BO monitoring requirement, USDI Fish and
> Wildlife Service 2011b).  The Bobtail Creek (disclosed in the Bear Year
> 2011 Monitoring Report), Lower Pipe Creek, and Cedar Creek (both
> disclosed in the 2019 Bear Year monitoring report) HUCs have met the
> recurring use criteria used in the Access Amendment.  The no-net
> increase in permanent open and total miles of road . . . has been applied
> to these HUCs once it was determined that they met the criteria for
> recurring use.

FS_962:026259.  In the administrative record before this Court, there are two

documents entitled "Annual Review of Grizzly Bear sightings outside the Selkirk

and Cabinet-Yaak Recovery Zones (Meeting Notes)"; one is dated January 15,

2020, and the other is dated March 18, 2021.  FS_472; FS_1038.

At the January 15, 2020 meeting, wildlife biologists and other participants

from the Forests and FWS met with the objective to "review Wayne Kasworm's

data to see if any additional HUCs met the recurring use criteria."  FS_472:004401.

They utilized the BORZ criteria established by the Access Amendments and

adopted by the Forest Plan.  FS_472:004401 (referring to FS_461:004192);

FS_930:024037, 024179–84 (Forest Plan adoption of Access Amendments).  At

the 2020 meeting, the agencies considered whether the remaining portion of the

Lower Libby Creek HUC—east of Highway 2—met the criteria for recurring use.

FS_472:004406–07.  The agencies noted that there was evidence of three different

males in the last five to seven years in that area but that much of the grizzly use

19

was seasonal and on private land with only "very scattered use on [National Forest System land]." FS_472:004406. They further noted that they would "closely monitor HUC east of Highway 2 to see if more use is occurring on [National Forest System land]." *Id.* However, the agencies concluded that "currently recurring use on [National Forest Service] land east of highway 2 does not meet criteria, so will not add that portion of the HUC in at this point in time." FS_472:004406–07. The agencies likewise concluded that bear usage in the Lower Fisher River HUC and Mitchell Creek – Kootenai River HUC did not meet the BORZ criteria. FS_472:004405, 004408. These conclusions were documented in the meeting notes in the record. *See generally* FS_472.

On March 18, 2021, wildlife biologists and other participants from FWS and the Forests met again to "review data to see if any additional HUCs met the recurring use criteria." FS_1038:028499. Applying the BORZ criteria, the participants found that the Lower Fisher River HUC and Mitchell Creek – Kootenai River HUC did not meet the BORZ criteria. FS_1038:028504, 028507. Regarding the Lower Libby Creek HUC, the agencies noted that as of Bear Year 2020, there were "not enough occurrences to meet all criteria in this portion of the HUC east of the Highway." FS_1038:028505–06. These conclusions were documented in the meeting notes in the record. *See generally* FS_1038.

The Project EA states that the Project area is not located within a BMU or BORZ area. FS_613:007559, 007674. The significance of being within a BORZ area is that the Access Amendments' general prohibition on increasing total and open linear miles of road above baseline conditions applies in BORZ areas. *See*

20

FS_897:021351–52.  The Project will result in a permanent increase in miles of road legally open to the public and temporary increases in total and open linear road miles during the Project.  FS_613:007675; FS_1024:029239.  Such an increase would have been prohibited within a BORZ area.  FS_897:021351.

### B.    Whether the Forest Plan Requires BORZ Reviews

Plaintiff's first objection to the F&R on this issue is that the F&R's conclusion that the BORZ Determinations are "simply part of the Forest Plan's requirement to monitor and report on grizzly bear observations" was erroneous.  (Doc. 73 at 1–3.)  Plaintiff contends that the Forest Plan (and the incorporated Access Amendments) require biologists to collect credible grizzly bear observations and add such information to the annual report, but they do not require application of the BORZ criteria to the observation data.  (*Id.* at 1.)  Plaintiff argues that the BORZ reviews are not mere reports of data, but rather make yes-or-no decisions of whether to include a watershed in a BORZ area, and the administrative record does not indicate that the agencies made these determinations on an annual basis.  (*Id.* at 2–3.)

Defendants respond that the BORZ reviews do not decide anything, but rather collect information to inform possible future agency action such as changing the boundary of a BORZ area—which, they argue, would require a Forest Plan amendment and ESA consultation.  (Doc. 79 at 1–2.)  Defendants further argue that the administrative record does not include any of these reviews before 2020 because Plaintiff's amended complaint challenged only the 2020 and 2021 reviews,

and the deadline to resolve issues concerning the administrative record has long passed. (*Id.* at 2–3.)

On de novo review of the record, the Court agrees with Defendants. The Forest Plan Reinitiation BA describes the BORZ reviews as meetings occurring "per 2011 BO requirements"—*i.e.*, pursuant to requirements in the Access Amendments' BiOp. FS_962:026259. The purpose of the reviews is "to review credible grizzly bear observations to determine if recurring use has expanded beyond the original BORZ boundaries[.]" *Id.* The Forest Plan Reinitiation BiOp provides further insight on the role of the annual reviews: "In 2012 and 2019, documented grizzly bear recurrence in areas outside of the recovery zones and existing BORZ led the Forest to delineate areas that met the guidelines for determining an RUA. Thus, the Forest added the RUAs to the existing BORZ, and began applying the standards for BORZ to these new areas." FS_963:026376–77. The BiOp notes that "future expansion areas that meet the criteria for BORZ delineation" "will be disclosed in the Bear Year monitoring reports to [FWS] as the changes are incorporated." *Id.* The 2020 Bear Year Report, for example, contains a section describing "New BORZ and BORZ expansions," which described the March 2021 BORZ review as reviewing "available BORZ data" and concluded, "[b]ased on review of the available data no additional HUCs met recurring use criteria." FS_1039:028542–43.

The record accordingly indicates that the BORZ reviews are, indeed, implementation of the Forest Plan's monitoring and reporting requirements. The Forest Plan Reinitiation BiOp indicates that the annual Bear Year report—not the

meeting notes from the BORZ reviews—is the document that "makes a yes-or-no decision" regarding expanding a BORZ area.  The BORZ reviews, by contrast, summarize data gathered by wildlife biologists from many agencies and provides a collective view of whether the BORZ criteria were met for each HUC, *see generally* FS_472, FS_1038, but there is no indication in the record that these meeting notes were intended to be the final position of USFS regarding BORZ boundaries, subject to no further review.

Accordingly, Plaintiff's objection on this issue is overruled.

### C.    Agency Action Under the ESA

Plaintiff objects to the F&R's conclusion that the BORZ reviews were not affirmative agency action and thus were not actionable under the ESA.  (Doc. 73 at 3–6.)  Specifically, Plaintiff contends that the agencies did take an affirmative action by applying the BORZ criteria to the information before them and denying BORZ protection to land within the Project area, and the agencies' denial—despite their disclosure of a significant increase in grizzly bear observations in the Project area since the last ESA consultation on BORZ mapping in 2011—necessitates ESA consultation.  (*Id.*)  Defendants respond that the annual reviews "simply maintained the status quo because the [BORZ] criteria w[ere] not met—the very process that had already received Section 7 consultation."  (Doc. 79 at 3–6.)

On de novo review, the Court agrees with Defendants.  The Ninth Circuit has articulated a two-part test to determine whether an agency decision is "agency action" within the meaning of Section 7 of the ESA: (1) "whether a federal agency affirmatively authorized, funded, or carried out the underlying activity" and (2)

"whether the agency had some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012).  Section 7 consultation is triggered only when the agency "makes an 'affirmative' act or authorization." *Id.*  "[F]ailure to act" is not included in the definition of agency action or action, despite being included elsewhere in the ESA.  *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006).  "'[I]naction' is not action for section 7(a)(2) purposes." *Id.*

A review of court decisions on agency action is informative to discern categories of agency conduct that fall within the ESA's definition of agency action and those that do not.  As to the first part of the test, affirmative action, the Ninth Circuit has concluded that LRMPs constituted continuing agency action such that when a species present on the Forest was newly listed as threatened or endangered, USFS was required to reinitiate consultation on its LRMP.  *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054–56 (9th Cir. 1994).  Although the LRMPs had undergone consultation and been adopted before the species was listed, the Court found the LRMPs "[set] guidelines for logging, grazing and road-building activities within [management area] boundaries" and "have ongoing effects extending beyond their mere approval." *Id.* at 1055.  The Ninth Circuit has also concluded that an agency action could be complete and not ongoing, but the agency still could be required to reinitiate consultation if there was discretionary federal involvement or control over the completed action when a triggering event occurs, such as new designation of critical habitat.  *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1085–86 & n.12 (9th Cir. 2015).  As to the

24

second part of the test, agency discretion, the Ninth Circuit has concluded that the
test is satisfied where the action agency has authority to place conditions on
activity permits or alter substance registrations in ways that could inure to the
benefit of a protected species. *Turtle Island Restoration Network v. Nat'l Marine
Fisheries Serv.*, 340 F.3d 969, 975–77 (9th Cir. 2003) (fishing permits); *Wash.
Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1033 (9th Cir. 2005) (pesticide
registrations), *abrogated on other grounds by Cottonwood Env't L. Ctr.*, 789 F.3d
at 1089–92; *Karuk Tribe*, 681 F.3d at 1025–27 (approval of notice of intent to
mine).

On the other hand, the Ninth Circuit has concluded that an agency's failure
to exercise regulatory authority over rights-of-way previously granted did not
constitute agency action triggering Section 7 consultation. *Matejko*, 468 F.3d at
1107–08. Emphasizing that agency actions must be affirmative, the court
concluded that the agency simply having the discretion to regulate "without more
is not an 'action' triggering a consultation duty." *Id.* at 1108. The court noted that
the lawsuit was not one "to 'compel agency action' under § 706(a) of the APA."
*Id.* at 1110. In *National Association of Home Builders v. Defenders of Wildlife*, the
United States Supreme Court relied on the requirement that agency action be
"discretionary" to find that the EPA's decision to transfer pollution permitting
authority to a state was not agency action triggering a consultation requirement.
551 U.S. 644, 673 (2007). The Court concluded that "[w]hile the EPA may
exercise some judgment in determining whether a State has demonstrated that it
has the authority to carry out § 402(b)'s enumerated statutory criteria, the statute

25

clearly does not grant it the discretion to add another entirely separate prerequisite to that list." *Id.* at 671.  In other words, though the EPA had some judgment in determining whether the State met the statutory criteria, it did not have discretion to alter the criteria or deny transfer if such criteria were met; thus, it lacked the necessary discretion for its decision to trigger Section 7 consultation.  *Id.* at 673.

Plaintiff primarily relies on *Native Ecosystems Council v. U.S. Forest Service*, 866 F. Supp. 2d 1209 (D. Idaho 2012), to support its position that the BORZ reviews constitute agency action.  However, the agency conduct in that case is distinguishable from that here.  In *Native Ecosystems Council*, USFS remapped the boundaries of lynx analysis units (LAU), eliminating eight units.  866 F. Supp. 2d at 1212.  This had the effect of removing various restrictions, including a prohibition on precommercial thinning of trees, from approximately 400,000 acres of land that were no longer designated as LAUs.  *Id.*  USFS argued that because they revised the LAU map in reliance on standards previously approved pursuant to ESA consultation, they satisfied the ESA's consultation requirements.  *Id.* at 1232.  However, the Court rejected that argument and found that the agency was still required to engage in consultation under the ESA to determine whether the remapping would jeopardize the continued existence of the lynx.  *Id.* at 1232–33. Here, unlike the revised map in *Native Ecosystems Council* that had not been previously considered in an ESA consultation, the map setting forth the BORZ areas was subject to consultation alongside the BORZ criteria.  FS_461:004184– 85.  Further, unlike the remapping in *Native Ecosystems Council* that removed the

LAU designation from hundreds of thousands of acres, the annual reviews did not change the designation of the HUCs.

The HUCs located in the Project area were non-BORZ areas prior to the reviews, and they were non-BORZ areas after the reviews.  FS_472:004405–08; FS_1038:028504–507.  Unlike in *Karuk Tribe*, where the agency was affirmatively authorizing or rejecting private mining activities upon review of notices of intent, the agencies here were not authorizing or rejecting any activity in the HUCs in undertaking these annual reviews.  While Plaintiff argues that USFS had an opportunity to designate these areas as BORZ areas and thereby implement greater protections for the grizzly bear, that characterization does not transform maintenance of the status quo into affirmative action.  Like in *Matejko*, having the discretion to take affirmative action and choosing not to "without more is not an 'action' triggering a consultation duty."  468 F.3d at 1108.

Concerning the second part of the test, agency discretion to alter the activity to inure to the benefit of a listed species, the activity in question on this claim is collecting data regarding grizzly bear observations, considering whether the settled BORZ criteria are satisfied for part or all of a particular HUC, and including that information in an annual report—not approving, modifying, or rejecting some independent activity with the potential to affect a listed species.

In sum, periodically comparing grizzly bear observation and monitoring data to the BORZ criteria for inclusion in an annual report does not constitute agency action that triggers consultation under Section 7.  The Access Amendments and Forest Plan, and not the BORZ reviews, were the agency action that resulted in

mapping BORZ areas in a manner that excluded HUCs within the Project area. The BORZ reviews in this case maintained the status quo and did not involve agency discretion to influence or change any particular activity within an HUC for the benefit of a protected species. The Court overrules Plaintiff's objection on this issue.

### D.     Final Agency Action under the APA

Plaintiff objects to the F&R's conclusion that the BORZ reviews were not final agency action because they did not change any BORZ designations for any watershed in the Project area. (Doc. 73 at 7–8.) Plaintiff contends that the appropriate test under the APA is not whether an agency decision changed the status quo, but rather "whether there was an agency decision with legal consequences." (*Id.* at 7.) Plaintiff argues that the 2021 BORZ review meets both conditions required to demonstrate that agency action is "final": (1) it is the consummation of the agencies' decisionmaking process and not merely tentative or interlocutory because the agencies denied BORZ designation for the Ripley Project area and adopted that decision in the Project EA and BA; and (2) legal consequences flow from the decision because the decision whether to designate an area as a BORZ area determines whether the Access Amendments standards—such as prohibiting a net increase in roads—apply. (*Id.* at 7–8 (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).)

Defendants respond that the BORZ reviews satisfy neither of those requirements: at step one, the annual reviews are an ongoing monitoring requirement of the Forest Plan, and determining whether BORZ criteria are

28

satisfied is merely one step along the way to potentially modifying the Forest Plan

to designate a new BORZ area; and at step two, legal consequences would flow

from projects implemented within the area, not from the annual reviews.  (Doc. 79

at 6–7.)

Reviewing de novo, the Court agrees with Defendants.  The BORZ reviews

do not "mark the consummation of the agency's decisionmaking process."

*Bennett*, 520 U.S. at 177–78.  To satisfy this requirement, the action must not be

"merely tentative or interlocutory" in nature.  *Id.* at 178.  Whether monitoring and

reporting activities constitute final agency action was addressed in *Ecology Center,*

*Inc. v. U.S. Forest Service*, 192 F.3d 922, 924–26 (9th Cir. 1999).  In that case, the

Kootenai National Forest Plan required USFS to perform certain monitoring

activities and produce an annual report.  *Id.* at 924.  In reviewing claims that USFS

failed to comply with those monitoring requirements, the Court found that neither

prong of the final agency action test was satisfied.  *Id.* at 925.  Regarding the first

prong, the Court held that "monitoring and reporting are only steps leading to an

agency decision, rather than the final action itself."  *Id.*

Here, like in *Ecology Center*, the LRMP imposes monitoring and reporting

requirements on USFS.  FS_930:024184; FS_897:021352.  In carrying out those

monitoring and reporting requirements, the BORZ reviews "several steps removed

from final agency action."  *Ecology Ctr. Inc.*, 192 F.3d at 925.  As discussed

above, the BORZ reviews do not formally decide whether HUCs are included in a

BORZ area.  They compare the BORZ criteria to the bear monitoring data to

determine if the HUCs meet the criteria, and this information is included in the

annual report.  Plaintiff has not demonstrated that the BORZ reviews are USFS "render[ing] its last word" on whether a HUC will be incorporated into a BORZ. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478, (2001)).

In determining whether an agency action meets the second prong of the final agency action test, the Court considers whether the action "impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship[.]"  *Or. Nat. Desert Ass'n*, 465 F.3d at 987 (quoting *Ukiah Valley Med. Ctr. v. Fed. Trade Comm'n*, 911 F.2d 261, 264 (9th Cir. 1990)).  The Court also looks to "whether the [action] has the status of law or comparable legal force, and whether immediate compliance with its terms is expected."  *Or. Nat. Desert Ass'n*, 465 F.3d 977 (quoting *Ukiah Valley Med. Ctr.*, 911 F.2d at 264).  For example, in *Fairbanks North Star Borough v. U.S. Army Corps of Engineers*, the Court examined whether an agency's decision that land met the criteria for wetlands constituted final agency action.  543 F.3d 586, 593 (9th Cir. 2008).  Although the lands became subject to the Clean Water Act based on the agency's determination, the Court held that the "rights and obligations remain unchanged"; rather, it was the agency's expression of its view of what the law requires, and the petitioners "would face liability only for noncompliance with the CWA's underlying statutory commands[.]"  *Id.* at 593–94.  Acknowledging that the designation resulted from comparing land characteristics to a set of criteria, the Court held that the agency did not alter the "physical reality or the legal standards used to assess that reality simply by opining" that a site met the criteria for wetlands.  *Id.* at 594.

Likewise here, the BORZ reviews did not authorize or prohibit any particular activities to occur in the Project area. Further, the reviews did not change the legal standards that apply to the HUCs in the Project area.  They neither "impose[d] an obligation" or "den[ied] a right."  *Or. Nat. Desert Ass'n*, 465 F.3d at 987 (quoting *Ukiah Valley Med. Ctr.*, 911 F.2d at 264).  The Project Area HUCS were never subject to the BORZ limitations prescribed by the Access Amendments, which underwent NEPA analysis and ESA consultation.  *See* FS_896; FS_897; FS_1052; FS_1053.  Thus, USFS has never been obligated to comply with the Access Amendments' BORZ standards in the Project area.  Contrary to Plaintiff's arguments, the annual reviews did not "relieve" USFS of any obligation or change the legal standards that it was required to implement. Because the "rights and obligations remain unchanged," the second prong of the final agency action test is not satisfied.  The BORZ reviews do not constitute final agency action and cannot be subjected to judicial review under the APA. Plaintiff's objection on this issue is overruled.

### E.    NEPA and Major Federal Action

Plaintiff objects to the F&R's conclusion that the BORZ reviews were not a major federal action under NEPA, arguing that "the BORZ determination document is an official document prepared and approved by federal agencies that future project decisions will rely upon to dictate the geographic boundaries of BORZ areas and thereby dictate whether Access Amendment protections apply." (Doc. 73 at 8–11.)  Plaintiff analogizes to a decision from the Eastern District of California that was affirmed by the Ninth Circuit, in which the district court held

that a non-Wilderness designation, which was issued as part of an inventory and designation process intended to inventory existing roadless National Forest lands for potential Wilderness designation, was "tantamount to a decision to engage in development activities on the individual areas" receiving the non-Wilderness designation.  (*Id.* at 9–11 (citing *California v. Bergland*, 483 F. Supp. 465, 479 (E.D. Cal. 1980), *aff'd sub nom. California v. Block*, 690 F.2d 753 (9th Cir. 1982)).)  Defendants respond in two ways: first, the lack of agency action under the ESA and final agency action under the APA foreclose a finding of major federal action under NEPA; and second, the BORZ reviews are not "formal plans" guiding or prescribing use of federal resources within the meaning of the applicable regulatory definition of major federal action, but rather, the 2015 Forest Plan that adopted the 2011 Access Amendments' BORZ designations was the formal plan at issue here, and the BORZ reviews Plaintiff challenges "merely confirm" that the Project area "still does not satisfy BORZ criteria."  (Doc. 79 at 8–10.)

To prevail on its NEPA challenge to the BORZ reviews, Plaintiff needs to show not only that there was final agency action within the meaning of the APA but also that there was "major federal action" triggering NEPA.  *See Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1099–101 (9th Cir. 2011).  NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(2)(C).

Neither party objected to Judge DeSoto's conclusion that, regardless whether the 2018 or 2020 NEPA regulations apply to Plaintiff's BORZ-related NEPA claim, "the analysis here is the same because both versions define the term 'major federal action' in materially the same way." (Doc. 71 at 31–32.) Reviewing this conclusion for clear error, the Court finds none and adopts Judge DeSoto's analysis of the relevant regulations.  Under NEPA's implementing regulations, major federal action "includes new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals."  40 C.F.R. § 1508.1(q)(2) (2020); 40 C.F.R. § 1508.18(a) (2018).  The regulations set out categories that major federal actions "tend to fall within," including, as relevant here, "[a]doption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based."  40 C.F.R § 1508.1(q)(3)(ii) (2020); *see also* 40 C.F.R. § 1508.18(b)(2) (2018) ("Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.").[4]

---

[4] Plaintiff did not object to the F&R's conclusion that the BORZ reviews did not fall within the category of "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive."  40 C.F.R. § 1508.1(q)(3)(iii) (2021); 40 C.F.R. § 1508.18(b)(3) (2018) (same).  Reviewing for clear error, the Court finds none.

Major federal actions do not include "[a]ctivities or decisions that do not

result in final agency action under the Administrative Procedure Act[.]"  40 C.F.R.

§ 1508.1(q)(1)(iii) (2020); *see also Cal. Wilderness Coal.*, 631 F.3d at 1099

(holding same before 2020 amendments to regulations).  Additionally, where

"there is no 'agency action' under what is probably the more liberal standard of the

ESA, there is no 'major federal action' under the more exclusive standard of

NEPA." *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996).

As stated above, this Court agrees with the F&R's conclusions that the

BORZ reviews are not agency action within the meaning of the ESA, nor are they

final agency action within the meaning of the APA.  Accordingly, these

conclusions provide a sufficient basis to adopt the F&R's conclusion that the

BORZ reviews also are not major federal action within the meaning of NEPA.  The

Court also agrees with Defendants and the F&R on the additional basis for

concluding that the BORZ reviews are not major federal actions:  The BORZ

reviews are not "formal plans" upon which future agency action will be based, and

they do not alter the status quo.  (Doc. 71 at 33–39.)

Generally, "agency action that does not alter the status quo does not require

an EIS." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343–44 (9th Cir. 1995).

Prior to the 2020 and 2021 BORZ reviews, no HUCs in the Project area were

designated BORZ areas.  FS_897:021296; FS_117:00348.  After the 2020 and

2021 BORZ reviews, the HUCs located in the Project area still were not designated

BORZ areas.  *See* FS_613:007354, 007674–75; FS_1039:028542–43.  This critical

fact distinguishes this case from *Bergland*, in which the review process's "non-

Wilderness" designation fundamentally altered the status quo, under which the "non-Wilderness" lands at issue had previously "been managed to preserve their wilderness qualities."  483 F. Supp. at 474.

Furthermore, contrary to Plaintiff's arguments, the BORZ review documents are not "official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based."  40 C.F.R. § 1508.1(q)(3)(ii) (2020); *see also* 40 C.F.R. § 1508.18(b)(2) (2018).  The BORZ review documents do not change the Forest Plan's BORZ designations of the HUCs in the Project area; it was the Forest Plan, not the BORZ reviews, that "prescribe[s] alternative uses of federal resources upon which future agency actions will be based" for these areas.  *Id.*

The Court finds this case analogous to a case before this Court in 2018, in which the Court rejected an argument that USFS's annual review of species approved for export under the Convention on International Trade in Endangered Species (CITES) constituted a major federal action.  *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 342 F. Supp. 3d 1047, 1059–60 (D. Mont. 2018).  This Court found that requiring USFS "to go through the EA/EIS process on an annual basis for five individual species" every time it approved a state or tribe for export of such a species was "not consistent with NEPA's baseline requirement for 'major Federal action.'"  *Id.* at 1059.  Further, this Court found that "a mere continuation of current activity is not consistent with the qualities shown" by the other actions listed in 40 C.F.R. § 1508.18(b) (2018).  *Id.* at 1060.  Recognizing that the annual reviews were simply "implement[ing] the procedural rules outlined" in the CITES

35

program, this Court held that such reviews were not major federal action. *Id.* at 1059–60.

Like the CITES reviews, the BORZ reviews implement the monitoring and reporting requirements of the Access Amendments and the Forest Plan, both of which underwent NEPA analysis. *See* FS_1053 (FSEIS for Access Amendments); FS_914 (FEIS for Forest Plan). Requiring USFS to undergo annual NEPA analysis on the BORZ reviews would be inconsistent "with NEPA's baseline requirement for 'major Federal action.'" *WildEarth Guardians*, 342 F. Supp. 3d at 1059. Accordingly, the Court overrules Plaintiff's objection on this issue.

**F.    Tiering**

Plaintiff objects to the F&R's finding that the Project EA does not tier to the annual BORZ reviews, arguing that, based on representations in the Project's BA, "the agency is not relying on the BORZ designations from the 2011 Access Amendments Record of Decision alone, but rather on the most recent determinations." (Doc. 73 at 11–13.) Plaintiff argues that the annual review's "internal application of the BORZ criteria to the facts cannot escape NEPA review forever," and USFS should "provide its full rationale for denying BORZ protection to the Ripley Project area" and allow public comment on that decision in an EIS on remand. (*Id.* at 13.)

Defendants respond that the Project EA does not tier to the annual reviews, but rather tiers to the Access Amendments and Forest Plan, both of which were subject to NEPA and allowed for public participation. (Doc. 79 at 10–12.) Specifically, Defendants assert that the "2015 Forest Plan incorporated the 2011

36

Access Amendments' designation of BORZ areas, established the monitoring program, and allowed for public participation under NEPA."  (*Id.* at 11.)

In the NEPA context, tiering allows an agency to "reference an earlier agency decision or policy when assessing the environmental impacts of a smaller project under NEPA without going into a full-blown discussion of the earlier decision."  *Native Ecosystems Council*, 866 F. Supp. 2d at 1226; *see also* 40 C.F.R. § 1508.28 (2018) ("Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.")  NEPA's implementing regulations authorize tiering: "[a]gencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."  40 C.F.R. § 1502.20 (2018).[5]

Tiering to a NEPA document is appropriate where "the subsequent statement is either of 'lesser scope' or a 'statement or analysis at a later stage.'"  *California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of Interior*, 767 F.3d 781, 792 (9th Cir. 2014) (quoting 40 C.F.R. § 1508.28 (2018)).  "However, tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA."  *Kern v. U.S. Bureau of Land*

---

[5] For this claim, Plaintiff is challenging the Project EA, not the BORZ review documents.  The 2020 regulations apply to "NEPA process[es] begun after September 14, 2020." Scoping for the Ripley Project, which is part of the NEPA process, *see* 40 C.F.R. § 1501.7 (2018), started in July of 2019.  Thus, the 2018 regulations apply to this claim.

*Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002).  Tiering to a document and

incorporating material by reference are not the same.  *See California ex rel.*

*Imperial Cnty. Air Pollution Control Dist.*, 767 F.3d at 792–94.  "[W]here an

agency merely incorporates material 'by reference,' without impeding agency and

public review of the action, the agency is not improperly tiering."  *All. for the Wild*

*Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1119 (9th Cir. 2018).

Plaintiff characterizes the BORZ review documents as non-BORZ

designations and argues that the Project EA tiers to the BORZ reviews to conclude

that the Project area does not contain any BORZ areas, and this tiering was

impermissible under NEPA because the annual reviews did not undergo NEPA

analysis.  The Court disagrees.  The project EA cites to the 1993 Grizzly Bear

Recovery Plan and a 2018 Research and Monitoring Progress Report for the

proposition that that "[t]he project area is not within a bear management unit

(BMU) or bears outside recovery zone (BORZ) area[,]" but bears had been using

the Project area in recent years.  FS_613:007534.  Plaintiff argues that various

statements in the Project's BA—not EA—rely on the determinations in the BORZ

reviews that the Project area HUCs do not meet the BORZ criteria.  But this

argument ignores that the BORZ review documents, contrary to Plaintiff's

arguments, did not designate the Project area HUCs as BORZ or non-BORZ.  The

Access Amendments and the 2015 Forest Plan's adoption of the Access

Amendments, both of which were subject to NEPA analysis, set the boundaries

and the criteria for BORZ areas.  *See* FS_1053: 027004–26; FS_1052:026965–66.

Thus, if the Project EA tiered to anything for its BORZ-related statements, it tiered

38

to the Access Amendments and Forest Plan.  Such tiering is permissible because the Access Amendments and Forest Plan each underwent NEPA analysis.  *See* FS_1053.  Accordingly, Plaintiff's objection on this issue will be overruled.

### F.   Substantive Review under the APA

In its motion for summary judgment, Plaintiff asked this Court to undertake substantive review under the APA and set aside the findings of the BORZ reviews, what Plaintiff terms "non-BORZ designations," as arbitrary and capricious.  (Doc. 26 at 26.)  Neither party objected to Judge DeSoto's conclusion that she could not engage in such review based on her conclusion that the BORZ annual reviews were not final agency action.  Reviewing for clear error, the Court finds none.

Given that the BORZ review documents do not constitute agency action, final agency action, or major federal action, and that this Court has determined that the Project EA did not impermissibly tier to the BORZ reviews, the Court will adopt the F&R in full as to these claims (Doc. 71 at 21–43), and Defendants and Intervenor-Defendants will be granted summary judgment on all of Plaintiff's claims regarding the BORZ annual review documents.

## II.   Analysis of the Project's Impacts on Grizzly Bears under the ESA and NEPA

### A.   Road Closures and a "Hard Look" Under NEPA

Judge DeSoto recommended granting summary judgment to Defendants on Plaintiff's claim that the Project EA violated NEPA by failing to take a hard look at how road closure ineffectiveness may impact grizzly bears, concluding that the record did not show documented historical evidence of ineffective road closures.

(Doc. 71 at 43–47.)  Plaintiff objects that the Project EA is premised on a false assumption that all road closures will be 100% effective, which is contrary to the record in violation of NEPA.  (Doc. 73 at 14–18.)  Defendants respond that "the principle of speculation" about ineffective road closures from this Court's decision in *Alliance for the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169 (D. Mont. 2020), applies here because the record shows that only a small percentage of monitored closure devices in the Project area were considered non-functional, some of those required only simple repairs, and the Forest responds to unauthorized use and repairs or improves closure devices as necessary.  (Doc. 79 at 12–16.)  Defendants also note that if Plaintiff's estimates of widespread closure failure are correct, the open road density would be greater than the threshold for occupancy by male bears, but current knowledge of grizzly bear use in the Project area indicates that the agencies' estimates, which assume effective road closures and decommissioning, are not inaccurate.  (*Id.* at 15–16.)

NEPA requires that federal agencies take "a 'hard look' at the potential environmental consequences of [their] proposed action[s]."  *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004).  "To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data."  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005).  Such reliance constitutes a failure to meet the "hard look" obligation and violates NEPA.  *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018).  Similarly, an agency fails to meet its "hard look" obligation when it provides information "that is 'so incomplete or misleading

40

that the decisionmaker and the public could not make an informed comparison of alternatives.'" *Id.* (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d at 964–65.)  Given that NEPA serves a dual purpose of ensuring that both agencies and the public are adequately informed about proposed actions and their environmental impacts, "the data USFS provides to the public to substantiate its analysis and conclusions must also be accurate."  *Id.* (quoting *Mont. Snowmobile Ass'n*, 790 F.3d at 926).

Plaintiff alleges that the Project EA violated NEPA because it failed to consider how ineffective road closures may impact or contribute to the impact on grizzly bears.  (Doc. 26 at 32.)  The Project proposes to place 23 miles of road into storage and decommission 2 miles.  FS_613:007542, 007544–55.  During the Project, the projected road density for roads legally and physically open to the public will be 2.4 mi/mi$^2$.  FS_613:007542.  Following the Project, the EA projects road densities of roads legally and physically open to the public of 2.2 mi/mi$^2$.  *Id.* Both of these projected road densities support the presence of male grizzly bears but not female grizzly bears.  FS_613:007534, 007541.

Plaintiff argues that the Project EA falsely assumes that all road closures will be 100% effective.  (Doc. 73 at 21.)  Plaintiff argues that the EA's road density calculations are based upon this false assumption and thus, that the EA fails to accurately assess the Project's likely impacts on grizzly bears.  (Doc. 26 at 34–36.)  Plaintiff relies on and analogizes this case to *Alliance for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188 (D. Mont. 2019).  In *Probert*, USFS had prepared an EIS for a logging project located in the Clark Face BORZ on the Kootenai

National Forest.  *Id.* at 1195.  Alliance for the Wild Rockies had previously challenged the EIS, arguing that it should have included barriered roads in its calculation of linear miles, and if it had, the Project would increase linear miles in violation of the Access Amendments.  *Id.* (citing *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1243 (9th Cir. 2017)).  The Ninth Circuit held that the miles were properly omitted from the calculation "assuming the closures were effective."  *Id.*  In *Probert*, Alliance for the Wild Rockies challenged the assumption that the road closures would be effective, presenting eight years of monitoring data "demonstrat[ing] that ineffective closures have contributed to increases in linear road miles and potentially impacted grizzly bears in ways not previously considered."  *Id.* at 1195.  This Court found that the agency's analysis on bear displacement and disturbance was "limited by its assumption that public use would be effectively restricted" and that "that assumption has shown false." *Id.* at 1207–08.  Thus, this Court held that a supplemental EIS was required.  *Id.*

Defendants and Intervenor-Defendants argue that Plaintiff has failed to provide the type of documented, historic evidence of ineffective road closures that were present in *Probert*.  (Doc. 78 at 26–27; Doc. 79 at 15–16.)  Further, they argue that this case more closely resembles *Alliance for the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169 (D. Mont. 2020).  (Doc. 79 at 21; Doc. 78 at 25–26.) In *Marten*, Alliance for the Wild Rockies raised a similar challenge to that in *Probert* concerning insect and disease management projects on the Custer Gallatin National Forest and the Helena-Lewis and Clark National Forest.  *Marten*, 464 F. Supp. 3d at 1171–72.  The Court distinguished that case from *Probert*: "*Probert*

dealt with documented historic road closures," not speculation or "the mere possibility that planned road closures will be ineffective." *Id.* at 1176.[6]

Although the Court acknowledges that this case falls within the gray area between *Marten* and *Probert*, the Court agrees with Defendants and Intervenor-Defendants that the facts of this case more closely resemble *Marten*. Plaintiff has presented monitoring data from Bear Year 2021 as evidence of ineffectiveness of earthen berms as closure devices. FS_1051. The parties disagree on the degree to which this monitoring report shows ineffective closures, with Plaintiff arguing that 72% of the closure devices were failing and Defendant and Intervenor-Defendants arguing that only 16% of the closure devices were failing. (Doc. 26 at 25; Doc. 32 at 34; Doc. 78 at 26.) Plaintiff focuses on the failures of earthen berms (Doc. 73 at 6), so the Court will do as well.

According to the report presented, fourteen of the existing roads have earthen berms installed on them. FS_1051:004639. Of these fourteen, only four showed signs of breach. *Id.* Additionally, of the thirty user-created roads documented, only six appear to have or previously had existing berms that the users have breached. *Id.* The others indicate where ATV trails have developed, where berms are needed, where gates have been breached, and where private land access points exist. *Id.* This monitoring report does not support Plaintiff's asserted 72% failure rate. While the 2020 monitoring report supports a failure rate of berms

---

[6] Plaintiff objects to the F&R's description of *Marten* as "another case involving a timber project in the Kootenai National Forest" because the challenged projects in *Marten* involved the Custer Gallatin National Forest and the Helena-Lewis and Clark National Forest. (Doc. 73 at 15.) Although the Court notes that Plaintiff is correct on this point, the Court also concludes that this distinction is not outcome-determinative.

closer to 35% based on a smaller sample size, the 2020 report also indicates that USFS responds to illegal use by reinstalling berms or repairing other closure devices to try to prevent illegal access.  FS_489:004635.  These data are insufficient to support Plaintiff's contention that earthen berms in the Project area are ineffective at restricting public access to roads.  In *Probert*, Plaintiff was able to demonstrate persistent illegal road use and ineffective closures with eight years of monitoring data, and the "ineffectiveness of the road closures" there was "a significant new circumstance [] or information relevant to environmental concerns' that was not previously considered."  412 F. Supp. 3d at 1207–08 (quoting 40 C.F.R. § 1502.9(c) (2018)).  Here, the EA contemplates illegal road usage and closure effectiveness and implements a variety of management activities designed to prevent illegal public access.  First, the EA proposes that money from the timber sales can be used to promote access management, including:

> [i]mprovement, maintenance, or replacement of restriction devices such as gates, berms, or other barriers to maintain wildlife habitat security within the project area; [p]ost-activity installation of barriers following public firewood opportunity on roads proposed for storage; [and] [m]onitoring the effectiveness of these improved, maintained, or replaced restriction devices.

FS_613:007477.  Additionally, the EA provides that "[t]o discourage unauthorized use around gates and barriers, a 1/4 to 1/2 acre patch of untreated timber should be left surrounding the restriction device location based on site conditions and proposed treatment."  FS_613:007483.  Finally, in the section of the EA specifically analyzing effects to grizzly bears, the EA provides that for roads that will be stored, "[a]t a minimum, an earthen berm would be installed at or near the

44

beginning of proposed stored roads at a location that would be effective at preventing motorized use including administrative use." FS_613:007544. These considerations demonstrate that the Defendants did take a "hard look" at the effectiveness of road closures in the Project area and the potential impact of the proposed road closure methods on grizzly bears. *See Swan View Coal.*, 2023 WL 3918686, at *1 n.1 ("The FEIS disclosed and considered reports regarding grizzly bears' avoidance of closed roads, regardless of motorized use, and quotes a report stating that grizzly bears did not avoid closed roads or roads used by less than 10 vehicles per day. Therefore, to the extent Swan View argues that the FEIS did not take a hard look at this issue, it is meritless.").

Accordingly, Plaintiff's objection on this issue is overruled, and the Court will adopt the F&R on this claim in full.

### B. Cumulative Effects Analysis

Judge DeSoto recommended granting summary judgment to Plaintiff on its claim that the Project's ESA consultation as to grizzly bears was insufficient because it failed to adequately analyze cumulative effects of reasonably certain State and private activities in the Project area. (Doc. 71 at 48–55.) Defendants object that the record demonstrates that the agencies did comply with the procedural requirement to collect and analyze all available non-Federal land information and properly "added another conservative layer to its analysis" by assuming that non-Forest Service lands in the Project area provide no secure habitat for grizzly bears. (Doc. 72 at 19–22.) Intervenor-Defendants likewise object to the F&R's rejection of Defendants' "conservative" approach. (Doc. 74 at

15–20.)  Plaintiff responds that Defendants' and Intervenors' objections rehash the same arguments this Court rejected in considering Plaintiff's motion for a preliminary injunction and which Judge DeSoto rejected in the F&R.  (Doc. 77 at 1–2.)  The Court agrees with Plaintiff.

Under the ESA, if "any species which is listed or proposed to be listed may be present in the area of [the] proposed action," the action agency must conduct a BA.  16 U.S.C. § 1536(c).  The BA must evaluate the potential effects that the proposed action may have on listed or proposed species and critical habitat.  50 C.F.R. § 402.12(a).  The action agency "may" include "[a]n analysis of the effects of the action on the species and habitat, including consideration of cumulative effects[.]"  50 C.F.R. § 402.12(f)(4).  In contrast, when the agency engages in formal consultation, the ESA's implementing regulations mandatorily impose "an affirmative duty to consider cumulative effects."  *Conservation Congress v. U.S. Forest Serv.*, 720 F.3d 1048, 1055 (9th Cir. 2013); 50 C.F.R. § 402.14(g)(3) (requiring FWS to "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat")  Cumulative effects are defined as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  50 C.F.R. § 402.02.

As this Court previously summarized the Ripley Project consultation process:

> Here, the agencies engaged in formal consultation concerning the grizzly bear at USFS's request after USFS's biological assessment

46

found that the Ripley Project may affect and is likely to adversely affect the grizzly bear. FS_119:000352. USFS's biological assessment, dated May 7, 2020, provides no details about potential road construction and management or land development on privately owned land; instead, it states, "[b]ecause the roads analysis focuses on roads under Forest Service management on National Forest System lands, any road construction and management occurring on private land would not cumulative [sic] contribute to open road densities for this analysis[,]" and "[a]ny of the activities that may occur on the private property parcels can only be estimated as all activities are outside the control of the Forest Service." FS_117:000338. The biological assessment describes the general location and/or acreage of five ongoing or future timber harvests by Stimson Lumber Company or Montana DNRC within or near the project area and acknowledges that "there is a possibility that certain locations within the project area would be affected by proposed Ripley activities as well as other on-going or proposed federal and private actions simultaneously." FS_117:000338–39. The cumulative effects section of FWS's May 13, 2021 Biological Opinion—which spans approximately one-half of a single page—largely echoes the same information, makes no mention of roads, states that "[n]o further site-specific, non-federal actions are known to be reasonably certain to occur in the future[,]" and concludes: "While some activities on non-federal land may contribute to cumulative effects at some point in the future, large Forest ownership within which human access is restricted by regulation and topography would help to reduce the impacts of larger residential human populations on grizzly bears." FS_125:000394.

*All. for Wild Rockies v. Gassmann*, 604 F. Supp. 3d 1022, 1031 (D. Mont. 2022).

Importantly, the Project BA and BiOp repeatedly acknowledge the impact of that motorized access on grizzly bears. The BA states: "The primary measure of habitat availability and quality is related to the amount and arrangement of roads on the landscape[,]" and "[t]he availability of secure habitat is primarily influenced by motorized access management which, if not managed or mitigated, can negatively impact habitat use and increase the potential for grizzly bear

mortality[.]" FS_117:000311–12, 000336. The Project BiOp acknowledges that "secure habitat and road densities outside of secure habitat were important predictors of grizzly bear survival." FS_125:000386. Despite these acknowledgements, Defendants largely left state and private roads out of their cumulative effects analysis. *See* FS_117:000338. Both the BA and BiOp rely heavily on a finding that the density of open roads in the Project area will be 2.2 miles per square mile, a level that supports the presence of male grizzly bears. FS_117:00325, 000339; FS_125:0003396. However, neither considers the presence of roads on state or private land and how they may increase the road density actually experienced by grizzly bears in the Project area.

Defendants argue that the agencies considered cumulative effects "to the extent possible" of non-federal activities on lands within the Project area. (Doc. 72 at 20.) However, the duration of the Project and the potential inaccuracy of information provided by the State and private landowners "impacted the accuracy of the cumulative effects analysis." (*Id.*) Thus, they contend that they engaged in a more conservative approach by analyzing the availability of secure habitat in the Project area. (*Id.*) Defendants argue that in calculating secure habitat, they "removed all motorized routes on Forest Service lands – including a 500-meter buffer to all motorized routes, all land along the inside of watershed boundaries, and all non-Forest Service lands." (*Id.* at 21.) Under their calculation "all State and private lands and 500 meters of Forest Service land that is immediately adjacent to State and private lands are buffered out of secure habitat." (*Id.*) Defendants contend that this approach accounted for all current and future actions

on state and private land because it conservatively assumed that those lands provided no secure habitat to begin with.  (*Id.*)  Thus, Defendants argue that FWS "did not need to know or mention or discuss the specifics associated with timber harvest or motorized access" since the "[a]gencies already assumed the worst-case scenario."  (Doc. 46 at 27.)

While the supplemental BA did describe the secure habitat analysis that Defendants identify, neither the BA, supplemental BA, nor BiOp connects this secure habitat analysis to the cumulative effects analysis.  The phrase "secure habitat" appears nowhere in the one-half page cumulative effects analysis contained in the BiOp, nor does it appear anywhere in the approximately three page long cumulative effects analysis contained in the BA.  FS_125:000394; FS_117:000336–39.  Further, the supplemental BA that contains the secure habitat analysis has one sentence on cumulative effects, and that sentence suggests that the document does not add anything to the cumulative effects analysis.  FS_122:000365 ("No additional cumulative effects are expected beyond what was previously disclosed in the prior BA.")  Thus, this secure habitat analysis appears to be an impermissible post-hoc rationalization by counsel.  *State Farm*, 463 U.S. at 50.  However, even assuming that it is not, this approach cannot salvage Defendants' analysis.

First, as this Court previously found, Defendants' approach is factually false. *Gassmann*, 604 F. Supp. 3d at 1032.  Despite claiming elsewhere in their briefing that the bears in the Project area primarily occur on private lands, Defendants' approach to cumulative effects assumes that state and private lands provide no

secure habitat for grizzly bears.  (*See* Doc. 32 at 27–28; Doc. 46 at 20.)   This approach defeats the purpose of the cumulative effects analysis, especially in this Project area, given that the record indicates grizzly bears are occurring more often on non-federal lands and thus may be affected by activities on non-federal lands. While USFS may not have control over activities on non-federal lands, the ESA requires FWS to formulate "a biological opinion that advises the action agency as to whether the proposed action, 'taken together with cumulative effects, is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat.'"  *Conservation Congress*, 720 F.3d at 1051 (quoting 50 C.F.R §402.14(g)(4)).  Thus, "the jeopardy analysis must consider both whether the species is currently able to tolerate the stressor and whether the species will continue to be able to do so in light of future non-federal actions."  *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1267 (E.D. Cal. 2010).

Here, the Defendants assumed, contrary to the evidence before them, that the non-federal lands do not provide habitat for grizzly bears.  They then used that false assumption to conclude that because the Project would not substantially reduce secure habitat on USFS land, the Project would not jeopardize the grizzly bear.  (Doc. 46 at 27 ("[T]he Ripley Project's potential effects on the secure habitat on Forest Service land would not likely jeopardize the continued existence of the grizzly bear.").)  Intervenor-Defendants argue that the false assumption is "overly-conservative" and provides greater protection for the species.  (Doc. 74 at 18.)  The Court fundamentally disagrees with this characterization of Defendants' reliance

on a false assumption.  To illustrate:  If, tomorrow, the State and private lands within the Project area suddenly provided no secure habitat for grizzly bears, the bears presumably would relocate to other nearby areas providing secure habitat, including federal lands within the Project area.  As discussed in greater detail below, the interplay between secure habitat and road density affects the safety of grizzly bears' travel, and thus both metrics are relevant to assessing cumulative effects of the Project and other reasonably certain activities in the area on bears' survival.  Defendants' approach may be "conservative" in the sense of establishing a known floor of secure habitat within the Project area, but it is not necessarily an approach that provides greater protection for the species than, for example, gathering and assessing details about reasonably certain State and private roads and logging activity and structuring the schedule and location of Project activities to avoid closing off potential safe travel routes for grizzly bears displaced by non-federal activities.  The Court cannot accept Defendants' and Intervenor-Defendants' naked assertion that their counterfactual assumptions inure to bears' benefit.

Second, this approach ignores the interplay between secure habitat and road density that the Defendants themselves recognize.  The Project BiOp relies on a study by Schwartz, et al., for its statement on the importance of secure habitat and road densities outside of secure habitat as predictors of grizzly bear survival.  FS_125:000386.  The Schwartz study explains the interplay between the two: "If road densities become too great, secure areas become isolated islands surrounded by heavily roaded areas. Travel among secure islands then becomes more

51

hazardous, effectively fragmenting the landscape." FS_1017:004175. Despite acknowledging this study's conclusions on the importance of road densities and secure habitat on grizzly bear survival, Defendants argued that "a quantitative roads analysis for State and private lands is not necessary as this type of analysis informs the effects to secure habitat." (Doc. 46 at 17.) This ignores the best available science presented in Schwartz that using the secure habitat metric alone is insufficient because it ignores whether bears can safely move between pockets of secure habitat. Failing to analyze how private and state roads in the Project area could affect bears' ability to move between secure habitat located in the Project area constituted a failure to adequately consider the cumulative effects under the ESA.

A recent case out the Fourth Circuit recognized that the ESA requires FWS, in completing their biological opinion, to "'seek out and consider all existing scientific data relevant to the decision it is tasked with making.'" *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (quoting *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 346 (4th Cir. 2019)). The court rejected a cumulative effects analysis that, like here, was less than a page. *Appalachian Voices*, 25 F.4th at 275. Despite the documents in the record suggesting that the action area was likely to be impacted by a variety of non-federal actions, the BiOp wrote off some of those projects as accounted for in the environmental baseline, stated FWS could find no available information on one project, and stated there were no anticipated effects of the final remaining project. *Id.* at 275–76. Like Defendants here, the agencies in that case pointed to other

documents in the record they claimed supported their analysis, *id.* at 276, and like the Fourth Circuit did, the Court must reject this justification.

The Court further rejects Defendants' argument that their cumulative effects analysis is sufficient because USFS obtained some data about non-Federal harvests and roads, and the agencies explained in *other* documents how those data were analyzed. (Doc. 72 at 20.) The Court and the public should not have to embark on a scavenger hunt through a nearly thirty-thousand page administrative record to find information that the BiOp itself was supposed to disclose. *See* 50 C.F.R. § 404.14.(h)(1). Defendants' and Intervenor-Defendants' objections on this claim are overruled, and the F&R on this claim will be adopted in full.

## III.   Road Analysis Under the TMR and NEPA

The Ripley Project calls for the addition of 13 miles of new permanent roads and 11 miles of undetermined roads to the National Forest System, for a total addition of 24 miles of roads to the System. FS_613:007469, 007472. The Project also proposes designating approximately 4 miles of those undetermined roads as open to mixed use by off-highway vehicles and adding a parking lot that is 1 to 2 acres in size to facilitate access to that trail. FS_613:007475. Additionally, as part of the Project, approximately 6 miles of temporary roads will be constructed, 23 miles of road will be stored, 2 miles of road will be decommissioned, and 13 miles of road will have cost-share access with the Montana Department of Natural Resources and Conservation. FS_613:007542.

Judge DeSoto recommended granting summary judgment to Defendants on Plaintiff's claim that the Project violates the Travel Management Rule, NEPA, and

the APA because the Project's EA fails to take a hard look at undetermined roads and does not adequately analyze the effectiveness of proposed mitigation measures.  (Doc. 71 at 55–66.)  Plaintiff raises three objections: (1) The TMR requires an analysis of available resources when designating roads, which USFS has failed to do in this case; (2) USFS violated the TMR by condoning existing illegal ATV trails rather than analyzing where ATV trail placement would minimize wildlife harassment; and (3) USFS's failure to discuss the efficacy of road closures violates NEPA's requirement to discuss the efficacy of proposed mitigation measures.  (Doc. 73 at 18–28.)  Defendants respond: (1) the requirement that USFS consider availability of resources for maintenance and administration of roads is general and does not require road-specific quantification of maintenance costs, and USFS properly considered maintenance cost concerns and available funding; (2) USFS properly considered the TMR's minimization criteria in designating an ATV trail on existing undetermined roads that already received motorized use, and USFS is not required to minimize environmental damage to the greatest extent possible by relocating the trail outside a wildlife movement area; and (3) USFS sufficiently analyzed proposed mitigation measures by identifying roads on which motorized access would be restricted, the mechanisms to do so, and a plan to monitor the effectiveness of the devices to deter unauthorized use.  (Doc. 79 at 17–23.)

### A.     Travel Management Rule

The TMR sets forth both general and specific criteria for agency officials to consider when designating National Forest System roads and trails.  *Compare* 36

C.F.R. § 212.55(a) ("General criteria for designation of National Forest System

roads, National Forest System trails, and areas on National Forest System lands")

*with* 36 C.F.R. § 212.55(b) ("Specific criteria for designation of trails and areas").

Plaintiff's TMR-based claims are construed as claims seeking to enforce the TMR.

Thus, both of these claims are reviewable under the APA as an aggrieved person's

"challenge [to] an agency's implementation of its own regulation." *Mont.*

*Snowmobile Ass'n*, 790 F.3d at 930.

### 1.    Availability of Resources for Road Management

The TMR requires responsible officials, when designating roads for motor

vehicle use, to consider "the need for maintenance and administration of roads,

trails, and areas that would arise if the uses under consideration are designated; and

the availability of resources for that maintenance and administration."  36 C.F.R.

§ 212.55(a).  Plaintiff correctly notes that the TMR does not "require responsible

officials to reconsider decisions authorizing motor vehicle use on NFS roads and

NFS trails." 70 Fed. Reg. 68264, 68269 (Nov. 9, 2005).  Rather, the TMR imposes

duties on the agency in designating *new* roads.

Defendants have argued that the Travel Analysis Report prepared for the

Project "examined individual routes in the Project area for annual and deferred

maintenance costs concerns, and also considered available funding for the road

system."  (Doc. 79 at 24.)  Intervenor-Defendants have similarly argued that the

Travel Management Report considered the addition of new roads to the National

Forest Land system and the availability of Project revenues to help with road

maintenance costs.  (Doc. 78 at 23.)  Plaintiff disagrees that any of the documents

cited by the F&R actually considers the new roads, arguing that the reports only consider existing roads in their analysis.  (Doc. 73 at 18–23.)  Plaintiff analogizes the maintenance consideration requirement to the minimization criteria, which the Ninth Circuit has held must be applied to each particular area and trail designation. (*Id.* at 22.)

The Court agrees with Defendants that the Travel Analysis Report, the Travel Management Report, and the EA's own analysis of roads adequately satisfied USFS's obligation under 36 C.F.R. § 212.55(a) to consider the needs for maintenance and administration and the resources available for such maintenance and administration.

The Travel Analysis Report considered the addition of the undetermined roads and the new roads to the National Forest System.  Comparing the map of the road systems in the Travel Analysis Report to that in the Project EA, it is clear that the new roads are those that the Travel Analysis Report considered for future construction or designation.  *Compare* FS_603:007032 (Travel Analysis Report map of road system in Project area) *with* FS_613:007707 (EA map of road system in Project area).  Further, it is clear that the undetermined roads to be added to the National Forest System are those that the Travel Analysis Report considered necessary for future management.  *Id.*  Similarly, the Travel Management Report identified that the Project would add over 23 miles of road.  FS_604:007060.

The Travel Analysis Report indicates an Engineering/Maintenance Concern measurement for each of these roads.  FS_603:007037–39.  For these measurements, "H" indicates high concern with annual maintenance costs greater

than $2,500 per mile and a maintenance level between 3 and 5.  FS_603:007023.

"M" indicates a medium concern with annual maintenance costs between $1,800

and $2,500 per mile and a maintenance level of 2.  *Id.*  "L" indicates low concern

with annual maintenance costs under $1,800 per mile and a maintenance level of 1.

*Id.*  Therefore, the Travel Analysis Report demonstrates that USFS evaluated the

maintenance needs of these undetermined roads to be added to the National Forest

System.  Thus, the Project EA, which incorporated the Travel Analysis Report by

reference, demonstrated that USFS adequately considered the maintenance needs

of these undetermined roads.

Further, the Travel Analysis Report and Travel Management Report

examined potential resources for funding maintenance costs of the road projects.

The Travel Management Report acknowledges "the opportunity to utilize revenue

from sales of timber" for maintenance and improvement treatments.

FS_604:007060.  For the one mile of new roads (and 12 miles of existing roads)

subject to the cost sharing agreement with the Montana Department of Natural

Resources and Conservation, the Travel Management Report acknowledges the

benefit of "shar[ing] in road maintenance and costs of the roads."  FS_604:007061.

The Travel Analysis Report provides that travel analysis itself helps "identify the

minimum number of roads needed" to reduce maintenance demands and promote

efficient use of available funds.  FS_603:007018.

The Project EA also contributed to the road maintenance and resource

analysis.  For the new construction roads and the undetermined roads to be added,

the Project EA provided a table indicating the necessary actions needed to be taken

for those roads (construction, gate installation, locking of gates, etc.) and who would be responsible for taking the action (purchaser or Forest Service). FS_613:007697–706.  For maintenance concerns, the EA provides that "[r]oad maintenance associated with a timber sale is the responsibility of purchaser." FS_613:007720.  The EA also acknowledged money from timber sales as an available resource for funding road management and maintenance. FS_613:007476–77.  Plaintiff has provided evidence indicating that timber sales alone may be inadequate to fund road maintenance.  (Doc. 43 at 46–47.)  However, the EA and Travel Management Report identify timber sales as an additional source of money, not the sole source.  *See, e.g.*, FS_613:007664 ("if funds become available through other sources such as Good Neighbor Authority, the financial efficiency for all timber and non-timber related activities would be improved.") Further, Plaintiff has failed to provide authority that 36 C.F.R § 212.55(a) requires timber sales need to fully cover the cost of road maintenance.

Overall, the EA, the Travel Analysis Report, and the Travel Management Report demonstrate that USFS generally considered the need for maintenance and administration that the roads proposed to be added to the National Forest System presented.  Plaintiff appears to argue that 36 C.F.R. § 212.55(a) requires federal agencies to engage in an in-depth road by road analysis, quantifying the maintenance costs and identifying the source of funds to cover those costs for each individual road.  But 36 C.F.R. § 212.55(a) establishes a general obligation to consider maintenance needs and available resources; the minimization criteria they analogize to are codified in § 212.55(b), the *specific* criteria, and for that reason,

58

they must be applied in an area-specific and trail-specific manner.  *See Mont. Snowmobile Ass'n*, 790 F.3d at 93.  Defendants satisfied their general obligation under § 212.55(a).

Accordingly, the Court overrules Plaintiff's objection on this issue.

## 2.   Minimization of Harm to Wildlife in Designating ATV[7] Trail

Plaintiff objects to the F&R's recommendation that summary judgment be granted to Defendants on Plaintiff's challenge to the Project's placement of the OHV trail, arguing that USFS "simply condoned existing illegal ATV use, and authorized a two-acre parking lot that will likely increase this motorized use, rather than attempting to relocate the motorized use to an area that would truly minimize wildlife harassment."  (Doc. 73 at 23.)  Plaintiff notes that the proposed ATV trail is "in an area that is formally designated by the Forest Plan for wildlife movement, and currently used on a recurring basis by ESA-listed grizzly bears" of the vulnerable Cabinet-Yaak population.  (*Id.* at 24.)  Plaintiff contends that "if the Forest Service's objective was truly to place ATV trails in an area that minimizes wildlife harassment, the Forest Service would have relocated the illegal ATV trails outside of [such] area[.]"  (*Id.* at 25.)

Defendants and Intervenor-Defendants argue that USFS appropriately considered and applied the minimization criteria by designating the trail near the Libby Airport on existing undetermined roads that already receive motorized use and eliminating the southern segment of the proposed route to limit the extent of

---

[7] The parties and record refer to the trial in question as an "ATV" (all-terrain vehicle) or "OHV" (off-highway vehicle) trail interchangeably, and the Court does the same.

off-highway vehicle use occurring in the area.  (Doc. 79 at 20–22; Doc. 78 at 25–27.)

Under 36 C.F.R. § 212.55(b), "in designating National Forest System trails and areas on National Forest System lands, the responsible official shall consider effects on the following, with the objective of minimizing: … (2) Harassment of wildlife and significant disruption of wildlife habitats."  Mere consideration of the minimization criteria or compilation of data is insufficient.  *Mont. Snowmobile Ass'n*, 790 F.3d at 932.  "Rather, the Forest Service must apply the data it has compiled to show how it designed the areas open to [ ] use 'with the objective of minimizing' 'damage to . . . forest resources,' 'harassment of wildlife,' and 'conflicts [with other] recreational uses.'"  *Mont. Snowmobile Ass'n*, 790 F.3d at 932 (quoting 36 C.F.R. § 212.55(b)(1)–(3)). USFS must "actually show that it aimed to minimize environmental damage when designating trails and areas."  *Id.* (quoting *Cent. Sierra Envtl. Res. Ctr. v. U.S. Forest Serv.*, 916 F. Supp. 2d 1078, 1096 (E.D. Cal. 2013)).

The Court agrees with Defendants and Intervenor-Defendants that the Project EA adequately demonstrates that USFS considered and applied data concerning harassment of wildlife and significant disruption of wildlife habitat in designating the proposed ATV trail with the objective of minimizing harassment to wildlife and their habitat in compliance with 36 C.F.R. § 212.55(b).  The Project EA proposes the designation of an OHV trail approximately 4 miles in length and a parking area approximately 1 to 2 acres in size.  FS_613:007475.  The Project EA acknowledges the requirement to consider the TMR minimization criteria and

notes that the initial OHV trail proposal was refined by removing a segment of trail from the south end in response to "resource and public concerns associated with some criteria." FS_613:007475–76. It also refers readers to the project file for "[d]ocumentation of how the project would minimize impacts to the five criteria." FS_613:007476.

The minimization criteria document in the Project file acknowledges that the OHV trail is located in an area that "provides potential habitat for a variety of wildlife species." FS_404:003496. However, it also states that the proposed location is not in a BMU or BORZ area, or suitable sensitive species habitat. *Id.* It also notes that "wildlife using this area already experience noise and activity" associated with the proposed use because it is adjacent to the Libby airport, adjacent to a well-used county road, and already experiences motorized use. FS_404:003497. For these reasons, it reasonably concludes that the proposed trail "is not expected to result in a measurable change from the existing condition." *Id.*

Similarly, the minimization criteria document demonstrates that USFS considered the impacts to wildlife habitat and acted to minimize those impacts. It acknowledges that the proposed location is in a "big game winter range and known movement area between the Cabinet Mountains and Fisher River" and has recently experienced use by grizzly bears, and wildlife has continued to move through the area with the existing motorized use. *Id.* "To help minimize the potential for disruption and facilitate continued occupation and use of the movement area" USFS removed the southern segment of the proposed trail to limit motorized use in that area. *Id.* Finally, the document addressed other methods for minimizing

61

effects including disseminating "tread lightly" principles on appropriate signage, education patrols and events, and partnership protocols.  FS_404:003495.

Plaintiff suggests that Defendants could not simultaneously act with the objective of minimizing harassment to wildlife and their habitat and place an OHV trail in a wildlife movement area.  (Doc. 26 at 35.)  The TMR minimization criteria require federal agencies to act with the objective of minimizing harassment to wildlife, but they do not require federal agencies to "eliminate environmental damage entirely." *Cent. Sierra Envtl. Res. Ctr.*, 916 F. Supp. 2d at 1095; *see also* Travel Management; Designated Routes and Areas for Motor Use, 70 Fed. Reg. 68264, 68281 (Nov. 9, 2005) ("An extreme interpretation of 'minimize' would preclude any use at all, since impacts always can be reduced further by preventing them altogether.")  USFS adequately considered that though the proposed OHV trail was in a wildlife movement area, it already was receiving motorized use, was located near an airport, and was adjacent to a well-used road.  FS_404:003496–97. USFS reasonably concluded that the wildlife using the area were already experiencing noise and activity such that designating this trail for OHV use would not likely result in increased harassment or substantial disruption of habitat. *Id.* Accordingly, the Court overrules Plaintiff's objection on this issue.

### B.    Analysis of Proposed Mitigation Measures under NEPA

Plaintiff objects to the F&R's recommendation that Defendants be granted summary judgment on Plaintiff's claim that the Project EA violates NEPA by failing to evaluate the effectiveness of dirt berms and gates as closure devices on the Forest, particularly in light of documented berm and gate failure in the

administrative record.  (Doc. 73 at 25–28.)  Plaintiff contends that the Project EA contains no discussion of the effectiveness of berms and gates and argues that such evaluation is mandatory under NEPA.  (*Id.*)

NEPA requires that agencies "consider appropriate mitigation measures that would reduce the environmental impact of the proposed action."  *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 581 (9th Cir. 2016) (citing 42 U.S.C. § 4332(2)(C)(ii)); *see also Methow Valley Citizens Council*, 490 U.S. at 351–52 ("Implicit in NEPA's demand that an agency prepare a detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." (internal citation omitted)). Mitigation measures must be "discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated."  *Methow Valley Citizens Council*, 490 U.S. at 352. "Perfunctory descriptions or mere lists of mitigation measures are insufficient" to satisfy NEPA.  *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1088 (9th Cir. 2013).  However, "proposed mitigation measures 'need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements.'"  *Protect Our Communities Found.*, 825 F.3d at 582 (quoting *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000)).  "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective."  *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009).

63

As discussed above, the Project EA contemplates potential illegal road usage and discusses measures to prevent illegal public access and increase the effectiveness of road closure devices.  The EA contemplates money from the timber sales being used to promote access management including "[i]mprovement, maintenance, or replacement of restriction devices such as gates, berms, or other barriers to maintain wildlife habitat security within the project area" and "[m]onitoring the effectiveness of these improved, maintained, or replaced restriction devices." FS_613:007476–77.  The EA further addresses steps that USFS can take to make gates and barriers more effective at preventing unauthorized access including leaving "a 1/4 to 1/2 acre patch of untreated timber … surrounding the restriction device location."  FS_613:007483.  Other steps include having earthen berms "installed at or near the beginning of proposed stored roads at a location that would be effective at preventing motorized use including administrative use."  FS_613:007544.  Accordingly, far from avoiding any discussion of the effectiveness of mitigation measures, the EA contemplated how to make closure devices more effective at deterring unauthorized use and implemented monitoring procedures to address and respond to any illegal use that may occur.

The EA also provides an in-depth analysis of proposed mitigation measures: identifying each route, how public access to routes will be restricted, where berms and gates need to be installed, the timing for such actions, and who is responsible for such actions.  FS_613:007697–706.  Where the EA goes into this level of detail—identifying "a portion of road . . . for closure, a mechanism to close it, and

a monitoring system to accommodate for possible lapses or breaches"—the

Defendants have gone beyond perfunctory descriptions or mere lists of mitigation

measures. *Friends of the Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1100 (D.

Idaho 2022).  In reviewing the Project EA's analysis of mitigation measures, "[i]f

we determine that the agency took a 'hard look' at a project's environmental

consequences, our review is at an end." *Nat'l Parks & Conservation Ass'n*, 222

F.3d at 680.  The record shows that Defendants discussed the mitigation measures

in sufficient detail to ensure that environmental consequences have been fairly

evaluated.  Thus, the Defendants did take a "hard look" at the effectiveness of road

closures in the Project area and the impact of the proposed road closure methods

on grizzly bears.  Accordingly, Plaintiff's objection on this issue is overruled, and

the F&R on this claim will be adopted in full.

## IV. Analysis of the Project's Impacts on Lynx under the ESA

Judge DeSoto recommended granting summary judgment to Plaintiff on its

claim that Defendants violated the ESA's consultation requirements in failing to

prepare a biological assessment for the lynx.  (Doc. 71 at 71–77.)  Defendants

object that: (1) USFS did, in fact, obtain a Forest-wide "may be present" list dated

December 12, 2019; (2) USFS determined that the Project would have no effect on

lynx after finding that they are not expected to occur in the Project area and

"completed a biological assessment for the lynx that fully complied the [sic]

parameters and discretion afforded the Forest Service[.]"  (Doc. 72 at 22–24.)

Intervenor-Defendants likewise object that Judge DeSoto's conclusions "elevat[e]

form over substance" and "failed to acknowledge that . . . any technical procedural violation was harmless."  (Doc. 74 at 10–15.)

Plaintiff responds: (1) USFS's failure to request a *Project-area* species list is the issue in this case, and the Forest-wide species list was acknowledged and discussed in the F&R; (2) Defendants' combination of documents purportedly constituting the "biological assessment" has already been rejected by this Court; and (3) the Ninth Circuit has held that the failure to prepare a BA prior to a decision to take agency action is "a substantial violation of ESA[.]"  (Doc. 77 at 4–6 (quoting *Thomas v. Peterson*, 841 F.2d 332, 335 (9th Cir. 1988)).)  The Court agrees with Plaintiff.

 Under the plain language of the ESA, federal agencies:

> shall, with respect to any agency action of such agency . . . request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action.

16 U.S.C. § 1536(c)(1).  Thus, the first step of ESA consultation requires the federal agency to obtain a list from FWS of the listed or proposed species that may be present in the proposed action area.  *Forest Guardians*, 450 F.3d at 457; *All. for the Wild Rockies v. Kruger*, 950 F. Supp. 2d 1172, 1179 (D. Mont. 2013).  The second step requires that the action agency produce a BA for any listed species that, according to the Secretary's determination, may be present in the proposed

action area.  *Forest Guardians*, 450 F.3d at 457; *Kruger*, 950 F. Supp. 2d at 1179

(citing 16 U.S.C. 1536(c)(1)).[8]  The purpose of the BA is to identify listed species

that are "likely to be affected by such action."  16 U.S.C. § 1536(c)(1).

The ESA's implementing regulations provide two methods for establishing

the list of species that may be present in the proposed action area.  The action

agency may provide to FWS "either (1) a written request for a list of any listed or

proposed species or designated or proposed critical habitat that may be present in

the action area; or (2) a written notification of the species and critical habitat that

are being included in the biological assessment."  50 C.F.R. § 402.12(c).  If the

agency provides a written notification of the species and critical habitat it is

including in its biological assessment, then FWS, within 30 days of receipt of that

notification, "shall either concur with or revise the list."  50 C.F.R. § 402.12(d).

Where the agency has requested a species list rather than providing a proposed

one, FWS must, within 30 days of receiving the request, "advise the Federal

agency . . . whether, based on the best scientific and commercial data available,

any listed or proposed species or designated or proposed critical habitat may be

present in the action area."  *Id.*  A species "may be present" in the action area even

---

[8] Intervenor-Defendants argue in a footnote that action agencies need only prepare a BA if the federal action constitutes a "major construction activity."  (Doc. at 43 n.10 (citing 50 C.F.R. § 402.12(b)(1)).) This interpretation of the regulation has already been rejected by this Court. *Native Ecosystems Council v. Marten*, 612 F. Supp. 3d 1146, 1160–61 (2020); *see also Friends of the Clearwater*, 588 F. Supp. 3d at 1094.

if the species is migratory, and "verified sightings or occupancy are not required."

*Kruger*, 950 F. Supp. 2d at 1181.  In fact, "the plain text of the statute requires only

the possibility that a listed species is present."  *Friends of the Clearwater*, 588 F.

Supp. 3d at 1088.

Judge DeSoto summarized this Court's analysis of this ESA claim in its

order granting Plaintiff's motion for a preliminary injunction.  The Court's

preliminary injunction analysis provided:

> The statute plainly requires the action agency, here USFS, to request a
> list of species that may be present in the action area.  16 U.S.C.
> § 1536(c)(1).  USFS concedes that it did not do so, nor did it avail itself
> of the regulatory alternative to provide a list to FWS and seek FWS's
> concurrence or revision, 50 C.F.R. § 402.12(c).  (Doc. 59 at 36.)
> Instead, USFS defends its approach by claiming that it "did prepare and
> adopt a lynx biological assessment" that determined that "lynx would
> not be present in the Ripley action area and that the Ripley Project
> would therefore have no effect on lynx."  (Doc. 55 at 10–11.)
>
> Defendants' approach in this case repeats a similar error identified by
> the district court in *Friends of Clearwater v. Petrick*, in which the same
> agencies argued that they did not need to prepare a biological
> assessment for the grizzly bear "because the Forest Service determined
> in its wildlife report that the action would have no effect on the grizzly
> bear."  588 F.Supp.3d at 1086.  As that court found, "the federal
> agencies' argument puts the cart before the horse—in a way not
> consistent with the statutory language . . . .  The Forest Service must
> adhere to the requirements of § 1536(c)(1)—requesting a species list
> and preparing a BA for species that may be present—as part of the
> process of determining whether the action may affect a listed species."
> *Id.*  Under the ESA and its implementing regulations, FWS makes the
> determinative "may be present" determination, not the action agency.
> 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c).  Plaintiff is likely to
> succeed on its claim that Defendants' backwards approach in this case
> violates the ESA.

Moreover, the Court is skeptical of Defendants' efforts to distinguish this case from *Friends of Clearwater* by claiming that USFS did, in fact, prepare a biological assessment for lynx. The portions of the administrative record they cite to as the "biological assessment" consist of the Wildlife Specialist Report for the Ripley Project, which contains less than three total pages about Canada lynx and their habitat, FS_531:005045, 005077–79; the Terrestrial Biological Assessment for the Ripley Project, which simply states that the Project "would have no effect to Canada lynx or Canada lynx critical habitat" because "[t]he analysis area is located outside any Lynx Analysis Units" and "outside designated critical habitat[,]" FS_117:000291; the cover letter to the Biological Assessment, which repeats the finding that the Project would have no effect on lynx or lynx habitat, FS_119:000352; and a letter to file dated September 22, 2021—the day after this lawsuit was filed— stating that the wildlife specialist report "serves as the 'no effect' biological assessment (BA) for Canada lynx and designated lynx critical habitat[,]" FS_1023:004642. (Doc. 55 at 11.) The purported biological assessment in this case is the legally insufficient wildlife report in *Friends of Clearwater* by another—retroactively assigned— name. *See* 588 F.Supp.3d at 1086–87 (rejecting argument that "no effect" determination for grizzly bear in wildlife report excused USFS from preparing biological assessment). Accordingly, the Court finds that Plaintiff is likely to succeed on the merits of its claim that the agencies violated the ESA by failing to follow the two-step statutory process of obtaining a list of endangered and threatened species and preparing a biological assessment for any listed species. 16 U.S.C. § 1536(c)(1).

*Gassmann*, 604 F. Supp. 3d at 1032–33. Judge DeSoto concluded that Defendants

provided no arguments or evidence on summary judgment that would lead the

Court to hold otherwise, and thus "the agencies violated the ESA by failing to

follow the two-step statutory process of obtaining a list of endangered and

threatened species and preparing a biological assessment for any listed species."

(Doc. 71 at 73–77.)

Defendants' first contention—that they followed the two-step process by obtaining a Forest-wide "may be present" list dated December 12, 2019—appears to miss the point. Setting aside that Section 7 requires the action agency to "request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action," indicating that the list should be tailored to the Project area, the fundamental problem with USFS's failure to follow the proper procedure in this case is that it is FWS, not USFS, that is statutorily required to determine whether a listed species may be present "based on the best scientific and commercial data available." 16 U.S.C. § 1536(c)(1). FWS's determination, in turn, triggers the action agency's obligation to conduct a BA. *Id.* USFS cannot ignore the statutorily mandated procedure and decide, on its own, that a listed species is not present in the action area.

The substantive inadequacy of the purported "biological assessment" resolves both Defendants' second contention and Intervenors' objection. This Court has already reviewed the documents Defendants continue to cite as the "biological assessment" in its order granting Plaintiff's motion for a preliminary injunction and continues to find them inadequate for the reasons stated in that order. *Gassmann*, 604 F. Supp. 3d at 1033. Because Defendants did not follow the statutorily mandated procedure and provide documents in the administrative

70

record substantiating their assertion that Canada lynx would not be affected by the Project, the Court cannot be assured that this is a harmless technical error as Intervenors argue.  As the Court previously concluded in its order granting a preliminary injunction, because the record indicates lynx use non-lynx habitat for travelling between patches of boreal forest, "the assertion that the Project area does not contain preferred lynx habitat does not suffice to foreclose the possibility of irreparable injury to lynx, . . . particularly considering that the Project area is surrounded on three sides by Lynx Analysis Units, two of which contain FWS-designated critical habitat."  *Gassmann*, 604 F. Supp. 3d at 1035.  Defendants' and Intervenors' objections on this claim are overruled, and the F&R on this claim will be adopted in full.

The Court also agrees with and adopts Judge DeSoto's conclusion that the Project should be remanded for the agencies to comply with the statutory procedure rather than to require a BA outright.

## V.     Necessity of an EIS under NEPA

Judge DeSoto recommended granting summary judgment to Plaintiff on its claim that USFS violated NEPA and the APA by failing to prepare an EIS for the Project because three of the intensity factors from 40 C.F.R. § 1508.27(b) (2019) raised substantial questions about whether the Project will have a significant environmental effect.  (Doc. 71 at 66–71.)  Defendants raised numerous

contentions in objection to this recommendation.  Plaintiff responds that it met the

"very low bar" of raising only substantial questions to trigger the requirement to

prepare an EIS.  (Doc. 77 at 7–8.)

NEPA requires a federal agency to prepare an EIS for all "major Federal

actions significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(2)(C).  A plaintiff raising a NEPA claim need only raise substantial

questions as to whether a project may have a significant effect to trigger the

requirement for an EIS; the plaintiff need not show that significant effects will in

fact occur.  *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th

Cir. 2005); *Bark v. USFS*, 958 F.3d 865, 868 (9th Cir. 2020).

To determine whether an action significantly affects the environment, the

agency must consider the context and intensity of the project; intensity refers to the

severity of the project's impact and is evaluated using ten factors.  40 C.F.R.

§ 1508.27(b)(1)–(10).  The presence of even "one of these factors may be

sufficient to require preparation of an EIS in appropriate circumstances."  *Ocean

Advocs.*, 402 F.3d at 865.

An agency may prepare an EA for the purpose of determining whether an

action requires an EIS.  40 C.F.R. § 1501.4(b) (2019).  USFS did so in this case,

and the EA included a finding of no significant impact.  FS_613:007669–76.  "If

an agency decides not to prepare an EIS, it must supply a 'convincing statement of

72

reasons' to explain why a project's impacts were insignificant." *Cascadia Wildlands v. Bureau of Indian Affs.*, 810 F.3d 1105, 1111 (9th Cir. 2015). Reviewing courts must apply the arbitrary and capricious standard to determine whether the agency has taken a "hard look" and provided the requisite convincing statement of reasons to explain why a project's impacts are insignificant. *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1069 (9th Cir. 2014).

A.    **Substantial Questions on Cumulatively Significant Impacts Under 40 C.F.R. § 1508.27**

Section 1508.27(b)(7) provides that the agency should consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts."  The F&R explained that the EA acknowledged the likelihood of overlapping state and private timber sales, logging, and road-building in and near the Project area during the Project's duration, which would be expected to cause temporary disturbance and/or avoidance of activity areas by grizzly bears, but the EA failed to gather information about or disclose any details about these projects.  (Doc. 71 at 67–69.)  Accordingly, the F&R concluded that Plaintiff "raised substantial questions as to whether the Project is related to other actions on

73

State and private lands in the Project area with the potential for cumulatively significant impacts on the grizzly bear."  (*Id.* at 69.)

Defendants object on the following grounds: (1) Plaintiff did not challenge the Project's analysis of cumulative impacts under 40 C.F.R. § 1508.25(a) and (c), but rather challenged the EA's explanation for why the Project's cumulative impacts are not significant within the meaning of NEPA under 40 C.F.R. § 1508.27(b), and thus the F&R erred in relying upon *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010), which concerned cumulative impacts; (2) the F&R improperly shifted the burden to USFS to prove that the agency action was not arbitrary and capricious by criticizing the EA for not containing specific information about acreage or location of State timber harvests; and (3) the F&R erroneously equated cumulative impacts under NEPA with cumulative effects under the ESA. (Doc. 72 at 4–11.)  Plaintiff does not respond directly to these arguments, but rather asserts that there are substantial questions regarding whether there could be cumulatively significant impacts "due to the ongoing and not-yet-fully-examined state and private activities and road density in the Project area."  (Doc. 77 at 7.)

Defendants' first objection is an exercise in hair-splitting.  The F&R's citation to *Te-Moak* leads with a "See" introductory signal, which is intended to inform the reader that "[t]he authority supports, but does not directly state, the

proposition[.]" *The Bluebook: A Uniform System of Citation* R. B1.2 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020). The parenthetical explanation following the citation makes clear that this authority was cited for the proposition that a plaintiff need only show the potential for cumulative impact to demonstrate that an agency should have analyzed the cumulative impact of a proposed project and other projects (Doc. 71 at 69); it simply restates Plaintiff's burden in proving a violation of NEPA's implementing regulations with language specific to cumulative impacts, and the F&R clearly was concluding that Plaintiff had raised substantial questions under 40 C.F.R. § 1508.27(b)(7), not another regulation. *Compare* Doc. 71 at 69 ("Alliance has likewise raised substantial questions as to whether the Project is related to other actions on State and private lands in the Project area with the potential for cumulatively significant impacts on the grizzly bear.") *with* 40 C.F.R. § 1508.27(b)(7) ("Whether the action is related to other actions with . . . cumulatively significant impacts.").

Defendants' second contention likewise is meritless. If an agency decides not to prepare an EIS, it must "supply a 'convincing statement of reasons' to explain why a project's impacts were insignificant." *Cascadia Wildlands*, 810 F.3d at 1111. To the extent the F&R "criticized" the lack of information about acreage and location of State timber harvests in or near the Project area, it did so in the context of explaining why the EA's statement of reasons was insufficient as to

the cumulatively significant impacts intensity factor in light of the acknowledged potential adverse effects on grizzly bears, and why Plaintiff raised substantial questions under § 1508.27(b)(7). Plaintiff bore the burden of raising substantial questions, but it was USFS's responsibility to prepare an adequate EA in the first place; its failure to do so does not mean the burden was improperly shifted, but rather that it was relatively easy for Plaintiff to meet.

Defendants' third contention again misconstrues the F&R. The F&R did not equate ESA "cumulative effects" with NEPA's "cumulatively significant impacts." Rather, the F&R stated: "As discussed above, . . . the agencies failed to conduct a lawful cumulative effects analysis in their ESA consultation for grizzly bears for essentially the same reason – they did not attempt to obtain and did not disclose details regarding the amount of logging on State lands or the increase in roads that will occur on State and private lands during logging operations in the Project area, and thus failed to consider the cumulative effects of those activities on the grizzly bear. *Consistent with this reasoning*," the F&R concluded that Plaintiff had raised substantial questions about potential for cumulatively significant impacts in the Project area. (Doc. 71 at 68–69.) Acknowledging the obvious similar factual basis for two of Plaintiff's claims does not amount to "equating" the two claims.

76

On de novo review, the Court agrees entirely with the F&R's analysis and recommendation concerning 40 C.F.R. § 1508.27(b)(7).  Defendants' objections on these issues are overruled.

### B.      Substantial Questions on Significant Adverse Impacts to Species under 40 C.F.R. § 1508.27(b)(9)

Section 1508.27(b)(9) provides that the agency should consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."  The F&R explained that the EA acknowledged the Project BA's finding that implementing the Project's activities resulted in a determination of "may affect, likely to adversely affect" grizzly bears, and the F&R referred back to the inadequacy of the BiOp's conclusion that the Project would not jeopardize the grizzly bear because of its failure to adequately analyze cumulative effects. (Doc. 71 at 69–70.)  Accordingly, the F&R concluded that "this intensity factor also weighs in favor of requiring the Forest Service to prepare an EIS."  (*Id.* at 70.)

Defendants object that the F&R erroneously assumes that adverse effects to listed species under the ESA equates to finding of significance under NEPA.  (Doc. 72 at 11–13.)  Plaintiff does not respond directly to this argument and reasserts that the Project will adversely affect the "especially vulnerable Cabinet-Yaak grizzly population."  (Doc. 77 at 7.)

77

On de novo review, the Court agrees with the F&R's recommendation and analysis of this issue.  As Defendants acknowledge, "adverse effects to a listed species is one factor that may warrant the preparation of an EIS[.]"  (Doc. 72 at 11.)  The F&R properly considered USFS's admission of likely adverse effects to grizzly bears in the EA, combined with the unreliable no-jeopardy determination in the BiOp, to conclude that "this intensity factor . . . weighs in favor of requiring the Forest Service to prepare an EIS."  (Doc. 71 at 70.)  The F&R did not treat this factor as dispositive, nor did it purport to equate likely adverse effects under the ESA with significant effects under NEPA as a matter of law.  Rather, on the facts of this specific case—involving a decades-long forest project, a uniquely vulnerable population of grizzly bears, and agencies' failure to comply with basic requirements of the ESA—the F&R appropriately concluded that Plaintiff had met its burden of raising substantial questions under § 1508.27(b)(9).

## C.     Substantial Questions on Significant Impacts from a Violation of Another Law under 40 C.F.R. § 1508.27(b)(10)

Section 1508.27(b)(10) provides that the agency should consider "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  The F&R cited the two ESA violations identified in this case to conclude that Plaintiff raised substantial questions on this factor.  (Doc. 71 at 70–71.)

Defendants object that: (1) the F&R erroneously rested on a claim not pled in the complaint, which did not allege that USFS's alleged ESA violations trigger significance factor (b)(10); (2) the F&R erroneously found that (b)(10) was triggered by a violation of another law's procedural, rather than substantive, requirement; and (3) Plaintiff failed to raise substantial questions that an EIS should have been prepared based on an alleged substantive violation of the ESA. (Doc. 72 at 13–16.)  Plaintiff does not respond directly to these arguments, but rather asserts that "this Court has twice found two separate violations of the ESA, which are violations of federal law."  (Doc. 77 at 7.)

As to Defendants' first contention, it is true that paragraph 155 of the operative complaint, which alleges that a full EIS is necessary based on factor (b)(10), specifically cites the alleged violations of the TMR and NFMA but not the alleged violations of the ESA.  (Doc. 4 ¶ 155.)  However, Plaintiff's NEPA claim concerning the failure to prepare an EIS incorporates all previous paragraphs by reference, which include allegations that Defendants violated the ESA.  (*E.g.*, *id.* ¶ 3.)  Defendants cannot reasonably argue that they lacked notice that Plaintiff raised a claim under § 1508.27(b)(10) or of the alleged ESA violations.  The cases Defendants rely upon to argue that it was error for the F&R "to base a holding on a claim that was not pled in the Amended Complaint" involved failure to allege essential *facts* to state a particular claim.  *Navajo Nation v. U.S. Forest Serv.*, 535

79

F.3d 1058, 1079–80 (9th Cir. 2008) (Plaintiffs alleged four specific considerations the EIS purportedly failed to consider, e.g., alternatives to recycled wastewater, but did not allege that EIS failed to adequately consider risks posed by human ingestion of artificial snow); *Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (plaintiff failed to allege agreement between defendants to commit wrongful acts, as required to state claim for civil conspiracy, and thus could not toll statute of limitations under unique rule for civil conspiracy). What Defendants seek here, by contrast, is for the Court to ignore the obvious import of factor (b)(10) in this case because a single paragraph of the amended complaint did not set forth every single alleged violation of law asserted in the rest of the complaint. This the Court will not do.

As to Defendants' second contention, it is true that this Court has concluded that Ninth Circuit case law concerning factor (b)(10) "concerns whether the agency violated substantive law in undertaking a project." *350 Mont. v. Bernhardt*, 443 F. Supp. 3d 1186, 1199 (D. Mont. 2020), *aff'd in part, rev'd in part on other grounds by* 29 F.4th 1158 (9th Cir. 2022). But in that case, the issue presented was "whether a downstream violation by another entity would require preparation of an EIS," and in each of the cases that decision cited, the court concluded that there was no violation of law or was insufficient evidence of a violation of law. *Id.* The other case finding no concerns under (b)(10) cited by Defendants is similarly

distinguishable.  In *Center for Community Action and Environmental Justice v. Federal Aviation Administration*, 18 F.4th 592 (9th Cir. 2021), the court rejected the petitioners' (b)(10) claims because they "failed to proffer any specific articulation of how the Project will violate California and federal law."  *Id.* at 610–13.  These precedents do not establish an escape hatch from factor (b)(10) where, as here, the plaintiff has adequately demonstrated a violation of federal, state, or local law or environmental protection requirements, merely because the violation is asserted to be "procedural."  And as this Court previously noted, "Defendants' underdeveloped cumulative effects analyses for the grizzly bear and so-called 'biological assessment' for the lynx deprive Defendants, the public, and the Court of sufficient information on which to conclude those species will not be jeopardized by the Ripley Project[.]"  *Gassmann*, 604 F. Supp. 3d at 1035.  The "procedural" violations of the ESA in this case directly implicate the substantive requirements of the ESA and cannot be distinguished as Defendants argue.

For the same reasons, Defendants' final contention fares no better.  Plaintiff is not required to copy and paste its substantive arguments concerning the ESA violations into the section of its summary judgment briefing addressing factor (b)(10).  The asserted ESA violations were thoroughly addressed, and application of the factor in this case is straightforward based on the Court's conclusion that Defendants did indeed violate the ESA.

Accordingly, Defendants' objections on this claim are overruled.  On de novo review, the Court concludes that Plaintiff has raised substantial questions about whether the Project will have a significant environmental effect under 40 C.F.R. § 1508.27(b)(7), (9), and (10), and USFS's FONSI was arbitrary and capricious.

### D.    EIS on Remand

Alternatively, Defendants object that if the Court remands to USFS for further proceedings, the Court should defer to the agency's discretion regarding the level of environmental analysis required on remand and should not require an EIS to be prepared.  (Doc. 72 at 17–19.)  Intervenor-Defendants likewise object on this basis, arguing that because the F&R found fault with information missing from the administrative record and EA, the proper course of action is to allow the agency to obtain the missing information and then determine whether an EIS is necessary.  (Doc. 74 at 10–15.)  Plaintiff does not respond to this argument.

"[P]reparation of an EIS is not mandated in all cases simply because an agency has prepared a deficient EA or otherwise failed to comply with NEPA."  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1225 (9th Cir. 2008).  "By contrast, if the court determines that the agency's proffered reasons for its FONSI are arbitrary and capricious and the evidence in a complete administrative record demonstrates that the project or regulation may

have a significant impact, then it is appropriate to remand with instructions to prepare an EIS." *Id.* "So, if there is uncertainty over whether the proposed project may have a significant impact, including uncertainty caused by an incomplete administrative record or an inadequate EA, the court should ordinarily remand for the agency to either prepare a revised EA or reconsider whether an EIS is required." *Id.* at 1226.

The Court agrees with Defendants and Intervenor-Defendants that this case falls into the "incomplete administrative record" category, and thus it is appropriate for this Court to remand without the instruction to prepare an EIS and instead allow the agencies to follow their ordinary processes to determine whether an EIS is required. However, it is not clear to the Court that the F&R's passing statement that "an EIS *is* required" rather than "an EIS *was* required" must be modified to achieve that outcome. Accordingly, Defendants' and Intervenors' objections are well-taken and the Court will clarify its intent upon remand to the agencies in this Order, but the Court overrules the objection to the extent it requests rejection of a portion of the F&R. The F&R as to this claim will be adopted in full.

## CONCLUSION

IT IS ORDERED that Judge DeSoto's Findings and Recommendations (Doc. 71) are ADOPTED IN FULL.  The cross-motions for summary judgment are GRANTED IN PART and DENIED IN PART as follows:

1.      Claim 1:  Defendants and Intervenor-Defendants are entitled to summary judgment on Plaintiff's claim that the January 2020 and May 2021 annual review findings relating to BORZ designations violate the ESA, NEPA, and the APA.

2.      Claim 2:  Defendants and Intervenor-Defendants are entitled to summary judgment on Plaintiff's NEPA claim that the agencies failed to take a hard look at how road closure ineffectiveness may impact grizzly bears, and Plaintiff is entitled to summary judgment on its ESA claim that the agencies failed to conduct a lawful cumulative effects analysis because they did not analyze State and private activities that are reasonably certain to occur in the Project area.

3.      Claim 3:  Defendants and Intervenor-Defendants are entitled to summary judgment on Plaintiff's claim that the Project EA fails to take a hard look at undetermined roads and does not adequately analyze the effectiveness of proposed mitigation measures.

4.      Claim 4:  Plaintiff is entitled to summary judgment on its claim that the Forest Service's decision not to prepare an EIS violated NEPA and the APA.

5.     Claim 5:  Plaintiff is entitled to summary judgment on its ESA claim related to the lynx.

IT IS FURTHER ORDERED that Defendants are ENJOINED from implementing the Ripley Project, and this matter is REMANDED to FWS and USFS to address the deficiencies identified in this Order.  The Court notes, however, that its remand does not require USFS to prepare an EIS.

The Clerk of Court is directed to (1) enter judgment in accordance with this Order and (2) close this case.

DATED this 26th day of June, 2023.


_____
Dana L. Christensen, District Judge
United States District Court